Alexis L. Cirel (AC-9067)
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York  10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 894-5739
alexis.cirel@kattenlaw.com

KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: (310) 788-4400
Facsimile:  (310) 788-4471

Attorneys for Defendants
Meritain Health, Inc. and Timothy J. Quinlivan

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
DR. DAVID B. PUSHKIN,                                      :
                                                          :
                                  Plaintiff,              :      CIVIL ACTION NO.: 10 Civ 9212 (JGK)
                                                          :
            -against-                                     :
                                                          :
Beth R. Nussbaum, RHI Entertainment, Inc.,:
Timothy J. Quinlivan, Meritain Health, Inc.,:
Kevin L. Bremer, Esq., Aronsohn Weiner and:
Salerno, L.L.C., Geico, Premier Prizm Solutions,:
Lisa Ardron, Gina Fuge, Dominic Spaventa, Paul:
Feldman,                                                  :
                                                          :
                                  Defendants.             :
------------------------------------------------------------ x

## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that, upon the accompanying Memorandum of Law and

Amended Complaint, and all prior pleadings and proceedings had herein, Defendants Meritain

Health, Inc. and Timothy J. Quinlivan ("Defendants") will move this Court before the Honorable

John G. Koeltl, at the United States Courthouse, 500 Pearl St. New York, New York, on a date

and time to be set by the Court, for an Order granting Defendants' motion to dismiss the

Amended Complaint filed against them in this action and for such other and further relief as this Court may deem just and proper.

Dated: April 26, 2011

KATTEN MUCHIN ROSENMAN LLP

By: _____
Alexis L. Cirel (AC 9067)
575 Madison Avenue
New York, New York 10022
(212) 940-8800

*Attorneys for Defendants Meritan Health, Inc. and Timothy J. Quinlivan*

To:

Dr. David B. Pushkin
300 State Highway Route 3 East, Suite 114
East Rutherford, NJ 07073
(201) 206-5160
*Plaintiff*

Sherri Lee Eisenpress, Esq.
Reiss, Eisenpress and Sheppe LLP
425 Madison Avenue
New York, NY 10017
(212) 753-2424
*Attorneys for Defendant RHI Entertainment, Inc.*

# THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRCIT OF NEW YORK
### MANHATTAN DIVISION

**Dr. David B. Pushkin**
*Plaintiff Pro Se*
300 State Highway Route 3 East
Suite 114
East Rutherford, NJ 07073                    CIVIL ACTION NUMBER **10 Civ. 9212 (JGK)**
(201) 206-5160

                                             JURY TRIAL REQUESTED

**v.**

BETH R. NUSSBAUM
RHI ENTERTAINMENT, INC.
TIMOTHY J. QUINLIVAN, ESQ.
MERITAIN HEALTH
KEVIN L. BREMER, ESQ.
ARONSOHN WEINER AND SALERNO, L.L.C.
GEICO
PREMIER PRIZM SOLUTIONS
LISA ARDRON
GINA FUGE
DOMINIC SPAVENTA
PAUL FELDMAN
*Defendants*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-17-2011

### AMENDED COMPLAINT

**I. Parties in Complaint:**
**A. Plaintiff Pro Se:**
Dr. David B. Pushkin
300 State Highway Route 3 East
Suite 114
East Rutherford, NJ 07073
Phone: (201) 206-5160
FAX: (201) 765-9495

**B. Defendants:**
1. Beth R. Nussbaum
200 Winston Drive, Apt. 812
Cliffside Park, NJ 07010
Phone 1: (917) 593-8429
Phone 2: (201) 224-0587

2. RHI Entertainment, Inc.
1325 Avenue of the Americas, 21st Floor
New York, NY 10019

Phone: (212) 261-9181

3. Timothy J. Quinlivan, Esq.
Chief Counsel, Contracting and Compliance
Meritain Health
300 Corporate Parkway
Amherst, NY  14226
Phone: (716) 319-5058

4. Meritain Health
300 Corporate Parkway, #100S
Amherst, NY 14226-1207
Phone: (716) 319-5500

5. Kevin L. Bremer, Esq.
Aronsohn Weiner and Salerno, P.C.
263 Main Street
Hackensack, NJ 07601
Phone: (201) 487-4747
FAX: (201) 487-7601

6. Aronsohn Weiner and Salerno, P.C.
263 Main Street
Hackensack, NJ 07601
Phone: (201) 487-4747
FAX: (201) 487-7601

7. GEICO
300 Cross Points Parkway
Getzville, NY 14068
Phone: (800) 301-1390

8. Premier Prizm Solutions
10 East Stow Road, Suite 100
Marlton, NJ 08053
Phone: (856) 596-5600
FAX: (856) 596-6300

9. Paul Feldman
GEICO
300 Cross Points Parkway
Getzville, NY 14068
Phone: (800) 301-1390, ext. 4500

10. Lisa Ardron
Premier Prizm Solutions
10 East Stow Road, Suite 100
Marlton, NJ 08053

Phone: (856) 596-5600
FAX: (856) 596-6300


11. Gina Fuge
Premier Prizm Solutions
10 East Stow Road, Suite 100
Marlton, NJ 08053
Phone: (856) 596-5600
FAX: (856) 596-6300


12. Dominic Spaventa
17 Roberts Lane
Somerdale, NJ 08083-2428
(856) 784-8227



**C. Original Complaint:**

1.  Between May 4, 2007 and January 8, 2010, multiple defendants willfully, repeatedly and adversely interfered with Plaintiff's health care and recovery following March 2007 spinal surgery and hospitalization.

2.  Between May 4, 2007 and February 12, 2009, multiple defendants willfully, repeatedly and adversely interfered with Plaintiff's physical disability status and legal eligibility for Social Security Disability (extended term) benefits under the Social Security Act.

3.  Between January 1, 2009 and December 31, 2009, multiple defendants willfully, repeatedly and adversely interfered with Plaintiff's legal eligibility for COBRA Health Insurance in accordance with the Social Security Act of 1935 and the Medicare Act of 1965.

4.  Between May 4, 2007 and January 8, 2010, multiple defendants willfully, repeatedly and adversely violated Plaintiff's rights and protections under the Americans with Disability Act of 1990.

5.  Between June 1, 2009 and December 31, 2009, multiple defendants willfully, repeatedly and adversely interfered with Plaintiff's legal medical insurance coverage.

6.  Between June 1, 2009 and December 31, 2009, multiple defendants willfully, repeatedly and adversely interfered with Plaintiff's legal right to independent medical coverage under the 2010 Recovery Act's COBRA Health Insurance Continuation Premium Subsidy.

7.  On or about June 1, 2009, multiple defendants willfully provided and used false information in order to deny Plaintiff's legal medical insurance coverage between July 1, 2009 and December 31, 2009.

8.  As a consequence of charges 1-2 and 4, multiple defendants caused Plaintiff additional and permanent physical injury.

9.  As a consequence of charges 1-7, multiple defendants contributed to Plaintiff having life-threatening neurological condition.

10. As a consequence of charges 1-2 and 4, multiple defendants caused a premature termination of Plaintiff's professional career, as well as prevented any legitimate opportunity for an equivalent alternative career.

11. As a consequence of charges 1-2 and 4, multiple defendants caused Plaintiff to be ineligible for retroactive Social Security Disability (extended term) benefits covering period from December 1, 2006 to December 31, 2008.

12. As a consequence of charges 1-2 and 4, multiple defendants caused Plaintiff to be ineligible for Medicare benefits covering period from April 1, 2009 to June 1, 2011.

13. As a consequence of charges 1-7, multiple defendants caused Plaintiff to be left with considerable unpaid medical expenses, requiring state and federal intervention on behalf of Plaintiff.

14. As a consequence of charges 1-7, multiple defendants caused Plaintiff to have interrupted access to adequate medical care between October 1, 2009 and June 1, 2010.

15. As a consequence of charges 1-7, multiple defendants caused Plaintiff inability to access appropriate and safe housing relative to physical disability and associated medical needs since June 1, 2009.

16. As a consequence of charges 1-7, multiple defendants caused Plaintiff considerable financial loss, financial distress, and permanently destroyed Plaintiff's credit rating.

17. As a consequence of charges 1-2 and 4, multiple defendants caused Plaintiff to attempt suicide on multiple occasions between December 1, 2007 and April 30, 2009.

**D. Request for Relief:**
Plaintiff request to proceed with civil suit in district court without prepaying fees or costs was granted.

**E. Trial by Jury:**
Plaintiff requested a jury for this civil suit in district court

**F. Request for Damages:**
Plaintiff seeks a total of **$2,092,375** in damages from defendants. Damages reflect lost potential wages and employer benefits for what would have been the remainder of Plaintiff's previous career, denied retroactive Social Security Disability (extended term) benefits, unpaid medical expenses, denied medical benefits, additional debt associated with unpaid medical expenses, costs associated with independent medical insurance premiums, and costs associated with Plaintiff obtaining appropriate housing to meet Americans with Disabilities Act and medical support requirements.

**G. Special Circumstances:**
In the event Plaintiff dies, before suit is brought to trial, as a consequence of medical condition, the executors of Plaintiff's estate will assume role of Plaintiff, and act on behalf of Plaintiff's estate.

**II. Basis for Jurisdiction:**
    A. Basis for federal court jurisdiction is both FEDERAL QUESTIONS and DIVERSITY OF CITIZENSHIP
    B. Federal Statutes:
- Americans with Disabilities Act 1990
- Social Security Act 1935
- Medicare Act 1965
- 2010 Recovery Act, COBRA Health Insurance Continuation Premium Subsidy
- Consolidated Omnibus Budget Reconciliation Act 1986
- Employee Retirement Income Security Act 1974

    C. State Citizenship of Plaintiff: New Jersey
       State Citizenship of Defendants: New Jersey and New York

**III. Statement of Claim:**
    A. Events giving rise to claim occurred in Cliffside Park, NJ, Hackensack, NJ, East Rutherford, NJ, New York, NY, Amherst, NY, Getzville, NY and Marlton, NJ
    B. Date and approximate time events commenced: May 4, 2007, at or about 11:00am
       Date and approximate time events concluded: January 8, 2010, at or about 3:00pm

    A. FACTS AND GENERAL CHRONOLOGY OF EVENTS:

1. On May 4, 2007, Plaintiff was discharged home after six weeks hospitalization and sub-acute rehabilitation following quintuple-level vertebral fusion surgery at New York Beth Israel Medical Center (BIMC) on March 21, 2007. Full-body bone scan on November 27, 2006 by Lenox Hill Radiology diagnosed Plaintiff with spinal fracture at lumbar-sacral junction. Lumbar spinal MRI by Hackensack Radiology on December 18, 2006 confirmed Grade III spondylolithesis at the lumbar-sacral junction as well as impingement of lower spinal cord nerves to lower extremities. Subsequent CT examinations in January 2007 provided full scope of spinal damage and cord nerve compromise and BIMC surgeons coordinated surgical protocol as well as established a 12-18-month post-operative recovery period before Plaintiff would be physically able to return to full-time employment, if at all.

2. Plaintiff's spinal cord dura was torn, requiring additional surgery on March 21, 2007. Plaintiff suffered post-operative Deep Vein Thrombosis (DVT) in left knee as well as MRSA post-op infection, requiring second surgery April 23, 2007. Plaintiff would remain on course of intravenous and oral antibiotics as well as anticoagulants through October 2007. Additionally, Plaintiff was on a 6-9-month oral pain management regimen that included low-dose morphine. Oral pain medication options were restricted until Plaintiff's surgeons observed complete fusion between vertebral bone, titanium hardware, and bone graft material to replace multiple ruptured intervertebral discs.

3. Plaintiff was married to and lived with Defendant #1 at Defendant #1's noted address in Cliffside Park, NJ. Plaintiff and Defendant #1 were married December 28, 2003 and divorced December 10, 2009. Plaintiff resigned from employment as chemistry and physics educator November 22, 2006, beginning status as physically disabled. From January 1, 2004 to November 22, 2006, Plaintiff was spouse on Defendant #1's health insurance plan. Defendant #2 was full-time employer of Defendant #1 from January 1, 2003 until November 21, 2008. Defendant #4 was the primary health insurance carrier for Defendant #1 and Plaintiff. Upon termination of Defendant #1, Defendant #2 paid for COBRA benefits (Defendant #1 and Plaintiff) from November 22, 2008 until September 21, 2009. Defendant #1 unilaterally declined all COBRA benefits at employee expense after September 21, 2009. Plaintiff carried own group insurance coverage through his academic employers from January 1, 2004 to November 22, 2006, but used said insurance as secondary coverage to insurance from Defendant #4. After November 22, 2006, Plaintiff declined secondary COBRA from his employers, due to coverage from Defendant #4 being superior in quality of medical provisions and cost being paid for by Defendant #2.

4. Upon Plaintiff's return home on May 4, 2007, Defendant #1 refused to have any modifications made in place of residence, specifically Plaintiff's bathroom (i.e., installation of safety bars in shower, replacing sliding shower door with shower curtain) in order to ensure Plaintiff's safety while ambulating, bathing or dressing. Adaptive modifications were prescribed by Plaintiff's BIMC spinal surgeon, as well as the physical/occupational therapy personnel at sub-acute facility (Care One of Teaneck, NJ) providing Plaintiff post-op rehabilitation. Plaintiff was only permitted by Defendant #1 to have folding shower chair in shower/tub despite Plaintiff's inability to bend over or lift objects from low heights. Additionally, Plaintiff had yet to regain full ability to consistently lift up legs over tub wall, hence repeatedly injuring his lower legs and feet as they hit up against the tub wall and shower door getting in and out of the shower.

5. Prior to Plaintiff's surgery, Plaintiff purchased a reclining chair in order to help facilitate convalescence at home, where Plaintiff needed to keep legs elevated several hours per day to minimize fluid collection and nerve inflammation caused by overall surgery and post-op DVT. Because of surgical site tenderness, Plaintiff often needed to sleep in reclining chair as opposed to couple's bed.

6.  Because Plaintiff was on intravenous antibiotics, said antibiotics needed to be delivered to and kept at place of residence and refrigerated. Defendant #1 objected to Plaintiff's visiting nurse service that refrigeration of intravenous antibiotics was a nuisance and inconvenience, but consented after sufficient space was cleared in couple's second refrigerator away from any food items Defendant #1 deemed personally important. Visiting nurse instructed both Plaintiff and Defendant #1 how to administer antibiotics. Defendant #1 informed visiting nurse Plaintiff would have to administer his own antibiotics without her assistance. Defendant #1 openly and verbally refused to be available to assist Plaintiff in any medical situation.

7.  On May 13, 2007 Defendant #1 informed Plaintiff she wanted a divorce, claiming Plaintiff's health disrupted her life and that Plaintiff was going to "cause financial ruin" by having "unnecessary surgery" and being "a lazy, unemployed drug addict." Defendant #1 issued first of several ultimatums for Plaintiff to "get off your ass and find a job, or get out of my house." Defendant #1 accused Plaintiff of "taking an extended vacation" at her expense.

8.  On January 22, 2007 Plaintiff filed application for New Jersey Temporary Disability benefits as well as application for Social Security Disability (SSD) benefits on basis that Plaintiff would still not be physically able to return to employment more than 12 months after November 22, 2006. Plaintiff followed all state and federal procedures in order to ensure a continuation of extended disability benefits upon expiration of state benefits after May 1, 2007. On March 2, 2007 Social Security Administration (SSA) notified Plaintiff he had an in-person appointment to be interviewed on March 29, 2007. Because Plaintiff was still hospitalized, Defendant #1 contacted SSA to request a rescheduled interview appointment on behalf of Plaintiff. SSA rescheduled the interview for June 4, 2007.

9.  On July 25, 2007 SSA notified Plaintiff of denial of SSD eligibility, requiring Plaintiff to file appeal within 60 days. At this point in time, Plaintiff was still ambulating with a cane and walker and had first been permitted by BIMC surgeon and local orthopedist to begin light outpatient physical therapy on July 22, 2007. Defendant #1 admonished Plaintiff and informed him: "even the government says there's nothing wrong with you! You're just lazy and don't want to work!" Defendant #1 demanded Plaintiff "stop this disability nonsense, and go find a job." Plaintiff never filed appeal with SSA on original SSD application, and continued searching for part-time academic positions that could accommodate Plaintiff's needs as per the Americans with Disabilities Act (ADA) and his physical therapy regimen. At advice of later-retained legal counsel, Plaintiff filed new SSD application February 11, 2009. Plaintiff's new SSD application was denied May 20, 2009 on basis of 2007-2008 employment and earnings (see Points 11-13, and 15). Plaintiff was declared disabled according to medical criteria, but declared non-disabled according to non-medical criteria. According to the Social Security Act, Provisions 20 CFR 404.1520(b) and 20 CFR 404.1572(a-b), Plaintiff was engaged in Substantial work and gainful activity based on 2008 taxable earnings of $21,742.80 earned over the entire calendar year, far exceeding the federal monthly threshold of $670 in accordance with Provision 20 CFR 404.1592. The SSA Office of Disability Adjudication and Review finally approved Plaintiff's new SSD application on October 14, 2010. Plaintiff was awarded SSD benefits at $1,635/month retroactive to January 1, 2009, not December 1, 2006. Plaintiff is eligible to begin Medicare coverage June 1, 2011.

10. Plaintiff's first round of outpatient physical therapy took place between late-July 2007 and late-October 2007. Even after first round of physical therapy, Plaintiff still required ambulation assistance with cane and walker, and his pain management regimen now included neuropathic medications in addition to low-dose morphine. Plaintiff suffered adverse side effects from neuropathic medications; physicians were subsequently forced to keep him on low-dose morphine, a protocol still followed as of today.

11. On or about September 13, 2007 Defendant #1 informed Plaintiff she met with a divorce attorney and issued another ultimatum of "get your act together and find a job, or move out of my house." On September 24, 2007 Defendant #1 emailed Plaintiff job advertisements from Craigs List seeking part-time tutors for $13-$25/hour. Defendant #1 demanded Plaintiff apply for the job and "take it if offered" in order to "act like the man in our marriage." Already applying to and interviewing for academic administrative positions with local universities while continuing his recovery and physical therapy – the Plaintiff was eventually hired in October 2007 as SAT tutor for $13/hour by Huntington Learning Center of Englewood, NJ. Plaintiff was scheduled to tutor 4-6 hours per week. The Plaintiff resigned from Huntington Learning Center in December 2007 when employers failed to pay him for all hours worked. Plaintiff sued Huntington Learning Center in Bergen County Small Claims Court, winning claim of $229 in back wages.

12. Defendant #1 insisted Plaintiff not use any means of ambulating assistance when at a job interview, and admonished him on numerous occasions throughout summer and fall of 2007 for disclosing his physical condition in application letters, or even mentioning the ADA. Defendant #1 repeatedly told the Plaintiff he was "lazy", "not disabled", "unwilling to work, unless it was on your terms", a "drug abuser", and "making up your own rules" with regards to ADA accommodations "for teachers." Defendant #1, however, repeatedly encouraged Plaintiff to apply for a handicapped-parking permit so "we can get better parking spaces when we go somewhere." Plaintiff refused to apply for said parking permit until February 2008, after an automobile accident (see Point 15).

13. Plaintiff agreed to a freelance writing contract on or around November 15, 2007 with Holt Reinhart Winston Publishers (now Holt-McDougal) to co-author a revised edition of a middle-school physical science textbook. Plaintiff would be able to work from home on assigned textbook units and balance writing time with physical therapy and tutoring schedules. Plaintiff was paid a total of $7,000 for his contributions to new textbook. Defendant #1, with no regard for Plaintiff's disability status, or his application to the SSA, or physical readiness to a return to full-time academic employment at the university level, or the ongoing assessments by his physicians and physical therapists, demanded Plaintiff find "real employment" and earn "real money" outside the home. Plaintiff reluctantly accepted two part-time teaching assignments for the January 2008 semester – two physics courses at Manhattan College (Riverdale, NY) and one chemistry course at Bergen Community College (BCC, Paramus, NJ) – despite physician and employer concerns about Plaintiff's ability to teach in a science laboratory environment without being at risk for further injury or compromising the safety of students. Plaintiff's part-time assignments constituted a full-time teaching schedule (14 contact hours, including morning, afternoon and night classes, not including required office hours and commuting time between colleges), but for one-third the salary rate and no insurance benefits, because he was a part-time employee at each academic institution.

14. Throughout 2007 Defendant #1 never attended any of the Plaintiff's medical appointments, nor did she offer transportation to these appointments, including three surgical procedures (February 2007 muscle biopsy at Hackensack University Medical Center (HUMC), February 2007 endoscopy and colonoscopy at NYU Medical Center, June 2007 post-DVT venous filter removal at BIMC). Defendant #1 called Plaintiff's spinal surgeon and orthopedist during summer 2007 to complain about slowness and validity of Plaintiff's recovery, demanding both approve Plaintiff ready to return to full-time teaching by September 1, 2007. Neither physician was willing to return or discuss Defendant #1's phone calls until she physically accompanied Plaintiff to check-ups.   Defendant #1 never met Plaintiff's orthopedist, and only met Plaintiff's spinal surgeon once (February 3, 2009), informing surgeon she thought surgery performed on Plaintiff was completely and medically unnecessary. Plaintiff routinely updates Defendant #4's case management nurse of all issues related to and interfering with his recovery and rehabilitation.

15. Plaintiff returned to part-time teaching January 22, 2008. On January 28, 2008, Plaintiff was victim in an auto accident en route to BCC. Plaintiff's automobile was rear-ended by a pick-up truck (driven by another BCC faculty member) at a yield sign near BCC campus. Spinal x-rays taken at HUMC showed no structural or spinal hardware damage. Plaintiff was eventually put on regimen of formal pain management and second round of physical therapy. Plaintiff did not miss any teaching time due to soft tissue injuries, primarily because Defendant #1 instructed him: "don't you dare quit your job. You've already been out of work long enough." Plaintiff continued to teach until December 18, 2008, progressively deteriorating from new spinal injury undetected by January 28, 2008 x-rays. On June 3, 2008 a CT myelogram at BIMC diagnosed a new vertebral instability immediately above Plaintiff's surgical hardware. This area of spinal instability was confirmed by a full-body bone scan on June 25, 2008 performed at Holy Name Hospital (Teaneck, NJ). An electromyelogram (EMG) was performed by Plaintiff's neurologist on July 18, 2008. EMG results showed Plaintiff's level of neurological and neuromuscular impairment to be worse than pre-op EMG performed December 29, 2006. Plaintiff was advised to reduce physical demands at home and work while spine was monitored for next several months. By end of 2008, Plaintiff was no longer capable of performing duties associated with teaching, especially in a laboratory setting. Since the laboratory is a fundamental component of teaching chemistry and physics, Plaintiff was terminated by all of his academic employers and filed for unemployment benefits on December 21, 2008. Plaintiff has not been employed in any capacity since. Plaintiff is still in litigation with liable motorist and motorist's insurance company, as well as his own auto insurance carrier at time of accident. All opposing parties contend Plaintiff had pre-existing spinal condition and auto accident could not be cause of additional spinal damage or continued physical deterioration.

16. On December 19, 2008 Defendant #1 accompanied Plaintiff to pain management appointment. Defendant #1 complained to pain management physician that she thought Plaintiff was "faking" how much pain he was in and physician was "feeding his drug addiction." Defendant #1 also objected to pain management physician being out-of-network for Plaintiff and called him "too expensive for being a pain drug doctor." Pain management physician demonstrated that Plaintiff indeed required a combination of opiate and neuropathic medications, was not abusing medications, and in fact under-using prescribed medications. Physician also instructed Defendant #1 to "find some empathy." Physician noted in subsequent report to SSA: "[Plaintiff] has no support system at home."

17. On January 15, 2009 pain management Physician ordered lumbar and cervical MRIs for Plaintiff, as well as another EMG. EMG was performed January 20, 2009; MRIs performed January 21, 2009. EMG showed continued neurological and neuromuscular decline. MRI results showed worsening damage at vertebral junction identified in the June 2008 CT myelogram and bone scan. Bulging disc identified in June 2008 was completely ruptured and a collection of fluid on Plaintiff's lumbar spinal cord was detected.

18. On February 3, 2009 Defendant #1 accompanied Plaintiff to spinal surgeon at BIMC, to discuss results of recent MRI. Surgeon informed Plaintiff and Defendant #1 additional surgery was necessary. Defendant #1 told surgeon his opinion was questionable and that Plaintiff never needed first surgery to begin with. Before surgeon demands Plaintiff and Defendant #1 leave his office, Defendant #1 asks surgeon, "so is he finally disabled?" Surgeon informs Defendant #1 Plaintiff was disabled from the beginning, before even having first surgery. On March 2, 2009 Plaintiff is evaluated by his orthopedist and neurosurgeon to discuss surgical options. Both orthopedist and neurosurgeon advise Plaintiff additional surgery will require even longer recovery and rehabilitation period compared to March 2007 surgery. Neurosurgeon advises Plaintiff that affected spinal cord region controls bowel and bladder function, estimating Plaintiff could begin to experience incontinence and GI-urological system problems within 12-18 months.

19. On February 11, 2009, Plaintiff meets with an attorney to discuss 2007 SSD application. Attorney informs Plaintiff he'll have to file completely new SSD application because first application was never appealed, too much time had passed, and Plaintiff likely did not have sufficient reason to justify a two-year delay in filing an appeal. Attorney informs Plaintiff he's "lost two years in time and disability benefits... if you filed your original appeal, you'd be preparing for your adjudicated hearing and winning your case, instead of starting all over again." Plaintiff shares this news with Defendant #1 at dinner later that day. On February 12, 2009, Plaintiff and Defendant #1 permanently separate after domestic dispute and attempted suicide by Plaintiff. Plaintiff is arrested by local police and involuntarily committed to Bergen Regional Medical Center (Paramus, NJ) for ten days. Defendant #1 hires Defendant #5 (Defendant #6 is law firm) to represent her in divorce from Plaintiff. Plaintiff is barred from residence without any legal order and denied access to personal property, including any items Plaintiff uses for ambulation and assistance relative to his physical condition (e.g., walker, recliner chair, adaptive equipment). Defendant #1 and Defendant #5 argue all items are considered "marital assets."

20. Plaintiff's February 12, 2009 suicide attempt was fourth during 14-month period. Plaintiff's earlier suicide attempts were on December 10, 2007, August 20, 2008, and February 6, 2009. Each suicide attempt followed either an argument with Defendant #1, or in response to Defendant #1's haranguing that Plaintiff wasn't legitimately disabled or in need of medical attention.

21. Defendant #1 and Defendant #5 refused to provide Plaintiff with his walker and other assistive devices until on or around April 1, 2009. Personal items were left at the service entrance in basement of marital residence.

22. Defendant #1 and Defendant #5 refused to provide Plaintiff with his recliner chair until June 21, 2009. Item was delivered to Plaintiff by a third party hired by Defendant #1.

23. Defendant #1 and Defendant #5 refused to provide Plaintiff's copies of his stored medical records until July 8, 2009. Plaintiff arrived with third-party assistance to retrieve remaining personal property. Defendant #1 and Defendant #5 packed personal property in unmarked boxes third-party assistants were allowed to take form residence. Plaintiff was forced to stand in parking lot for 3 hours, open each unmarked box, and inventory property before it was placed in vehicles. Plaintiff suffered extreme back and leg pain, requiring emergency appointment with pain management physician the next day. Spinal x-rays and CT scans were ordered and performed on July 13, 2009. Plaintiff was diagnosed having partially torn muscles near his pelvis and worsening impingement at vertebral site noted in June 2008. Fluid collection on spinal cord detected in January 2009 had now expanded to a larger region of lumbar region. Plaintiff and third-party assistants were unable to retrieve all of Plaintiff's personal property from former residence. On September 1, 2009, after two months monitoring, neurosurgeon advises that Plaintiff is no longer a good candidate for further surgery. By August 2009 Plaintiff is already under the care of an urologist for urinary retention issues. All examinations of bladder and kidneys are normal; urologist identifies fluid collection on lumbar spinal nerves as causing interference with Plaintiff's ability to effectively urinate.

24. Defendant #1 and Defendant #5 denied any further requests for remainder of Plaintiff's personal property without a finalized divorce settlement. Defendant #5 submitted a "take it or leave it" settlement to Plaintiff on June 8, 2009. Settlement never addressed Plaintiff's personal property or provisions to retrieve it. Plaintiff was advised by free legal counsel (North Jersey Legal Services) documentation needed considerable changes before it was legally sound to agree upon. Defendant #5 repeatedly antagonized Plaintiff's counsel between June 2009 and August 2009 to the point where counsel resigned, leaving

Plaintiff to serve as his own counsel in divorce proceedings. Defendant #1 refused any further provision of personal property until a divorce was agreed upon. All parties eventually agreed to a settlement December 8, 2009. Plaintiff never obtained the rest of his personal property until January 7, 2010. Among Defendant #1 and Defendant #5's demands in divorce settlement was fifty (50) percent claim to Plaintiff's pending SSD Award as well as survivor's benefits after Plaintiff's death. Defendant #1 retracted this demand in final settlement documents.

25. On or about June 1, 2009 Defendant #1 and Defendant #5 consulted with the Human Resources Office of Defendant #2, to inquire how Plaintiff's insurance coverage could be terminated prior to finalizing of divorce. Defendant #1 and Defendant #5 used Plaintiff's need for health insurance and continuous care -- as a "weapon" against Plaintiff -- in order to force acceptance of a legally invalid divorce settlement. In accordance with the 2009 Federal Stimulus and 2010 Recovery Act's COBRA Health Insurance Continuation Premium Subsidy, in the event of a divorce involving unemployed spouses, each spouse is entitled to their own separate COBRA policy for the remainder of the COBRA period. In the event of divorce, the non-employee spouse is responsible for his/her own premiums less what is subsidized by the state providing unemployment benefits. At no time did Defendants #1, #2, #4, #5, or #6 ever present Plaintiff an application for his own COBRA policy in the event of divorce. Defendants #1 and #5 unilaterally moved to terminate Plaintiff's insurance coverage. In accordance with provisions of the Social Security Act and Medicare Act, if prior to the onset of disability, a person is employed or insured by an employer that maintains group coverage, that person's COBRA eligibility is for 29 months versus the standard 18. All Defendants were aware that Plaintiff filed for SSD benefits in January 2007 and again in February 2009 because of disclosure of Plaintiff's medical records to SSA as well as Defendant's #1 and #5 demanded claim of pending SSD benefits. Plaintiff's individual COBRA eligibility period would run from January 1, 2009 through May 31, 2011. Since Plaintiff was already on COBRA status effective November 21, 2008, all Defendants were obligated before finalize date of divorce to provide Plaintiff his own separate insurance policy with Defendant #2 and Defendant #4, where the cost of monthly premiums were his responsibility. Based on October 14, 2009 SSA ruling, Plaintiff was and still is legally eligible for COBRA benefits with Defendants #2 and #4 until May 31, 2011, and Plaintiff's terminated coverage on September 22, 2009 violated federal law.

26. On or about June 1, 2009 Defendant #1 and Defendant #5 advised the Human Resources Office of Defendant #2 that the Plaintiff had other active insurance coverage related to his January 28, 2008 automobile accident. This was not the case; Plaintiff's accident claim was closed September 30, 2008, and case was not re-opened until one year later when Plaintiff filed suit against his own automobile insurance carrier. Defendant #2 provided Defendant #4 with aforementioned misinformation, and Defendant #4 ceased payment of Plaintiff's medical claims after July 1, 2009, claiming health plan was not legally obligated to pay. Plaintiff filed complaints on December 14, 2009 against Defendant #2 and Defendant #4 with the Attorney General Offices in New York, New Jersey and Minnesota (location of Defendant #4's claims office). Plaintiff received partial resolution on March 11, 2010 through the New York State Attorney General's Office, Division of Social Justice Health Care Bureau. Defendant #4 honored all outstanding claims between July 1, 2009 and September 21, 2009. However, Defendant #3 failed to provide the New York State Attorney General's Office any explanation as to how denial of claims originated. Plaintiff was advised by the New York State Attorney General's Office to pursue further with the United States Department of Labor's Employee Benefits Security Administration. Plaintiff filed an inquiry and complaint on March 18, 2010. On October 5, 2010 the United States Department of Labor's Employee Benefits Security Administration notified Plaintiff with redundant information Defendant #3 previously provided the New York State Attorney General's Office, again failing to determine how denial of benefits originated. On or around November 15, 2010, Defendant #3 communicated to Plaintiff that the denial process was

automated and random with no specific human beings to trace process to. When Plaintiff responded to Defendant #3 of his skepticism as well as inquiry about Defendant #2 and Defendant #4 checks and balances regarding an insured party in the SSD evaluation process, Defendant #3 stated his intention to seek independent counsel and recuse himself from further inquiry by Plaintiff.

27. On September 21, 2009 Plaintiff was taken by ambulance to HUMC because of acute neurogenic renal failure. Plaintiff was hospitalized September 21-25. Defendant #4 paid for claims only related to first day of hospitalization and denied all subsequent in-patient claims because Plaintiff's COBRA benefits were terminated September 22, 2009. To date, HUMC is still owed $39,685.58 and has filed collection notices as well as litigation against Plaintiff for said amount. Defendants #3 and #4 both deny responsibility for amount because Plaintiff's coverage was terminated. Parties Plaintiff is suing relative to January 2008 automobile accident deny financial responsibility because they contest Plaintiff had pre-existing spinal condition that should be covered by his major medical carrier.

28. On January 30, 2008 Defendant #12, as a representative of Defendants #7 and #8, notified Plaintiff, in response to January 28, 2008 automobile accident, of his medical benefits (PIP, Personal Injury Protection), income continuation benefits, and essential services benefits. Plaintiff was advised on how to file medical claims for processing and how pre-approval for certain medical services would be required. Defendant #12 was never accessible, rarely returned phone calls or inquiries, and was non-existent other than to notify Plaintiff of independent medical examinations (IME) of discontinuation of benefits. According to Defendant #12's January 30, 2008 letter, Plaintiff was eligible for $50,000 in PIP benefits to cover medical expenses. According to claim records Plaintiff obtained or received from Defendants #7 and #8, only $3,983.96 has been paid towards Plaintiff's medical expenses in 2008 and 2009.

29. On April 12, 2008 Defendants #7, 8, and 12 notified Plaintiff of his first IME scheduled for May 19, 2008. Plaintiff was examined by 75-year-old orthopedist Menachem Epstein, M.D., the mentor of Plaintiff's regular orthopedist, Seth Kane, M.D. In Dr. Epstein's report, he stated that Maximum Medical Improvement (MMI) had not been achieved, and causality between automobile accident and subsequent injury/pain was verified. Plaintiff obtained a copy of Dr. Epstein's first IME report upon request on or about October 15, 2009 from Defendant #10.

30. On June 25, 2008 Defendants #7, 8, and 12 notified Plaintiff of his second IME (re-evaluation) scheduled for July 28, 2008. Dr. Epstein again examined the Plaintiff. In his second report, Dr. Epstein again stated that MMI had not been achieved, and causality between automobile accident and subsequent injury/pain was verified. Dr. Epstein stated, "MMI status not yet achieved with regards to the car accident but it anticipated in 6 weeks." By this second IME date, Plaintiff was already diagnosed to have new spinal damage and pelvic injuries according to June 3, 2008 CT myelogram and June 25, 2008 bone scan, both noted by Dr. Epstein's report. After several requests by Plaintiff and his legal counsel, Seth Malkin, Esq., Plaintiff did not obtain a copy of Dr. Epstein's second IME report from Defendant #10 until January 15, 2010. Both the CT myelogram and bone scan were scheduled, authorized and covered through the Plaintiff's primary insurance (Defendants #2 and #4) because neither his BIMC spinal surgeon nor his pain management provider were able to reach Defendant #12 for pre-authorization of immediately necessary procedures. All subsequent procedures required for Plaintiff between June 2008 and July 2009 were scheduled by Plaintiff's providers through primary insurance because of previous difficulties contacting Defendant #12.

31. On August 8, 2008 Defendants #7, 8, and 12 notified Plaintiff that "based on the result of IME performed by Dr. Epstein on 07/28/2008, it has been determined that [Plaintiff] has reached MMI for orthopedic

treatment for injuries resulting from his loss.  Accordingly, all orthopedic treatment will be denied effective 08/11/2008." Six weeks from Dr. Epstein's second report would have been on or around September 8, 2008.  Plaintiff's orthopedic care coverage was terminated a full month prior to Dr. Epstein's recommendation. No third IME was scheduled for Dr. Epstein to make a final re-evaluation, and Defendant #12 was never heard from again. On or about September 1, 2009, Defendant #10 informed Plaintiff that Defendant #12 was "no longer with the company" because of his dereliction handling accident claims as a medical adjuster.

32. On September 1, 2009 Plaintiff was examined by his neurosurgeon to discuss surgical intervention for his worsening subsequent spinal injury.  Neurosurgeon advised Plaintiff he was not a good candidate for surgery pending bowel and bladder incontinence. On September 8, 2009 Plaintiff contacted Defendant #10 to re-open his automobile accident claim, which was granted.

33. On September 17, 2009 Plaintiff underwent a Lidocain infusion at Holy Name Hospital (Teaneck, NJ) to address chronic pain by means other than oral narcotics. Plaintiff tolerated procedure well, and was not taking any narcotic medications between September 17 and his admittance to HUMC on September 21 for acute neurogenic renal failure.  Holy Name Hospital filed a claim with Defendants #7 and #8 for the Lidocain infusion. Defendants #7, #8 and #11 denied the claim. Defendants #2 and #4 also denied the claim, but eventually honored the claim, paying off entire balance ($5,437.80) on or around December 30, 2009, after intervention by the New York State Attorney General's Office.

34. While Defendants #7, #8 and #11 denied the claim filed by Holy Name Hospital, these Defendants honored claims filed by Plaintiff's pain management provider for physician services provided between September 10, 2009 and December 1, 2009. Defendants #7, #8 and #11 denied all claims filed by HUMC, Plaintiff's Primary Care Physician and urologist with regards to Plaintiff's September 21-25 hospitalization and October 2009 follow-up care, claiming services by these providers were unrelated to Plaintiff's automobile accident.  However, Defendants #7, #8 and #11 did honor claims filed September 21-25 by Plaintiff's neurologist, neurosurgeon, and a nephrologist (kidney specialist) consulted by the Plaintiff's Primary Care Physician and urologist.

35. On September 29, 2009 Defendants #7, #8 and #11 notified Plaintiff of a scheduled IME for October 15, 2009 with a pain management physician, Boris Prakhina, M.D., an anesthesiologist lacking any board certification in orthopedics, neurology or urology. In Dr. Prakhina's report, obtained by Plaintiff's counsel November 19, 2009, he states no relationship between Plaintiff's present condition and the automobile accident, and that Plaintiff "has reached MMI as it related to the accident in question." Dr. Prakhina's reports are fraught with errors and misstatements from previous medical reports.  In his own final recommendations, he states the following contradiction: "It appears the accident in question was a probable cause for aggravating and exacerbating patient's prior medical condition. At this juncture, aggravation is exacerbation expected to subside…. Patient has reached MMI as it related to eh accident in question."

36. On October 8, 2009 Plaintiff contacted Defendant #10 regarding his dissatisfaction with how Defendants #7, #8 and #11were handling his re-opened claim. Of most dissatisfaction were: 1) Defendant #11 informing providers claim was "closed for a long time, so I'm denying authorization"; 2) Defendant #11 "cherry-picking" what claims she thought were relevant (i.e., cost-effective for Defendants #7 and #8); and 3) Defendant #11's refusal to return phone inquiries by Plaintiff or Plaintiff's legal counsel, Seth Malkin, Esq.

37. On November 5, 2009 Defendants #7, #8 and #11 notified Plaintiff that based on October 15 IME report, all pain management treatment would be denied effective November 18, 2009. Plaintiff was scheduled for a second Lidocain infusion procedure at Holy Name Hospital on November 8, 2009. Defendants #7, #8 and #11 denied authorization for said procedure and refused to entertain an appeal by Plaintiff's pain management physician. Because of denied authorization and no other insurance coverage that provided out-of-network benefits to accommodate Plaintiff's pain management provider, Lidocain infusion procedure was canceled and Plaintiff was forced to seek a new pain management provider.

38. On January 7, 2010 Plaintiff terminated his policy with Defendant #7 after nearly 30 years of having coverage with this auto insurer. Plaintiff commenced a new auto policy with a different insurance carrier, which he currently maintains. On January 18, 2010 Plaintiff sent a written inquiry and complaint to CEO of Defendant #7, including notification of and reasons for policy termination. On February 2, 2010 Defendant #9 responded with perfunctory letter showing no inclination to rectify denied claims. Additionally, on or around February 2, 2010 Defendants #7-11 sent a disjointed hodge-podge of medical reports to an internist in Upper Holland, Pennsylvania, Harold Gever, M.D. Dr. Gever has no board certification in orthopedics, neurology, urology or pain management, yet without ever personally examining Plaintiff or medical records leading up to Plaintiff's September 2009 hospitalization, states, "it is my impression that the events of the hospitalization [at HUMC] are not causally related to this same accident." On or around the same date, Plaintiff's legal counsel submitted civil complaint in Superior Court of New Jersey (Bergen County) against the liable motorist in January 2008 automobile accident, the motorist's auto insurance carrier and Defendant #7. Additionally, on or around the same date, the State of New Jersey Department of Banking and Insurance notified Plaintiff of an assigned investigator to his complaint against Defendants #7 and #8. To date, has yet to present any results of this investigation.

39. As a result of his September 2009 renal failure episode, Plaintiff's neurosurgeon advises more episodes will occur until Plaintiff's urinary system is permanently compromised and organ failure begins. Estimation was 12-15 months after September 2009 episode. Plaintiff has had two minor renal episodes in December 2009, March 2010, and September 2010. Plaintiff currently requires multiple medications in order to urinate without catheterization and have bowel movements. Plaintiff's current complications involve daily bowel and fluid retention as well as onset of compromised liver, diagnosed in July 2010. Plaintiff has begun discussions with physicians regarding a surgical colostomy in order to address bowel retention issues. Plaintiff has also required eyeglass prescription changes in July 2009, May 2010, and December 2010.

40. Several physicians also have outstanding accounts related to Plaintiff's hospitalization and after care during October 2009. It is estimated that Plaintiff has $45,000 outstanding medical debt related to his September 2009 hospitalization.

41. Plaintiff did not obtain his own individual health insurance coverage until November 2009. Since November 2009, Plaintiff has paid approximately $600 each month in premiums, totaling $9,600. Because Plaintiff's current health insurance lacks the coverage quality relative to his COBRA benefits with Defendants #2 and #4, Plaintiff is not treated for pain management by a licensed pain management physician (Plaintiff's internist handles this responsibility). Plaintiff is also unable to be treated by a licensed spinal surgeon or neurosurgeon. Because of disputed medical bills, Plaintiff cannot be treated by his regular urologist or be treated at HUMC. Plaintiff does not receive adequate medical care for his progression of physical deterioration.

42. Plaintiff has resided in a studio suite at an extended-stay hotel since February 23, 2009. Plaintiff's living space is approximately 400 square feet. Plaintiff's personal property requires approximately 800 square feet

of living space. Plaintiff routinely falls in his living space and on hotel's property while ambulating. Plaintiff is advised to ambulate with his walker, but there's insufficient living space to do so. He ambulates with his cane, but progressive loss of balance results in multiple falls and additional injury. Plaintiff has had ongoing discussion with multiple physicians regarding the need for a wheelchair as well as changing his housing situation. Plaintiff has also had brief regimen of physical therapy in July-August 2010, but therapy was discontinued when Plaintiff kept falling down and injuring himself. Because of Plaintiff's current residence, he is unable to hire through his insurance a home health aid service. Because Plaintiff is unable to hire a home health aid service, he is his own caregiver for all functions and provides his own transportation despite his documented injuries and propensity for further injury. Plaintiff's neurologist routinely monitors him with monthly examinations, spinal MRIs and EMGs. Plaintiff is currently being evaluated for secondary-onset neuromuscular disease because he's progressively losing strength and use of his arms and hands making grooming, dressing and eating increasingly difficult. Plaintiff has discussed requirements for ordering a wheelchair, but living space limitations make a wheelchair presently impractical. Plaintiff has become progressively homebound as his physical health declines.

43. Because Plaintiff is under 55 years of age, he is ineligible for senior and disabled housing, as well as residence in an assisted living facility. Because Plaintiff collected beyond a threshold in unemployment benefits and/or SSD benefits, he is ineligible for any public assistance or social services programs. Because Plaintiff is still intellectually functional, he is not a candidate for permanent residence in a skilled nursing facility. Because Plaintiff's claim for SSD benefits between December 1, 2006 and December 1, 2008 were denied, Plaintiff was denied $40,875 in retroactive benefits that could have given him financial solvency (independent of disputed medical debt). Because Plaintiff is financially insolvent and had collection notices against him, his credit rating declined for all three agencies (TransUnion, Experian and Equifax) by an average of 15 percent between November 2009 and November 2010. Because of Plaintiff's declined credit rating, he is unable to get approved for private housing.

44. Plaintiff holds BS, MA and PhD degrees, was a full-time chemistry and physics educator between 1984 and 2006, the author of more than 150 scholarly writings in the field of science education, and is affiliated with five international professional organizations. Plaintiff is still recognized for his expertise and contributions to professional and scholarly community, is regularly invited to write articles and give lectures at conferences. He's served as an unpaid research consultant to the chemistry department at the University of British Columbia since September 2008, serves as the chairperson of the American Chemical Society's Subdivision for Chemists with Disabilities under the Division of Professional Relations, actively advocates for the rights of disabled professionals as a liaison to the United States Equal Employment Opportunity Commission, and is under contract to write three textbooks with a Canadian e-book publisher (Intersog, L.L.C.). However, Plaintiff has been routinely denied employment as a professor/administrator because of his physical limitations. Plaintiff has filed 30 complaints with the USEEOC during 2009 and 2010, and currently has 4 open civil suits in US District Court acting on behalf of the American Chemical Society's Subdivision for Chemists with Disabilities under the Division of Professional Relations. If Plaintiff had full and proper recovery period from first surgery, he would have been physically capable of returning to full-time academic employment, with accommodations under the ADA, in September 2009. Given Plaintiff's age, a full and complete recovery would have enabled him to work another 20 years in his profession (average compensation $75,000/annum + benefits).

45. As a result of Defendant's #7-12 repeated and pre-emptive termination of benefits and denial of provider claims, Plaintiff has gone without several medical procedures and other means of health care that would reduce his pain level, perhaps without the use of narcotics, and perhaps minimize the progression of complications associated with a compromised spinal cord. Denied coverages by Defendants #2, 4 and 7-12

repeatedly intimidated Plaintiff's providers from challenging claims denials, resulting in providers not receiving payments for services and reporting Plaintiff to collection agencies, resulting in Plaintiff's credit rating decline. With the constant stress of having restricted access to high-quality health care, Plaintiff's opportunities for medical consultations outside his local region are severely limited, further denying him access to more effective and appropriate medical providers having more extensive expertise relative to his complex level of orthopedic and neurological injuries. The combination of stressful circumstances creates an increasing stressful existence for the Plaintiff relative to his declining health and isolated and unsafe living situation.

### IV. Injuries:

A. The following medical documents are attached:
1. Relevant bone scan, spinal MRI and X-ray, and abdominal studies reports
2. Post-op Case Management reports
3. 11/3/2009 Neurological assessment letter
4. List of all medical procedures since November 2006
5. All IME reports relative to January 2008 automobile accident
6. Neurological, neurosurgical, orthopedic, urological and pain management evaluations/reports

B. The following legal/insurance documents are attached:
1. 10/14/2010 SSA ruling on Plaintiff's SSD application and attorney letter
2. SSA rulings on Plaintiff's 2007 and 2009 SSD applications
3. Plaintiff's original award of New Jersey Temporary Disability benefits, 2007
4. Plaintiff's and Defendant #1's COBRA benefit agreement as spouse of employee
5. Correspondences from NYS and Minnesota Attorney General's Office and US Dept of Labor
6. Correspondence from Defendant #3 on behalf of Defendant #4
7. Correspondence from Defendant #1 to Plaintiff, September 24, 2007
8. Finalized Divorce Settlement between Defendant #1 and Plaintiff
9. Civil Action filed by Plaintiff's counsel re: January 2008 automobile accident
10. Correspondences between Plaintiff and Defendants #7-12 re: January 2008 automobile accident

C. List of Witnesses:
1. Andrew Casden, M.D. (BIMC, New York, NY)
2. Seth Kane, M.D. (Oradell, NJ)
3. Mario Vukic, M.D. (Hackensack, NJ)
4. Kenneth Park, D.O. (Oradell, NJ)
5. Andre' Taylor, M.D. (North Bellmore, NY)
6. Mark Gurtovy, M.D. (Fort Lee, NJ)
7. Stephen Glassberg, M.D. (New York, NY)
8. Mark Korlie, Ph.D. (West Orange, NJ)
9. Robert Kornhaber, Ph.D. (Fort Lee, NJ)
10. Linda Cozzi, Ph.D. (New York, NY)
11. Gregg Hobbie, Esq. (Eatontown, NJ)
12. Josh Choi, Esq. (Fort Lee, NJ)
13. Linda Schwager, Esq. (Oakland, NJ)
14. Donna Tamayne, Esq. (River Vale, NJ)
15. Seth Malkin, Esq.

16. Mr. Arnold Nussbaum (Englewood, NJ)
17. Mrs. Carole Nussbaum (Englewood, NJ)
18. Mrs. Eden Aronoff (Englewood, NJ)
19. Mr. Stuart Aronoff (Edgewater, NJ)
20. Mr. Alan Lichterman (Bogota, NJ)
21. Rabbi Meir Konikov (Fort Lee, NJ)
22. Rabbi Shmuel Goldin (Englewood, NJ)
23. Ms. Susan Graziano (New York, NY)
24. Ms. Violetta Debowski (RHI, New York, NY)
25. Mr. Alan Block (RHI, New York, NY)
26. Mr. Todd Sokolove (RHI, New York, NY)
27. Ms. Marie Briscoe (NYS Attorney General's Office, Albany, NY)
28. Ms. Robin Paradowski (US Dept of Labor, New York, NY)

**V. Relief/Damages:**

The Plaintiff seeks a total of **$2,092,375** in collective damages/compensation from Defendants.  Basis/Breakdown of Damages are as follows:

- Lost retroactive Social Security Disability (SSD, extended term) benefits = **$40,875**
- Legal fees associated with SSD case = **$6,000**
- Outstanding medical debt = **$45,000**
- Plaintiff's payment for alternate health insurance premiums = **$9,600**
- Total cost of monthly premiums for denied COBRA benefits = **$20,640**
- Denied PIP coverage from eligible benefits = **$46,000**
- Denied income continuation benefits associated with 2009 unemployment = **$5,200**
- Denied essential services benefits re: January 2008 automobile accident = **$4,380**
- Unreimbursed medical expenses (excluding insurance premiums) for 2009 and 2010 = **$27,000**
- Lost potential wages and employer benefits (medical + TIAA-CREF) for remainder of Plaintiff's career, based on $75,000/year + salary $1,032/month medical + $3,000/year TIAA-CREF = **$1,807,680**
- Approximate cost for disabled-accommodating housing and personal assistant for two years = **$80,000**

Lost potential wages and employer benefits represent Punitive damages in this complaint. No additional damages are sought for "pain and suffering."

Respectfully submitted on this <u>11th</u> day of <u>**February, 2011**</u>

**Dr. David B. Pushkin** (Plaintiff *Pro Se*)
**300 State Highway Route 3 East, Suite 114**
**East Rutherford, NJ  07073**
**(201) 206-5160/ (201) 765-9495/ dpushkin@nj.rr.com**
(Telephone Number/FAX/email)

# HACKENSACK NEUROLOGY GROUP

Dev R. Gupta, MD, PA*
Damon M. Fellman, MD, PA*
Anthony I. Marquinez, MD
Mario Vukic, MD
Mukesh Solanky, MD
John F. Nogueira, MD
Michael P. Silverstein, MD
Diplomates in Neurology, ABP&N
*Diplomates in Stroke and Vascular Neurology, ABP&N

211 Essex Street, Suite 202
Hackensack, NJ 07601
Tel 201-488-1515
Fax 201-488-9471

Rayhana Merali
Office Manager

www.hackensackneurologygroup.com

November 3, 2009.

RE:   David Pushkin

To Whom It May Concern:

Dr. David Pushkin has been a patient of our practice since December of 2006. At that time, he presented with complaints of loss of manual dexterity and progressive leg weakness and spasm. Subsequently, he had an MRI of the lumbosacral spine which revealed the presence of lumbar stenosis. An EMG revealed the presence of lumbosacral radiculopathy with no evidence of myopathy. He underwent lumbar surgery and then developed a lumbar radiculopathy in the postoperative period. Subsequently, he had an EMG in July of 2008 which revealed the presence of a lumbosacral radiculopathy; and at that time, the possibility of reflex sympathetic dystrophy as a component of his complaints was also raised as he was continuing to experience significant pain in the left leg. A follow up EMG in January of 2009 revealed the presence of a chronic lumbosacral radiculopathy. He had an opportunity to see Dr. Hooman Azmi and was diagnosed with a postlaminectomy syndrome. Dr. Azmi believed that he would not benefit from any further surgical intervention with respect to his continued leg and low back pain. In January of 2009, he underwent a follow up MRI of the lumbosacral spine which revealed the presence of a disc at L1-2. Subsequently, he also began to have some transient visual and hearing difficulty and an MRI of the brain was negative.

Throughout this period of time since 2006, Dr. Pushkin has experienced significant limitations with respect to his low back and leg pain. Specifically, he has had difficulty ambulating and often needs to use assisted devices in ambulating safely. He frequently has to take breaks when he is walking and also finds that activities such as getting dressed are difficult for him and require an extended period of time due to the severity of his underlying pain. The pain he is currently experiencing interferes with his ability to concentrate and to perform simple tasks of attention. As a result of this, I believe that he is fully and permanently disabled from his lumbar spine complaints. He has been seen by a neurosurgeon and has been deemed not a surgical candidate. He continues to have symptoms of a lumbosacral radiculopathy which have not abated. His symptoms are not well managed with pain medication.

I can be of any further assistance in this matter, please do not hesitate to contact me.

Mario Vukic, M.D.

/ jzs

**Updated list of Dr. David Pushkin's medical procedures since Nov. 2006:**

**Lumbar/Thoracic/Chest/Spinal x-rays**
- Nov. 13, 2006 at 401 Medical Imagining (ordered by Dr. Thomas Argyros)
- Dec. 11, 2006 at Dr. Seth Kane's Office, Paramus, NJ
- Jan. 19, 2007 at Beth Israel Spine Institute, New York, NY (Dr. Andrew Casden)
- Feb. 13, 2007 at Beth Israel Spine Institute, New York, NY (Dr. Andrew Casden)
- May 15, 2007 at Beth Israel Spine Institute, New York, NY (Dr. Andrew Casden)
- June 26, 2007 at Beth Israel Spine Institute, New York, NY (Dr. Andrew Casden)
- July 31, 2007 at Beth Israel Spine Institute, New York, NY (Dr. Andrew Casden)
- Aug. 27, 2007 at New Century Imaging, Oradell, NJ (Dr. Steven Winer)
- Sept. 18, 2007 at Beth Israel Spine Institute, New York, NY (Dr. Andrew Casden)
- Nov. 27, 2007 at Beth Israel Spine Institute, New York, NY (Dr. Andrew Casden)
- Jan. 28, 2008 at Hackensack University Med. Center, NJ (Emergency Room)
- May 2008 at Beth Israel Spine Institute, New York, NY (Dr. Andrew Casden)
- Feb 2009 at Beth Israel Spine Institute, New York, NY (Dr. Andrew Casden)
- June 23, 2009 at New Century Imaging, Oradell, NJ (Dr. Hooman Azmi)
- July 13, 2009 at New Century Imaging, Oradell, NJ (Dr. Patrick Roth)
- Sept. 21, 2009 at HUMC, NJ (Dr. Stephen Sherer and Dr. Mario Vukic)
- Jan. 12, 2010 at Beth Israel Spine Institute, New York, NY (Dr. Andrew Casden)
- Feb. 5, 2010 at Dr. Kane's office, Paramus, NJ

**Hip/Pelvis x-rays**
- Feb. 5, 2010 at Dr. Kane's office, Paramus, NJ
- May 21, 2010 at Dr. Seth Kane's Office, Oradell, NJ
- Dec. 6, 2010 at Dr. Seth Kane's Office, Oradell, NJ

**Full-Body Bone Scans**
- Nov. 27, 2006 at Lenox Hill Radiology (ordered by Dr. Thomas Argyros)
- June 25, 2008 at Holy Name Hospital (Dr. Kenneth Park)

**Lumbar and Cervical Spine MRI**
- Dec. 18, 2006 at New Century Imaging (ordered by Dr. Seth Kane)
- Jan. 21, 2009 at New Century Imaging (Dr. Kenneth Park)

**Cervical Spine MRI**
- January 27, 2011 at Hackensack Imaging Center, NJ (Dr. Mario Vukic)


**Lumbar Spine MRI**
- Sept. 21, 2009 at HUMC, NJ (Dr. Stephen Sherer and Dr. Mario Vukic)


**Full Spine MRI**
- Sept. 20, 2010 at Hackensack Imaging Center, NJ (Dr. Mario Vukic)


**Lumbar Spine CT Scan**
- Jan. 22, 2007 at New Century Imaging (ordered by Dr. Andrew Casden)
- July 13, 2009 at New Century Imaging, Oradell, NJ (Dr. Patrick Roth)


**Thoracic Spine CT Scan**
- Sept. 22, 2009 at HUMC, NJ (ordered by Dr. Stephen Sherer and Dr. Mario Vukic)


**Discogram with CT Scan follow-up**
- Feb. 22, 2007 at Beth Israel Spine Institute, Dr. Andrew Casden and Dr. Stuart Kahn


**Muscle Biopsy**
- Feb. 12, 2007 at Hackensack University Hospital by Dr. Seth Kane (ordered by Dr. Eugene French and Dr. Seth Kane)


**Brain MRI/CT**
- Dec. 27, 2006 at New Century Imaging (ordered by Dr. Mario Vukic)
- May 21, 2009 at New Century Imaging (ordered by Dr. Mario Vukic)
- Sept. 21, 2009 at HUMC, NJ (ordered by Dr. Mario Vukic)
- June 18, 2010 at New Century Imagining (ordered by Dr. Mario Vukic)


**EMG**
- Dec. 29, 2006 at Hackensack Neurology Group by Dr. Mario Vukic (ordered by Dr. Seth Kane)

- July 18, 2008 at Hackensack Neurology Group by Dr. Mario Vukic (Dr. Kenneth Park)
- Jan. 20, 2009 at Hackensack Neurology Group by Dr. Mario Vukic (Dr. Hooman Azmi)
- Sept. 23, 2010 at Hackensack Neurology Group by Dr. Mario Vukic (Dr. Vukic ordered)
- Feb. 4, 2011 at Hackensack Neurology Group by Dr. Mario Vukic (Dr. Vukic ordered)

**Echocardiogram**

- Jan. 16, 2007 by Tri-County Radiology, Hackensack (ordered by Dr. Eugene French)

**Radiological Swallowing Evaluation**

- Jan. 17, 2007 at NYU Hospital, RUSK Institute, by Patricia Kerman Lerner (ordered by Dr. Morris Traube)

**Colonoscopy and Endoscopy**

- Feb. 15, 2007 at NYU Hospital by Dr. Morris Traube

**Pre-Op EKG**

- Feb. 27, 2007 at Beth Israel Hospital Pavilion (ordered by Dr. Andrew Casden)
- Subsequent EKGs performed by Dr. Stephen Sherer (in office)

**Anterior/Posterior Lumbar-Sacral (L2-S1) Spinal Fusion surgery**

- March 21, 2007 at Beth Israel Hospital, Dr. Andrew Casden and Spinal Institute team
  - Arthrodesis, Posterior and Anterior Laminectomy, Facetectomy, and Foraminotomy.
  - Spinal dura torn during hardware application. Necessitated intubation for 72 hours, followed by 48 hours additional restriction to bed. DVT diagnosed by Doppler ultrasound behind left knee on March 28, 2007 when finally ambulatory.
  - Hospitalized until April 5, 2007
  - Transferred to CareOne of Teaneck for rehabilitation stay
  - Transferred back April 18, 2007 to Beth Israel Hospital for surgical staph infection (MRSA)

**Spinal wound (staph, MRSA) infection surgery**

- April 23, 2007 at Beth Israel Hospital, Dr. David Friedman (ordered by Dr. Andrew Casden)
  - Retrievable vascular filters inserted by Dr. Paul Yang (removed 6/6/07).

- Poly RadPicc inserted 3/25/07 by intervention radiology, Beth Israel Hospital.
- IV antibiotics, Vancomycin (1g/250cc, every 12 hours) until 5/31/07, directed by Dr. David Perlman.  Picc line removed 5/31/07 by visiting nurse (Judy Amico, Nursefinders).
- Hospitalized until 4/30/07.  Transferred back to CareOne
- Discharged to home from CareOne 5/4/07.

## MRI of left knee

- June 20, 2007 at New Century Imaging (ordered by Dr. Seth Kane)
  - Followed up with cortisone injection, July 22, 2007
  - PT prescribed for July-October 2007 (Kessler-Paramus, Alliance-Hackensack)

## Doppler Ultrasound of left leg/lower extremities

- 8/15/07 at Hackensack University Medical Center (ordered by Dr. Seth Kane)
- 10/23/07 at Beth Israel Hospital (Dr. Paul Yang)
- 8/17/09 at New Century Imagining (Dr. Kenneth Park)

## MRA

- April 11, 2008 at New Century Imaging (ordered by Dr. Alvin Wertentheil)

## Myelogram CT

- June 3, 2008 at Beth Israel Hospital (ordered by Dr. Andrew Casden)

## Urodynamics Study

- July 16, 2009 at North Jersey Prostate Cancer and Urology, Maywood, NJ (Dr. Greg Lovallo)

## Cyscoscopy

- July 20, 2009 at North Jersey Prostate Cancer and Urology, Maywood, NJ (Dr. Greg Lovallo)

## Uro-flow Dynamics study

- Dec. 14, 2009 at North Jersey Prostate Cancer and Urology, Maywood, NJ (Dr. Greg Lovallo)

## Kidney & Bladder Ultrasound

- 8/10/09 at North Jersey Prostate Cancer and Urology, Maywood, NJ (Dr. Greg Lovallo)

- 9/22/09 at HUMC, NJ (Dr. Stephen Sherer and Dr. Greg Lovallo)
- 9/25/09 at HUMC, NJ (Dr. Stephen Sherer and Dr. Greg Lovallo)

**Abdominal Ultrasound**
- 8/17/10 at Hackensack Imaging Center (ordered by Dr. Stephen Sherer)

**Abdominal/Pelvic CT**
- 12/6/10 at New Century Imaging (ordered by Dr. Stephen Sherer)

**Lidocaine Infusion**
- 9/17/09 at Holy Name Hospital, Teaneck, NJ (ordered by Dr. Kenneth Park)

LENOX HILL RADIOLOGY & MEDICAL IMAGING ASSOCIATES P.C.

Erich Eidenschenk, M.D.
David A. Bollett, M.D.
Keith S. Tobin, M.D.
William Louie, M.D.
Shelley E. Wertheim, M.D.
Peter Roumanas, M.D.
Kathy J. Tobin, M.D.
Ronald S. Wagner, M.D.
Fred A. Pezulli, M.D.
Mykola Mohuchy, M.D.
Tuan X. Ha, M.D.
Karen Fried, M.D.
Ritika Arora, M.D.

51 East 77th Street, New York, NY 10021 • TEL: 212-772-3111 • FAX: 212-288-1637 • www.lenoxhillradiology.com

THOMAS ARGYROS, MD
122 EAST 76TH STREET
NEW YORK, NY 10021
        Patient Name: **Pushkin, David**
        Date of Birth: 03/21/1963
        Identification#: 385154
        Accession: 938996
        Exam Date: 11/27/2006

Dear Dr. Argyros,

WHOLE-BODY BONE SCAN

24.8 mCi of technetium 99m labeled MDP was administered intravenously. Then, 3 hour delayed, scintigraphic images of the skeleton were obtained.

HISTORY: Spondylosis. Multifocal thoracolumbar spine pain.

Findings: Moderate, likely degenerative uptake is seen over the L5-S1 spine. Mild degenerative uptake is seen in the right T12 costovertebral junction / right lateral T11-T12 disc level.
No other areas of significant abnormal tracer uptake are seen within the remaining axial or appendicular skeleton area
Normal uptake and excretion of tracer is seen by both kidneys and bladder.

Impression:
1. Moderate L5-S1 spondylosis. Fracture cannot be completely excluded. Correlation with plain films is suggested for further evaluation as warranted clinically.

Thank you for referring this patient.

Electronically Signed By: William Louie, MD        11/30/2006

Access your patients images and reports @ www.lenoxhillradiology.com

| CT SCAN-MULTIDETECTOR | DIGITAL X-RAY | ULTRASOUND | MRI/MRA | BREAST MRI BIOPSY | PET |
|---|---|---|---|---|---|
| HEART SCAN | FLUOROSCOPY | HDI | OPEN MRI | ULTRASOUND BIOPSY | CT/MR FUSION |
| VIRTUAL COLONOSCOPY | | MAMMOGRAPHY | HIGHFIELD 1.5T | FINE NEEDLE ASPIRATION | NUCLEAR MEDICINE |
| DENTAL SCAN | | BONE DENSITOMETRY | 3T MRI/MRA | | RADIATION ONCOLOGY |

ACCREDITED BY THE AMERICAN COLLEGE OF RADIOLOGY - PET • NUCLEAR MEDICINE • MRI • CT • ULTRASOUND • MAMMOGRAPHY



NEW CENTURY IMAGING
O R A D E L L

555 Kinderkamack Road
Oradell, N.J.  07649

PH  201.599.1311
FX  201.599.8333
www.ncimaging.com

SETH KANE, MD
277 FOREST AVENUE-STE 201
PARAMUS NJ 07652

MRN: 349565-1
Date of Service: 12/18/2006
Accession Number: 494763

DEAR DR KANE,

**RE:**        **PUSHKIN, PHD, DAVID**
**DOB:**       **03/21/63**

**CHIEF COMPLAINT:  43 YEAR OLD MALE COMPLAING OF BACK PAIN AND WEAKNESS**

**EXAM:    MRI SPINE, LUMBAR**

Sagittal T1 weighted, T2 weighted, and inversion recovery images of the lumbosacral spine were obtained, in addition to transaxial T1 weighted and fast spin echo T2 weighted images.

No prior similar examinations are currently available for direct comparison.

There is mild dextroscoliotic deformity of the lumbosacral spine.  Exaggeration of expected lumbar lordosis is seen.  There is grade I-II spondylolisthesis of L5 on S1, likely due to changes of advanced degenerative facet osteoarthropathy.  In addition, minimal retrolistheses of L3 on L4 and L4 on L5 are seen.

Changes of degenerative disc disease are noted with disc desiccation particularly from L3-L4 through L5-S1.  Marked intervertebral disc space narrowing and end plate change is seen at L5-S1.

Review of the individual levels demonstrates minimal flattening of the ventral surface of the thecal sac at T12-L1.

At L1-L2, a small left paracentral protrusion at L1-L2 is seen with deformity of the ventral surface of the traversing thecal sac.  No neural foraminal compromise is identified.

At L2-L3, mild broad based disc bulge is noted, again with flattening of the ventral surface of the traversing thecal sac.  Slight asymmetric inferior neural foraminal narrowing is noted, left greater than right.

NEW CENTURY IMAGING
ORADELL

555 Kinderkamack Road
Oradell, N.J. 07649

PH 201.599.1311
FX 201.599.8333
www.ncimaging.com

At L3-L4, broad based and laterally bulging disc is seen, which flattens the ventral thecal sac. Superimposed changes of degenerative facet osteoarthropathy contribute to bilateral lateral recess stenosis as well as minimal inferior neural foraminal narrowing.

At L4-L5, there are changes of degenerative facet osteoarthropathy. Broad based disc bulge is seen which mildly deforms the ventral thecal sac. Minimal spinal canal narrowing is noted. No significant inferior neural foraminal encroachment is identified.

At L5-S1, advanced facet osteoarthropathy contributes to grade I-II spondylolisthesis, with severe spinal canal stenosis. Mild bilateral neural foraminal narrowing is seen.

There is a focal hemangioma involving the T12 vertebral body eccentric to the right. The visualized spinal cord demonstrates normal signal intensity. The conus medullaris terminates at T12. Review of the paraspinal soft tissue structures demonstrates T2 hyperintense lesion involving the lateral aspect of the left mid renal zone.

IMPRESSION:
1. Significant exaggeration of expected lumbar lordosis with grade I-II spondylolisthesis of L5 on S1, likely due to changes of degenerative facet osteoarthropathy with associated severe spinal canal stenosis.

2. Minimal retrolistheses of L3 on L4 and L4 on L5.

3. Small left paracentral disc protrusion at L1-L2.

4. Focal hemangioma involving T12 vertebral body eccentric to the right.

Thank you for referring this patient. Very truly yours,
AD

**Pierce, Sean**
Electronically signed Wed 12/20/2006 1:17 pm



NEW CENTURY IMAGING
O R A D E L L

555 Kinderkamack Road
Oradell, N.J. 07649

PH 201.599.1311
FX 201.599.8333
www.ncimaging.com

ANDREW CASDEN, MD
10 UNION SQUARE EAST
NEW YORK NY 10003

MRN: 349565-1
Date of Service: 01/22/2007
Accession Number: 501184

DEAR DR CASDEN,

RE:        PUSHKIN, PHD, DAVID
DOB:       03/21/63

CHIEF COMPLAINT: LOW BACK PAIN

EXAM:     CT L-SPINE W/O CONT WITH RECONSTRUCTION

CT scan of the cervical spine without contrast. Sagittal and coronal reconstructions were also obtained.

A 10 mm anterolisthesis of L5 on S1 is appreciated. A 7 mm retrolisthesis of L4 on L5 is appreciated. Vacuum disc phenomenon involving the L3-L4 and L4-L5 facet joints is appreciated bilaterally. There is severe widening of the L4-L5 disc space anteriorly. Disc space narrowing of the L3-L4 disc space is noted with small amount of vacuum disc phenomenon posteriorly.

There is no definitive evidence of L5 spondylolysis. Fusion of the L5-S1 facets is appreciated posteriorly possibly on a degenerative basis.

The L1-L2 to L2-L3 levels are unremarkable.

The L3-L4 level demonstrates a broad based bulge and facet degenerative changes which result in a moderate to severe canal stenosis. The L4-L5 level demonstrates a moderate canal stenosis secondary to a mild broad bulge and ligamentum flavum hypertrophy/facet degenerative change. Bilateral foraminal however are unremarkable.

The L5-S1 level is poorly delineated on the axial images, but demonstrates severe stenosis related to the L5 on S1 anterolisthesis. Bilateral foraminal are severely narrowed related to the anterolisthesis.

The visualized portions of the abdomen demonstrate suture material associated with the rectum. Surgical clips

NEW CENTURY IMAGING
O R A D E L L

555 Kinderkamack Road
Oradell, N.J. 07649

PH 201.599.1311
FX 201.599.8333
www.ncimaging.com

of the retroperitoneum are also noted.

The T12 vertebral body demonstrates a likely hemangioma.

IMPRESSION:

1. At least 10 mm anterolisthesis of L5 on S1. Severe stenosis at the L5-S1 level. Severe stenosis of the bilateral foramina.

2. Moderate stenosis at the L3-L4 level related to broad based disc osteophyte.

3. Overall, these changes are not significantly changed from prior examination.

Thank you for referring this patient. Very truly yours,
AD


**W KIM, MD**
Electronically signed Tue 1/23/2007 11:08 am

BETH ISRAEL MEDICAL CENTER
FIRST AVENUE AT 16TH STREET, NEW YORK, NY 10003

2007

RADIOLOGY REPORT

| NAME | MR/DEPT# | LOC | ACC |
|------|----------|-----|-----|
| PUSHKIN PHD, DAVID B | 02243094 | PRARD | 4322137 |
| DOB: Mar-21-1963 | | | |

Requesting MD: CASDEN, ANDREW M MD
EXAM: CT MYELOGRAM LUMBAR
DATE OF EXAM: Jun-3-2008

POST-MYELOGRAPHIC CT SCANS OF THE LUMBOSACRAL SPINE:

Clinical information: status post anterior, posterior spinal
fusion of L spine in 2007.  LBP, radiating to left side.

Following myelography, helical axial scans were obtained from T3
to S5 at 3 mm intervals.  These were then reconstructed into 1 mm
axial scans at 1 mm intervals.   Sagittal and coronal reformated
images were creasted.   The CTdata were sent to the vitrea
workstation and curved coronal reformated immges were created.

The contrast material fills the subarachnoid spaces well.

There is evidence of laminectomy at L3, L4, L5 levels with
anterior and posterior spinal fusions from L2 to S1.  Two metallic
rods are noted in the retrospinal region from L2 to S1 with
metallic screws transfixing the pedicles and vertebral bodies at
L2, L3, L4, S1 levels and through iliac bones.  Metallic interbody
cages are seen in the disc spaces at L2-L3, L3-L4, L4-L5 levels.
metallic screws are seen transfixing the vertebral bodies at L2,
L3, L4 levels to secure the position of the interbody cages.
There is evidence of bony fusion in the disc space and the
prevertebral region at L5-S1 level.

All the the instrument are intact and in satisfactory position.

Anterior displacement of the L5 vertebral body in relation to S1
is noted constituting grade II spondylolisthesis.  An exaggerated
lumbosacral lordotic curvature is noted.

Bone grafts are present along the articular processes from L2 to
S1.  Productive bony changes are seen in the articular processes
at L5-S1 level, resulting in slight narrowing of the bony spinal
canal at L5-S1 level in transverse dimension.  The thecal sac is
slightly  compressed at L5-S1 level.  The bony spinal canal at
other levels is normal in size.  There is slight narrowing of

Case 2:12-cv-00324-KM-MAH   Document 25   Filed 04/27/11   Page 63 of 266 PageID: 2684

cv-09213-JGK-DCF   Document 15   Filed 02/17/11   Page 29 of 30

BETH ISRAEL MEDICAL CENTER
FIRST AVENUE AT 16TH STREET, NEW YORK, NY 10003

2007

RADIOLOGY REPORT

NAME                          MR/DEPT#        LOC       ACC
PUSHKIN PHD, DAVID B          02243094        PRARD     4322137
DOB: Mar-21-1963

Requesting MD: CASDEN, ANDREW M MD
EXAM: CT MYELOGRAM LUMBAR
DATE OF EXAM: Jun-3-2008
bilateral neural foramina at L5-S1 level.

At L1-L2 level, an anterior extradural defect is noted, more
prominent on the left side.  The findings represent slight
psoterior disc bulging with a posterolateral hernaited disc on the
left side.

At L2-L3 level, a small anterolateral extradural mass (image #100,
series #4) is seen on the left side, measuring 4 mm in diameter.
This probably represent a small posterolateral herniated disc.

The other discs are normal in position.

The spinal cord below the level of T3 is normal in size and
postion.  Postsurgical changes are seen in the retrospinal region
from L2 to S1.  The other paraspinal soft tissues are
unremarkable.

IMPRESSION:

1.   Status post laminectomy at L3, L4, L5 levels with anterior and
posterior spinal fusions from L2 to S1.

2.   Slight psoterior disc bulging at L1-L2 level with a
posterolateral hernaited disc on the left side.

3.   A small anterolateral extradural mass at L2-L3 level on the
left side, probably representing a small posterolateral herniated
disc.

4.   Slight spinal stenosis at L5-S1 level.

5.   Grade II  spondylolisthesis of L5 in relation to S1.

**BETH ISRAEL MEDICAL CENTER**
FIRST AVENUE AT 16TH STREET, NEW YORK, NY 10003

2007

RADIOLOGY REPORT

```
NAME                          MR/DEPT#        LOC        ACC
PUSHKIN PHD, DAVID B          02243094        PRARD      4322137
DOB: Mar-21-1963
```

Requesting MD: CASDEN, ANDREW M MD
EXAM:CT MYELOGRAM LUMBAR
DATE OF EXAM:Jun-3-2008


Interpreted by:
Wen C Md Yang   /signed by/ Wen C Md Yang

Dictated on:
Transcribed on: Jun-4-2008 6:30 PM by Talkstation Interface
Finalized on:   Jun-4-2008 6:30 PM by Talkstation Interface


400384116

# DATE OF SERVICE: 6/25/2008

**DATE OF DICTATION: 6/25/2008**

**CLINICAL INFORMATION: 45 year old male with costochondritis.**

**EXAMINATION: Bone scan**

25.86 mCi of Tc-99m MDP were injected intravenously. At 2 hours after injection, anterior and posterior whole body images were obtained along with a SPECT study of the rib cage with reconstruction in axial, coronal and sagittal planes. There is no previous examination available for comparison.

The study demonstrates a mild lumbar scoliosis. There is increased activity noted in the lumbar spine at the level of L2. There is photopenic defect in the lumbar spine inferior to this level that suggests a previous laminectomy. Additionally seen is symmetric increased activity in the SI joints within which are photopenic defects possibly post surgical in nature. This would be better evaluated with plain film or MRI.

Activity throughout the rib cage is normal. There is no evidence to suggest costochondritis. There is mild increased activity at the junction of the manubrium in the body of the sternum that could be degenerative. There is normal distribution of radiopharmaceutical in the remaining osseous tructures.

IMPRESSION:

Probable post surgical changes in the lumbar spine.

Normal activity in the rib cage.

ENDOFIMPRESSION:

Jacqueline Brunetti, M.D.

Holy Name Hospital, Teaneck, NJ



NEW CENTURY IMAGING
O R A D E L L

555 Kinderkamack Road
Oradell, N.J.  07649

PH  201.599.1311
FX  201.599.8333
www.ncimaging.com

KENNETH H PARK, MD
433 HACKENSACK AVENUE
HACKENSACK NJ 07601

MRN: 349565-1
Date of Service: 01/21/2009
Accession Number: 644841

DEAR DR PARK,

**RE:**       **PUSHKIN, PHD, DAVID**
**DOB:**      **03/21/63**

**CHIEF COMPLAINT:  NECK AND BACK PAIN**

**EXAM:    MRI SPINE, LUMBAR W/WO CONT**

An MRI scan of the lumbar spine was performed on David Pushkin was performed on the GE 1.5 T high field
strength MR system.  Scan sequences utilized included sagittal T1, T2 and inversion recovery examinations as
well as axial T1 and T2 weighted scans.  Post contrast sagittal T1 weighted examination and axial T1 weighted
scans were also obtained.  20cc of gadolinium was administered for this exam.

Preoperative study of January 22, 2007 is evaluated in conjunction with this study. The study is also evaluated
in conjunction with preoperative study of 12/18/06.

The patient has undergone multilevel spinal fusion from L2-S1.  Susceptibility artifact within the disc spaces
are a result of the spaces likely reflecting cages at L2-L3 and L3-L4 and L4-L5.  Preoperative CT scan had
demonstrated significant anterolisthesis of L5 relative to S1 which patient has undergone a fusion for as there
are bilateral upper sacral screws seen.  As seen on the sagittal examination, the significant anterolisthesis of L5
relative to S1 is stable in configuration as compared to the prior listhesis on CT, however, with the multilevel
laminectomy, the spinal canal is more capacious at this level.  At the level of laminectomy at L4, a fluid
collection within the posterior paraspinal soft tissues is seen extending from the mid L4 vertebral body to the
lower aspect of the L5 vertebral body on the axial examination.  Enhancement surrounding the margin of this
fluid collection is seen as well as enhancement of the posterior paraspinal soft tissues at the site of resection is
seen.  The collection is measured on the sagittal examination.  Image #10 extends for 2.3 cm in coronal extent
and 1.8 cm in the anterior posterior diameter.  Bilateral pedicle screws at L2 through L5 are seen resulting in
regional susceptibility artifact.  The nerve roots with the neural foramen at L2-L3, L3-L4 and L4-L5 can be



NEW CENTURY IMAGING
O R A D E L L

555 Kinderkamack Road
Oradell, N.J. 07649

PH 201.599.1311
FX 201.599.8333
www.ncimaging.com

discerned below the susceptibility artifact from the metal in these regions. Narrowing of the L5-S1 foramen due to the anterolisthesis is similar to the prior preoperative study.

At the first mobile segment of the fusion at L1-L2, retrolisthesis of L1 relative to L2 is seen which is new since the 2006 examination. The broad protrusion which extends beyond the end plate at this level results in mild ventral sac distortion seen on the sagittal examination. On the axial study, the midline protrusion deforms the sac as seen on Image #19 of Series 5. On preoperative examination of 12/18/06, the disc at this level had a focal mild eccentric protrusion towards the left resulting in less deformity. Greater sac distortion posteriorly by the facets at this level is seen as well.

Hemangioma of the T12 vertebral body is seen. No signal abnormality of the thoracic cord or conus is seen. The conus terminates at T12-L1.

**IMPRESSION:**

1. This patient who is status post spine surgery fusion from L2 through S1. At the first mobile segment at L1-L2, greater extension of disc beyond the end plate is seen with associated retrolisthesis of L1 relative to L2 of several millimeters which is new since the preoperative MRI of 12/18/06. Whereas previously the canal is capacious at this level with a mild left sided eccentric protrusion, the current exam demonstrates constriction of the thecal sac posteriorly as well as a larger ventral protrusion as compared to the 2006 examination.

2. At the level of spinal fusion from L2-S1, the spinal canal appears capacious.

3. At the site of laminectomy at L4, the fluid collection extends from the inferior spinous process of L3 to the mid L5 vertebral body with peripheral rim enhancement is seen. This could represent organizing seroma. Clinical correlation as to any active infection in this patient.

4. While susceptibility artifact obscures portions of the neural foramen, on the sagittal examination the nerve roots exit normally with respect to the neural foramina from L2-L3 through L4-L5.

5. The neural foraminal compromise bilaterally at L5-S1 is a result of the anterolisthesis of L5 relative to S1, is similar to the preoperative study.

Thank you for referring this patient. Very truly yours,
SHC

NEW CENTURY IMAGING
O R A D E L L

555 Kinderkamack Road
Oradell, N.J.  07649

PH  201.599.1311
FX  201.599.8333
www.ncimaging.com

**D PANUSH, MD**
Electronically signed Wed 01/21/2009 3:48 pm

NEW CENTURY IMAGING
O R A D E L L

555 Kinderkamack Road
Oradell, N.J.  07649

PH  201.599.1311
FX  201.599.8333
www.ncimaging.com

HOOMAN AZMI GHADIMI, MD
680 KINDERKAMACK RD STE 300
ORADELL NJ 07649

MRN: 349565-1
Date of Service: 06/23/2009
Accession Number: 678595

DEAR DR AZMI GHADIMI,

**RE:**      **PUSHKIN, PHD, DAVID**
**DOB:**     **03/21/63**

**CHIEF COMPLAINT:  BACK PAIN**

**EXAM:     XRAY LUMBOSACRAL SPINE 2 VIEWS**

Three lateral views of the lumbosacral spine with neutral flexion and extension views.  Comparison is made to a previous MRI from 01/21/09.

There is posterior stabilization of L2 through S1.  Intervertebral cage spacers are also seen as well as anterior directed screws at L2 and L3 and L4, unchanged.  Hardware appears unchanged in position from previous MRI.

There is anterolisthesis of L5 on S1 of approximately 1.4 cm on both flexion and extension with no instability noted.  There is retrolisthesis of L1 with respect to L2 of 7 mm, unchanged between flexion and extension. There is anterolisthesis of L4 with respect to L3 of 5 mm, unchanged with flexion and extension.

Vascular calcification is seen.

Thank you for referring this patient.  Very truly yours,
PR

**Naik, Mohit**
**Electronically signed Tue 06/23/2009 12:54 pm**

# NEW CENTURY IMAGING

O R A D E L L

555 Kinderkamack Road
Oradell, N.J. 07649

PH  201.599.1311
FX  201.599.8333
www.ncimaging.com

PATRICK ROTH, MD
680 KINDERKAMACK RD STE 300
ORADELL NJ 07649

MRN: 349565-1
Date of Service: 07/13/2009
Accession Number: 682792

DEAR DR ROTH,

**RE:**       **PUSHKIN, PHD, DAVID**
**DOB:**      **03/21/63**

**CHIEF COMPLAINT:   LOWER BACK PAIN**

**EXAM:      X-RAY LUMBOSACRAL SPINE 2 VIEWS**

Upright AP and lateral neutral radiographs of the lumbar spine were obtained as well as lateral upright flexion and extension views.

Comparison is made to a study dated 6/23/09 as well as a CT myelogram from 6/03/08.

There has been a previous anterior and posterior lumbosacral fusion extending from L2 through the sacrum. There are bilateral posterior rods.  Pedicle screws are present at L2, L3 and L4 bilaterally as well as at S1. Anterior interbody spacers are seen at L2-3, L3-4, and L4-5.  There appears to have been a posterior decompression laminectomy extending from L3 through L5.

There is mild lumbar scoliosis, convex left.  There is also mild left lateral listhesis of L2 relative to L1.  There is mild retrolisthesis of L1 relative to L2.  This measures about 7 mm in flexion and 5 mm in extension.  There is moderate narrowing of the L1-2 disc space.

Mild retrolisthesis of L3 relative to L4 is also evident, unchanged, measuring about 5 mm.

At L5-S1, there is stable anterolisthesis of L5 relative to S1 measuring about 15 mm and without change on flexion or extension.

No compression fracture deformities are seen.

| Oradell-NEW CENTURY IMAGING  PUSHKIN, PHD, DAVID    Accession # 00682792 | Page 1 of 2 |
|---|---|

**NEW CENTURY IMAGING**
O R A D E L L

555 Kinderkamack Road
Oradell, N.J. 07649

PH 201.599.1311
FX 201.599.8333
www.ncimaging.com

**IMPRESSION:**

Status post previous anterior and posterior lumbosacral spine fusion and decompression. Stable positioning and appearance of instrumentation. Spondylolisthesis are again evident at L1-2, L3-4 and L5-S1. These are as detailed above and have not changed significantly in severity compared to the prior study of 6/23/09.

Thank you for referring this patient. Very truly yours,
SHC

**G HAN, MD**
**Electronically signed Mon 07/13/2009 4:01 pm**

NEW CENTURY IMAGING
ORADELL

555 Kinderkamack Road
Oradell, N.J. 07649

PH 201.599.1311
FX 201.599.8333
www.ncimaging.com

PATRICK ROTH, MD
680 KINDERKAMACK RD STE 300
ORADELL NJ 07649

MRN: 349565-1
Date of Service: 07/13/2009
Accession Number: 682791

DEAR DR ROTH,

**RE:** **PUSHKIN, PHD, DAVID**
**DOB:** **03/21/63**

**CHIEF COMPLAINT:   LOWER BACK PAIN; STATUS POST LUMBAR FUSION**

**EXAM:     CT L-SPINE W/O CONT WITH RECONSTRUCTION**

A spiral CT scan of the lumbar spine was performed from the inferior aspect of T11 to the caudal aspect of the sacrum using spiral technique.  Reconstructions were done.   Comparison is made to a prior post operative MRI of the lumbar spine dated 1/21/09.

Patient is status post a multilevel anterior and posterior fusion extending from L2 through S1 as has been seen on prior plain films dated 7/13/09.  Anterior fusion components consist of metallic cages centered within the L2-3, L3-4 and L4-5 interspaces.  Obliquely oriented anchoring screws are seen at L2, L3, and L4.  There are bilateral pedicle screws along with bilateral posterior fixation rods at the L2, L3, L4 and S1 levels bilaterally.  Mild posterior subluxations of L1 and L3 are noted.  There is a grade I anterior spondylolisthesis at L5.  The fusion hardware appears intact.  Bone grafting material is present within the posterior elements at the fusion levels.  Wide laminectomies are seen at L3-4, L4-5 and L5-S1.  Post surgical changes are seen in the paraspinal region posterior to the laminectomies.  I cannot exclude a seroma in this region.

There is a minimal broad-based bulge at L1-2 and bilateral facet degenerative changes.  There is mild bilateral foraminal narrowing.

Examination of the L2-3 level demonstrates artifact in association with post surgical changes.  No significant foraminal narrowing is seen.

Examination of the L3-4 level demonstrates bilateral facet degenerative changes and wide laminectomy.  There

NEW CENTURY IMAGING
ORADELL

555 Kinderkamack Road
Oradell, N.J. 07649

PH 201.599.1311
FX 201.599.8333
www.ncimaging.com

is moderate bilateral foraminal narrowing at L3-4 in association with eccentric disc/osteophyte complexes.

Examination of the L4-5 level demonstrates evidence of a wide laminectomy. No significant foraminal narrowing is seen.

Examination of the L5-S1 level demonstrates bilateral lateral recess compromise as well as a posterior laminectomy. There is moderate to severe bilateral foraminal narrowing in association with eccentric disc/osteophyte complexes.

IMPRESSION:

1.  The patient is status post a multilevel anterior and posterior fusion procedure as discussed in detail above with multilevel posterior laminectomies performed. The fusion hardware appears intact. Multilevel spondylitic changes are identified as discussed above. Bone grafting material is also seen in the region of the posterior elements at the fusion levels.

2.  There is a T12 hemangioma.

Thank you for referring this patient. Very truly yours,
JD

**J DEMERITT, MD**
**Electronically signed Wed 07/15/2009 2:56 pm**

# NEW CENTURY IMAGING
### O R A D E L L

555 Kinderkamack Road
Oradell, N.J. 07649

PH 201.599.1311
FX 201.599.8333
www.ncimaging.com

STEPHEN SHERER MD
714 BERGEN BOULEVARD
RIDGEFIELD NJ 07657

MRN: 349565-1
Date of Service: 08/17/2010
Accession Number: 768149

DEAR DR SHERER,

RE:        PUSHKIN  PHD, DAVID
DOB:       03/21/63

CHIEF COMPLAINT:  ABDOMINAL PAIN

EXAM:    ULTRASOUND, ABDOMEN

Real-time ultrasound examination of the abdomen was performed on David Pushkin. The abdominal aorta is normal in caliber. The inferior vena cava is normally patent. The pancreas is not well visualized. The liver is increased in echogenicity consistent with diffuse fatty infiltration. The liver is enlarged with the right lobe measuring 20.6 cm in length. There are no liver masses. The gallbladder is mildly distended. The gallbladder wall is normal in thickness. There are no gallstones seen. The bile ducts are not dilated with the common hepatic bile duct measuring less than 5 mm in diameter. The right kidney measures 10.9 cm in length. The left kidney measures 11.0 cm in length. There are no renal masses or calcifications, and there is no evidence of hydronephrosis. The spleen is not well visualized but is grossly normal in size measuring 10.2 cm in length.

**IMPRESSION:** Hepatomegaly with diffuse fatty infiltration of the liver. Mildly distended gallbladder without evidence of gallstones.

Thank you for referring this patient.  Very truly yours,
KSAF

**A ALBERT, MD**
**Electronically signed Tue 08/17/2010 5:45 pm**

NEW CENTURY IMAGING
O R A D E L L

555 Kinderkamack Road
Oradell, N.J.  07649

PH  201.599.1311
FX  201.599.8333
www.ncimaging.com

STEPHEN SHERER MD
714 BERGEN BOULEVARD
RIDGEFIELD NJ 07657

MRN: 349565-1
Date of Service: 08/17/2010
Accession Number: 768149

DEAR DR SHERER,

RE:         PUSHKIN PHD, DAVID
DOB:        03/21/63

CHIEF COMPLAINT:  ABDOMINAL PAIN

EXAM:    ULTRASOUND, ABDOMEN

Real-time ultrasound examination of the abdomen was performed on David Pushkin. The abdominal aorta is normal in caliber. The inferior vena cava is normally patent. The pancreas is not well visualized. The liver is increased in echogenicity consistent with diffuse fatty infiltration. The liver is enlarged with the right lobe measuring 20.6 cm in length. There are no liver masses. The gallbladder is mildly distended. The gallbladder wall is normal in thickness. There are no gallstones seen. The bile ducts are not dilated with the common hepatic bile duct measuring less than 5 mm in diameter. The right kidney measures 10.9 cm in length. The left kidney measures 11.0 cm in length. There are no renal masses or calcifications, and there is no evidence of hydronephrosis. The spleen is not well visualized but is grossly normal in size measuring 10.2 cm in length.

IMPRESSION: Hepatomegaly with diffuse fatty infiltration of the liver. Mildly distended gallbladder without evidence of gallstones.

Thank you for referring this patient. Very truly yours,
KSAF

A ALBERT, MD
Electronically signed Tue 08/17/2010 5:45 pm

Oradell-NEW CENTURY IMAGING PUSHKIN PHD, DAVID   Accession # 00768149                    Page 1 of 1

Case 2:12-cv-00324-KM-MAH   Document 25   Filed 04/27/11   Page 89 of 266 PageID: 2710

From HRG                    Tue 21 Sep 2010 09:07:53 AM EDT                    Page 2 of 6
Case 1:10-cv-09212-JGK -DCF   Document 13-1   Filed 02/17/11   Page 12 of 30

MARIO VUKIC MD                                      MRN: 349565- 1
211 ESSEX STREET 202                                Date of Service:
09/20/2010
HACKENSACK NJ 07601                                 Accession Number: 774892


DEAR DR VUKIC,

RE:        **PUSHKIN, DAVID**
DOB:       **03/21/63**

**CHIEF COMPLAINT:        LOW BACK PAIN**

**EXAM:     MRI SPINE, LUMBAR W/WO CONT**

TECHNIQUE:

MRI of the cervical spine was performed without and with contrast on a 1.5- T high- field
strength system. Multiplanar multisequence exam was obtained. A total of 20 cc of contrast
was administered.

MRI examination of the thoracic spine was performed without and with contrast on a 1.5- T
high- field strength system. A total 20 cc of contrast was administered.

MRI examination of the lumbar spine without and with contrast was performed on a 1.5- T
high- field strength system. Multiplanar multisequence exam was obtained. A total 20 cc of
contrast was administered.

COMPARISON: Comparison is made to a CT thoracic spine from 09/22/2009 and an MR
lumbar spine from 09/21/2009 from Hackensack University Medical Center, as well an MRI of
the cervical spine dated 01/21/2009.

FINDINGS:

| Newman Street Imaging Center   PUSHKIN, DAVID   Accession # 00774892 | Page 1 of 5 |
|---|---|

Mild leftward convex curvature of the cervical spine, as well as cervical lordosis straightening are unchanged. A focal sclerotic lesion in the superior aspect of the C4 vertebra likely reflects a Schmorl's node, unchanged. No compression fractures or suspicious osseous lesions have developed. The cervical cord has normal signal. No masses are evident. No abnormal contrast enhancement seen in the canal after contrast.

At C2-C3, mild left foraminal stenosis due to moderate facet arthritis in the left is stable. No spinal or right foraminal stenoses have developed. The disc is normal.

At C3-C4, mild disc height loss, moderate left greater than right facet arthritis and minimal degenerative retrolisthesis remains stable. Minimal spinal stenosis due to a central ridge composed of disc and osteophyte, stable. Minor left foraminal stenosis due to facet arthritis is unchanged. No right foraminal stenosis has developed.

At C4-C5, mild disc height loss, moderate facet arthritis and a posterior ridge composed of disc and osteophyte eccentric to the left remain stable in appearance. Minimal spinal stenosis is stable. Minimal foraminal stenoses are stable.

At C5-C6, mild facet arthritis, mild degenerative disc height loss and a small posterior ridge composed of disc and osteophyte are unchanged. Minimal spinal stenosis is stable. Minimal left foraminal stenosis due to an uncinate process osteophyte, stable. No right foraminal stenosis is seen.

At C6-C7, minimal disc height loss and disc bulging is unchanged. No spinal or foraminal stenoses are evident. Mild facet arthritis is unchanged.

All other cervical levels are normal.

Thoracic spine imaging demonstrates no interval change in mild leftward convex curvature of the thoracic spine. The thoracic kyphosis is maintained. No compression fractures, listheses or suspicious osseous lesions are noted. A small hemangioma in the T4 vertebra is stable. A medium sized hemangioma in T12 is stable. The thoracic cord has normal signal. No masses are seen in the thoracic canal. No abnormal enhancement seen in thoracic canal.

At T1-T2, a tiny left foraminal disc protrusion mildly narrows the left neural foramen. There is mild disc height loss.

Case 2:12-cv-00324-KM-MAH   Document 25   Filed 04/27/11   Page 93 of 266 PageID: 2714

From HRG                          Tue 21 Sep 2010 09:07:53 AM EDT                          Page 4 of 6
Case 1:10-cv-09212-JGK -DCF   Document 13-1   Filed 02/17/11   Page 14 of 30

At T2- T3, a small left foraminal disc protrusion mildly narrows the left neural foramen. There is mild disc height loss.

At T3- T4, there is a small right central disc protrusion flattening the ventral aspect of the spinal cord, however, there is no significant spinal or foraminal stenoses.

At T7- T8, there is a tiny left central disc protrusion, minimally flattening the ventral aspect of the spinal cord but no spinal or foraminal stenoses are evident.

At T10- T11, mild left ligamentum flavum hypertrophy and facet arthritis minimally narrow the left neural foramen. There is no spinal or right foraminal stenoses.

There is mild degenerative disc height losses in the thoracic spine from C7- T1 down through T8- T9.

A small cyst is seen in the liver. There is a small cyst in the left kidney.

The MRI of the lumbar spine again demonstrates a rightward convexity superiorly. This is unchanged. Exaggeration of lumbar lordosis is unchanged. No compression fractures or suspicious osseous lesions have developed. The conus medullaris has normal signal. The conus medullaris terminates at the T12- L1 level, unchanged.

At T12- L1, mild disc height loss and disc bulging is unchanged. No spinal or foraminal stenoses are evident. Mild facet arthritis is stable.

At L1- L2, moderate disc height loss anteriorly has progressed. Bright signal and long TR sequences in the endplates anteriorly are compatible with Modic type 1 endplate changes. These have mild to moderately progressed. Disc bulging and moderate facet arthritis remains stable. Mild spinal stenosis is stable. Moderate right and mild left foraminal stenoses are stable.

At L2- L3 through L5- S1, the patient is again noted to have had prior anterior and posterior fusion procedures. The hardware is better assessed on CT. It results in local susceptibility artifact. At L2- L3, no gross spinal or foraminal stenoses have developed. Mild facet arthritis is stable.

At L3- L4, laminectomies are evident. Mild right and moderate left foraminal stenoses due to

Case 2:12-cv-00324-KM-MAH Document 25 Filed 04/27/11 Page 95 of 266 PageID: 2716
From HKG                    Tue 21 Sep 2010 09:07:53 AM EDT                    Page 5 of 6
Case 1:10-cv-09212-JGK -DCF   Document 13-1   Filed 02/17/11   Page 15 of 30

marginal osteophytes and moderate facet arthritis remains stable. No spinal stenosis has developed. The spinal canal is decompressed posteriorly.

At L4-L5, mild retrolisthesis is stable. Severe facet arthritis is stable. Laminectomies are evident. Minimal right foraminal stenosis due to moderate facet arthritis is stable. There is no left foraminal stenosis. There is no evidence for spinal stenosis.

At L5-S1, again evident is a grade II anterolisthesis and advanced facet arthritis. Moderate foraminal stenoses due to the listhesis remains stable. Lateral recess stenoses because of the listhesis remains stable. No spinal stenosis has developed.

Again evident is a fluid collection posterior to the L3 through L5 vertebrae within the laminectomy bed. It is probably a postsurgical seroma or possibly a pseudomeningocele. It currently measures 1.9 cm AP x 3.6 cm transverse x 3.0 cm craniocaudal. It previously measured 2.0 cm AP x 3.7 cm transverse x 2.9 cm craniocaudal. It is stable. It does not result in significant effacement of the dorsal thecal sac.

Again noted is pronounced atrophy and distortion of the erector spinae muscles in the lower lumbar spine, unchanged in appearance. Postcontrast images demonstrate no mass in the lumbar region. There is stable postsurgical enhancing scar tissue in laminectomy beds.

IMPRESSION:

1. No interval change in the appearance of the cervical spine since the prior cervical MRI dated 12/18/2006.
2. MRI of the thoracic spine demonstrates a few small disc protrusions, however, no spinal stenoses are evident. Mild left foraminal stenosis is present at T10-T11 due to facet arthritis. There are several levels of degenerative disc height loss. There are no compression fractures, listheses or suspicious osseous lesions in the thoracic region.
3. Multiple postsurgical changes in the lumbar spine are stable. This includes a fluid collection within a large laminectomy bed posterior to the L3 through L5 vertebrae; this could reflect a seroma or pseudomeningocele, unchanged. The only interval change in the lumbar spine since the MRI lumbar spine from Hackensack University Medical Center dated 09/21/2009 is that the patient has worsening Modic type I endplate changes at L1-L2; this is presumably from worsening degenerative disc disease at this level. No other interval changes are noted in the appearance of the lumbar spine.

Case 2:12-cv-00324-KM-MAH   Document 25   Filed 04/27/11   Page 97 of 266 PageID: 2718

From HRG                    Tue 21 Sep 2010 09:07:53 AM EDT              Page 6 of 6
Case 1:10-cv-09212-JGK -DCF   Document 13-1   Filed 02/17/11   Page 16 of 30

Thank you for referring this patient.  Very truly yours,
KSPD

**G NICOLA, MD**
**Electronically signed Tue 09/21/2010  9:08 am**

12/09/2010  13:02   2012655144          NEW CENTURY IMAGING          PAGE  01/02
Case 2:10-cv-00210-JMK -DCF   Document 13-1   Filed 02/17/11   Page 17 of 30



NEW CENTURY IMAGING
O R A D E L L

555 Kinderkamack Road
Oradell, N.J. 07649

PH 201.599.1311
FX 201.599.8333
www.ncimaging.com

STEPHEN SHERER MD
714 BERGEN BOULEVARD
RIDGEFIELD NJ 07657

MRN: 349565-1
Date of Service: 12/06/2010
Accession Number: 792224

DEAR DR SHERER,

RE:        PUSHKIN, DAVID
DOB:       03/21/63

CHIEF COMPLAINT:  CHRONIC BOWEL OBSTRUCTION

EXAM:    CT ABDOMEN & PELVIS W/ CONTRAST

FINDINGS: CT of the abdomen and pelvis was performed with the administration of intravenous contrast. Reference is made to prior ultrasound of the abdomen dated 08/17/10.

Evaluation of the lower chest demonstrates normal heart size. There is coronary arterial calcification. Negative for pulmonary consolidation and mass.

Evaluation of the abdomen demonstrates diffuse low attenuation throughout a mildly enlarged liver. There are two hypervascular lesions in the posterior aspect of the right lobe measuring up to 14 mm which may represent flash filling hemangiomas. The spleen, pancreas, gallbladder, bilateral adrenal glands, and bilateral kidneys are normal in appearance aside from tiny bilateral renal hypodensities which are much too small to characterize. Evaluation of the gastrointestinal tract demonstrates radiopaque material within the large bowel likely related to ingested pill material. The appendix is normal in appearance. Negative for obstruction.  Negative for bowel thickening. Negative for malrotation. Evaluation of the pelvis demonstrates the prostate gland, seminal vesicles, and bladder are normal in appearance.

Negative for free fluid. There are clips in the pelvis.  There is calcified mesenteric lymph node in the right lower quadrant.  Negative for enlarged abdominal, pelvic, or retroperitoneal adenopathy by CT size criteria.

Evaluation of the bony structures demonstrates post-surgical change of the lower lumbar spine and negative for aggressive osseous lesion.

NEW CENTURY IMAGING
ORADELL

555 Kinderkamack Road
Oradell, N.J. 07649

PH  201.599.1311
FX  201.599.8333
www.ncimaging.com

**IMPRESSION:**

Hepatic steatosis associated with moderate hepatomegaly.

Two hypervascular lesions in the posterior aspect of the right lobe of the liver are felt to most likely represent flash filling hemangiomas.  Correlation with hepatic MRI may be performed as clinically indicated.

Bilateral renal hypodensities too small to characterize.

Negative for bowel obstruction or bowel thickening.

Calcified mesenteric lymph node in the right lower quadrant due to prior granulomatous disease.


Thank you for referring this patient.  Very truly yours,


**Patel, Kavita**
**Electronically signed Tue 12/07/2010 9:06 am**

  powered by 

American Health Holding, Inc.
Marsha Mihalak
4312 Lightfoot Street
Spring Hill, FL 34609

CONFIDENTIAL
5/3/2007

PATIENT:                DAVID PUSHKIN
CARDHOLDER:             BETH NUSSBAUM
MEMBER ID:              053465595
GROUP:                  RHI Entertainment, LLC
REFERRAL SOURCE:        Utilization Review
REFERRAL REASON:        Rate Negotiation
DIAGNOSIS:              Spondylolisthesis
CASE OPENED:            April 03, 2007

The patient listed above has been accepted in the Case Management program. The case manager may communicate with the patient/family, physician(s), and provider(s) to obtain additional clinical information, identify plan of treatment, and assess patient teaching and service needs. Please contact the case manager listed at (800) 259-7028 Ext: 1713 if you have any questions regarding this case.

The patient was referred to case management for the following reasons:

- Negotiate discounts/services
- Assist with discharge planning needs
- Diagnosis has Potential for High Dollar Claims

**COMMENTS:**

44 year old man s/p anterior L2-L5 posterior L2 pelvis spinal fusion and post-op course was complicated by a dural tear, DVT, paralytic ileus and urinary retention. Patient ambulating only 10 feet with rolling walker with moderate assist. INR is at non-therapeutic level and Lovenox/Coumadin is continued. Goal is for INR to be at 2.2. Call received for bill negotiations.

**NEXT REPORT DUE:** On or about June 02, 2007

Respectfully Submitted,
Cindy Flood, RN, BSN, CCM
Guided2Health

* Case 2:12-cv-00324-KM-MAH   Document 25   Filed 04/27/11   Page 105 of 266 PageID: 2726



powered by 

CBSA                                        CONFIDENTIAL
400 Hwy169 South                            6/29/2007
Ste 800
Minneapolis, MN 55426-1141

PATIENT:            DAVID PUSHKIM
CARDHOLDER:         BETH NUSSBAUM
MEMBER ID:          053465595
GROUP:              RHI Entertainment, LLC
REFERRAL SOURCE:    Utilization Review
REFERRAL REASON:    Rate Negotiation
CASE OPENED:        April 03, 2007

REPORTING PERIOD:   May 05, 2007 to June 29, 2007

**HISTORY:**
Dr. David Pushkin is a 44 year old man admitted to the hospital on 3/21/07. He
underwent an anterior L2-L5 and posterior L2 pelvis spinal fusion. His post-operative
course was complicated by a dural tear, deep vein thrombosis, paralytic ileus and urinary
retention.

Dr. Pushkin was transferred to a skilled nursing facility on 4/4/07 for continued medical
management with wound care, pain management and therapies. Pain management
continued to be an issue and on 4/18/07 Dr. Pushkin was transferred back to the acute
hospital with a wound infection. He required additional surgery for an incision and
drainage once his clotting times were stabilized. Dr. Pushkin was transferred back to the
skilled nursing facility 4/30/07 on intravenous antibiotics, wound care and therapies. His
cultures grew MRSA and he will need long term antibiotics. Dr. Pushkin was transitioned
home with skilled nursing and intravenous Vancomycin twice per day on 5/4/07.

**CURRENT MEDICAL STATUS/TREATMENT PLAN:**

Dr. Pushkin completed 6 weeks of intravenous antibiotics at home without complications.
He is on oral antibiotics for an additional 3 months. He is progressing in his recovery and
reports his pain is decreasing. He is weaning his narcotics and doing a home exercise
program. Dr. Pushkin continues to ambulate with a cane. He is currently having issues
with foot pain and is being evaluated for shifting foot bones.

**CASE MANAGEMENT INTERVENTIONS:**

- Established and maintained contact with the patient/family to monitor the clinical status, collaborate on plan of care and to provide education and support.
- Established and maintained contact with provider(s) to monitor the patient's progress, collaborate on plan of care, identify needs and authorize needed services.
- Established and maintained contact with facility discharge planner/case manager to collaborate on plan on care and identify needs.
- Established contact with physician to monitor the patient's progress, collaborate on plan of care, and identify needs.

**COST SAVINGS:**

Case Manager facilitated transition to lower level of care; patient discharged home on intravenous antibiotics x 6 weeks in lieu of continued Skilled Nursing Facility. Saving an estimated $550.00/day x 30 days = $16,500.
HHC charges per DG = $3,127.80
Total estimated savings = $13,372.20 ($16,500 - $3127.80 = $13,372.20)

**MANAGED SAVINGS:**

| MANAGED SAVINGS REASON | SAVINGS |
|---|---|
| Transition to Alternate Level of Care | $13,372.20 |
| Total Savings This Report Period | $13,372.20 |
| Total Savings Previous Reporting Period | $0.00 |
| Total Savings | $13,372.20 |

**NEGOTIATED SAVINGS:**

| NEGOTIATED SAVINGS REASON | SAVINGS |
|---|---|
| Total Savings This Report Period | $0.00 |
| Total Savings Previous Reporting Period | $10,602.00 |
| Total Savings | $10,602.00 |

**CM RECOMMENDATIONS / ACTION ITEMS:**

- Recommends ongoing case management services as this patient remains at risk for ongoing complications and may have upcoming healthcare needs with the potential for high dollar claims.

Please feel free to contact me if you have any questions regarding this case. I can be reached at (888) 259-7028 Ext: 1713.

Respectfully Submitted,
Cindy Flood, RN, BSN, CCM
Guided2Health

 

American Health Holding, Inc.
Marsha Mihalak
4312 Lightfoot Street
Spring Hill, FL 34609

CONFIDENTIAL
5/4/2007

PATIENT:              DAVID PUSHKIN
CARDHOLDER:           BETH NUSSBAUM
MEMBER ID:            053465595
GROUP:                RHI Entertainment, LLC
REFERRAL SOURCE:      Utilization Review
REFERRAL REASON:      Rate Negotiation
CASE OPENED:          April 03, 2007

REPORTING PERIOD:     May 04, 2007 to May 04, 2007

**HISTORY:**
Dr. David Pushkin is a 44 year old man admitted to the hospital on 3/21/07. He
underwent an anterior L2-L5 and posterior L2 pelvis spinal fusion. His post-operative
course was complicated by a dural tear, deep vein thrombosis, paralytic ileus and urinary
retention.
Dr. Pushkin was transferred to a skilled nursing facility on 4/4/07 for continued medical
management with wound care, pain management and therapies. Pain management
continued to be an issue and on 4/18/07 Dr. Pushkin was transferred back to the acute
hospital with a wound infection. He required additional surgery for an incision and
drainage once his clotting times were stabilized. Dr. Pushkin was transferred back to the
skilled nursing facility on 4/30/07.

**CURRENT MEDICAL STATUS/TREATMENT PLAN:**
Dr. Pushkin was transferred back to the skilled nursing facility on 4/30/07 on intravenous
antibiotics, wound care and therapies. His cultures grew MRSA and he will be on long
term intravenous antibiotics. Dr. Pushkin is ambulating with a cane, continues having
pain issues and is depressed. The plan is to transition Dr. Pushkin home with skilled
nursing and intravenous Vancomycin twice per day on 5/4/07.

**CASE MANAGEMENT INTERVENTIONS:**

- Communicated with the discharge planner to offer assistance in the coordination of
  discharge plans and network steerage.
- Communicated with the patient/family to determine needs, provide education, and
  act as a resource for medical and insurance questions.

- Contacted the provider to negotiate rates with success.
- Established and maintained contact with facility discharge planner/case manager to collaborate on plan on care and identify needs. .
- Verified eligibility and obtained benefit information.
- Verified that the following are network providers for PHCS: Dr. Andrew Casden, Orthopedic Surgeon, Beth Israel Medical Center.
- Verified that the following are not network providers for PHCS: CareOne at Teaneck SNF

## COST SAVINGS:

Case Manager negotiated discount for out of network Skilled Nursing facility all inclusive. Agreed to rate of $550.00 /day, Benchmark rate of $1,139.00 saving an estimated $589.00 /day .

## NEGOTIATED SAVINGS:

| NEGOTIATED SAVINGS REASON | SAVINGS |
|---|---|
| SNF | $2,356.00 |
| Total Savings This Report Period | $2,356.00 |
| Total Savings Previous Reporting Period | $8,246.00 |
| Total Savings | $10,602.00 |

## CM RECOMMENDATIONS / ACTION ITEMS:

- Recommends continued case management to: assist with coordination of discharge needs and medical necessity of services. Patient will be discharged home on long term intravenous antibiotic and home health care.

Please feel free to contact me if you have any questions regarding this case. I can be reached at (800) 259-7028 Ext: 1713.

Respectfully Submitted,
Cindy Flood, RN, BSN, CCM
Guided2Health



# MERITAIN<sup>SM</sup>
## HEALTH

CBSA                                              CONFIDENTIAL
400 Hwy169 South                                  10/3/2007
Ste 800
Minneapolis, MN 55426-1141

PATIENT:              DAVID PUSHKIM
CARDHOLDER:           BETH NUSSBAUM
MEMBER ID:            053465595
GROUP:                RHI Entertainment, LLC
REFERRAL SOURCE:      Utilization Review
REFERRAL REASON:      Rate Negotiation
CASE OPENED:          April 03, 2007

REPORTING PERIOD:     June 30, 2007 to October 03, 2007

**HISTORY:**
Dr. David Pushkin is a 44 year old man admitted to the hospital on 3/21/07. He
underwent an anterior L2-L5 and posterior L2 pelvis spinal fusion. His post-operative
course was complicated by a dural tear, deep vein thrombosis, paralytic ileus and urinary
retention.

Dr. Pushkin was transferred to a skilled nursing facility on 4/4/07 for continued medical
management with wound care, pain management and therapies. Pain management
continued to be an issue and on 4/18/07 Dr. Pushkin was transferred back to the acute
hospital with a wound infection. He required additional surgery for an incision and
drainage once his clotting times were stabilized. Dr. Pushkin was transferred back to the
skilled nursing facility 4/30/07 on intravenous antibiotics, wound care and therapies. His
cultures grew MRSA and he will need long term antibiotics. Dr. Pushkin was transitioned
home with skilled nursing and intravenous Vancomycin twice per day on 5/4/07.

Dr. Pushkin completed 6 weeks of intravenous antibiotics at home without complications.
He is on oral antibiotics for an additional 3 months. He is progressing in his recovery and
reports his pain is decreasing. He is weaning his narcotics and doing a home exercise
program. Dr. Pushkin continues to ambulate with a cane. He is currently having issues
with foot pain and is being evaluated for shifting foot bones.

**CURRENT MEDICAL STATUS/TREATMENT PLAN:**

Dr. Pushkin continues to experience low back pain, pain in his right knee, edema and
depression related to his illness. He is compliant with a home exercise program,

completed his oral antibiotics and continues to ambulate with a cane. Dr. Pushkin was evaluated for his right foot pain and told that he is not a surgical candidate at this time unless he is unable to walk. His physician reports his recovering is satisfactory after his spinal fusion and will follow up in 4 months.

## CASE MANAGEMENT INTERVENTIONS:

- Established and maintained contact with the patient/family to monitor the clinical status, collaborate on plan of care and to provide education and support.
- Established contact with physician to monitor the patient's progress, collaborate on plan of care, and identify needs.

## COST SAVINGS:

No Cost Savings this Report Period.

## MANAGED SAVINGS:

| MANAGED SAVINGS REASON | SAVINGS |
|---|---|
| Total Savings This Report Period | $0.00 |
| Total Savings Previous Reporting Period | $13,372.20 |
| Total Savings | $13,372.20 |

## NEGOTIATED SAVINGS:

| NEGOTIATED SAVINGS REASON | SAVINGS |
|---|---|
| Total Savings This Report Period | $0.00 |
| Total Savings Previous Reporting Period | $10,602.00 |
| Total Savings | $10,602.00 |

## CM RECOMMENDATIONS / ACTION ITEMS:

- Recommends ongoing case management services as this patient remains at risk for ongoing complications and may have upcoming healthcare needs with the potential for high dollar claims.

Please feel free to contact me if you have any questions regarding this case. I can be reached at (888) 259-7028 Ext: 1713.

Respectfully Submitted,
Cindy Flood, RN, BSN, CCM
Meritain Health



# MERITAIN ™SM
## HEALTH

CBSA                                                    CONFIDENTIAL
400 Hwy169 South                                        11/2/2007
Ste 800
Minneapolis, MN 55426-1141

| | |
|---|---|
| PATIENT: | DAVID PUSHKIM |
| CARDHOLDER: | BETH NUSSBAUM |
| MEMBER ID: | 053465595 |
| GROUP: | RHI Entertainment, LLC |
| REFERRAL SOURCE: | Utilization Review |
| REFERRAL REASON: | Rate Negotiation |
| CASE OPENED: | April 03, 2007 |
| CASE CLOSED: | November 02, 2007 |

REPORTING PERIOD:        October 04, 2007 to November 02, 2007

**HISTORY:**
Dr. David Pushkin is a 44 year old man admitted to the hospital on 3/21/07. He underwent an anterior L2-L5 and posterior L2 pelvis spinal fusion. His post-operative course was complicated by a dural tear, deep vein thrombosis, paralytic ileus and urinary retention.

Dr. Pushkin was transferred to a skilled nursing facility on 4/4/07 for continued medical management with wound care, pain management and therapies. Pain management continued to be an issue and on 4/18/07 Dr. Pushkin was transferred back to the acute hospital with a wound infection. He required additional surgery for an incision and drainage once his clotting times were stabilized. Dr. Pushkin was transferred back to the skilled nursing facility 4/30/07 on intravenous antibiotics, wound care and therapies. His cultures grew MRSA and he will need long term antibiotics. Dr. Pushkin was transitioned home with skilled nursing and intravenous Vancomycin twice per day on 5/4/07.

Dr. Pushkin completed 6 weeks of intravenous antibiotics at home without complications. He was on oral antibiotics for an additional 3 months. Dr. Pushkin is currently having issues with foot pain and is being evaluated for shifting foot bones.

Dr. Pushkin continues to experience low back pain, pain in his right knee, edema and depression related to his illness. He is compliant with a home exercise program, completed his oral antibiotics and continues to ambulate with a cane. Dr. Pushkin was evaluated for his right foot pain and told that he is not a surgical candidate at this time unless he is unable to walk. His physician reports his recovering is satisfactory after his



**MERITAIN** ™
**HEALTH**

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

#BWNCQWH
#EC////AUTCDUUWU8#
Beth   Nussbaum and David   Pushkin
200 Winston Drive Apt 812
Cliffside Park, NJ  07010

Date of this Certificate: November 18, 2009
Participant Name: Beth   Nussbaum
ID# of Participant: 9872273915
Name of Group Health Plan:
    Rhi Entertainment, LLC

Under the federal Health Insurance Portability and Accountability Act (HIPAA) of 1996, health insurance companies and/or employers must provide "certification of coverage" to participants verifying past coverage.

This certificate provides evidence of your prior health coverage. You may need to furnish this certificate if you become eligible under a group health plan that excludes coverage for certain medical conditions that you have before you enroll. This certificate may need to be provided if medical advice, diagnosis, care or treatment was recommended or received for the condition within the 6-month period prior to your enrollment in the new plan. If you become covered under another group health plan, check with the plan administrator to see if you need to provide this certificate. You may also need this certificate to buy, for yourself or your family, an insurance policy that does not exclude coverage for medical conditions that are present before you enroll.

### Certification of Coverage

| Name | Date Waiting Period Began | First Date Covered | Last Date Covered |
|------|---------------------------|--------------------|--------------------|
| Beth   Nussbaum  -  Subscriber | N/A | 12-28-03 | 09-21-09 |
| David   Pushkin  -  Spouse | N/A | 12-28-03 | 09-21-09 |

Name and address of plan administrator or issuer responsible for providing this certificate:
    Rhi Entertainment, LLC
    1325 Av Of Americas 21st Floor
    New York, NY  10019
    212-261-9181

**This Certificate of Coverage is for your records. Please keep this with your other important records. We strongly recommend that you do not discard this information.**

Questions about the coverage listed above should be directed to the service center at 866-839-4301

**MERITAIN™**
**HEALTH**

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

# COBRA Election Form

NOVEMBER 18 2008
BETH NUSSBAUM AND COVERED SPOUSE/DEPENDENT(S)

200 WINSTON DRIVE APT 812
CLIFFSIDE PARK NJ 07010

File No:      02850.005
SSN:          9872273915
Employer:     RHI ENTERTAINMENT, LLC

Coverage under the group plan terminated on 11-22-08  Due to  Termination of Employment

Are you or any of the dependents for whom coverage is requested currently covered under another group health plan or Medicare?

_____ Yes    X   No

If you answered yes, please indicate who the coverage is with: _____

Effective date of other coverage or Medicare: _____

I have read the Notice to Plan Participants and want to continue the following coverages (You must check all coverages being elected and list all Qualified Beneficiaries electing COBRA coverage):

DENTAL COVERAGE IS INCLUDED WITH MEDICAL COVERAGE.

| Medical Coverage | Monthly Premium | Dental Coverage | Monthly Premium | Vision Coverage | Monthly Premium |
|---|---|---|---|---|---|
| Employee only | 1032.00 | ☑ Employee only | 0.00 | ☑ Employee only | 0.00 |
| Employee & Spouse | 1857.00 | ☑ Employee & Spouse | 0.00 | ☑ Employee & Spouse | 0.00 |
| Employee & One Child | 0.00 | ☑ Employee & One Child | 0.00 | ☑ Employee & One Child | 0.00 |
| Employee & Children | 0.00 | ☑ Employee & Children | 0.00 | ☑ Employee & Children | 0.00 |
| Employee, Spouse & Children | 0.00 | ☑ Employee, Spouse & Children | 0.00 | ☑ Employee, Spouse & Children | 0.00 |
| Spouse & One Child | 0.00 | ☑ Spouse & One Child | 0.00 | ☑ Spouse & One Child | 0.00 |
| Spouse & Children | 0.00 | ☑ Spouse & Children | 0.00 | ☑ Spouse & Children | 0.00 |
| Spouse only | 1032.00 | ☑ Spouse only | 0.00 | ☑ Spouse only | 0.00 |
| One Child | 0.00 | ☑ One Child | 0.00 | ☑ One Child | 0.00 |
| Two Children | 0.00 | ☑ Two Children | 0.00 | ☑ Two Children | 0.00 |
| Three or More Children | 0.00 | ☑ Three or More Children | 0.00 | ☑ Three or More Children | 0.00 |

Qualified Beneficiaries Electing COBRA Coverage     Soc. Sec. #
1. BETH NUSSBAUM    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
2. DAVID AISHKIN    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

Qualified Beneficiaries Electing COBRA Coverage     Soc. Sec. #
4. _____
5. _____
6. _____

I understand this form must be returned to Meritain within 60 days of the date of this notice, or 60 days after the COBRA event (whichever is later) in order to continue coverage and that my benefits and/or coverage may change subject to any change in my former employer's plan. I understand my first payment is due to Meritain 45 days from the date I mail or fax this form and that I will not be billed for this amount. My first payment must include the total of all premiums due, from the date my coverage terminated as an active employee  11-22-08  through the date I make actual payment. In order to continue my coverage after that, I understand I must continue to pay the Monthly Premium due to Meritain on or before the first day of the coverage period in which it is due and that I WILL NOT be billed for premiums due. I also understand that continuation coverage under this plan will terminate if the employer terminates this plan for its active employees.

_____    _____
Date                         Signature of Qualified Beneficiary ELECTING Coverage

If I DO NOT wish to continue your coverage, please sign below and return to our office.
I HAVE BEEN GIVEN THE OPPORTUNITY TO CONTINUE MY GROUP HEALTH COVERAGE AND HAVE CHOSEN NOT TO DO SO.

_____    _____
Date                         Signature to DECLINE Coverage

 **MERITAIN™**
HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax 952.541.9943

#E/////AUTCDUOWU5#
BETH NUSSBAUM

200 WINSTON DRIVE APT 812
CLIFFSIDE PARK NJ  07010

Date: JULY 15 2009
Re: Claim No: XZV0859 270695
ID: 9872273915  Group: 02850.014
Claimant: DAVID    PUSHKIN
Dates of Service: 07-01-09 to 07-01-09

Dear BETH NUSSBAUM:

The Contract Administrator for the RHI ENTERTAINMENT, LLC Employee Medical Plan
has received a claim for David    Pushkin
for a back or neck injury or disorder.

The purpose of this letter is to assist us in evaluating your claim and to
ensure that no other party is responsible for payment. In accordance with the
terms of your plan document, your cooperation is required in providing the
requested information. Please provide the date of occurrence and check the box
nearest the most accurate description of the reason for the treatment noted
above. Provide a brief description in the space provided on page 2.

Date of onset, occurrence, or injury: _____ 6/3/08 _____

( ✓ )  Motor Vehicle Accident(any accident involving an automobile or
       motorcycle on a public road)

( )   Off Road Vehicle accident not involving automobile (i.e. ATV, dirt bike,
      snowmobile)

( ✓ )  Work injury or illness(worker's compensation)

( )   Wear and tear, developed over time

( )   Other party responsible (i.e. property liability, medical malpractice,
      product liability, animal bite, assault)

( ✓ )  Injury in your own home, home of neighbor, friend, or relative

( )   Recreational or sports injury (i.e. bicycle, soccer, play equipment)

( ✓ )  Illness or ongoing condition such as congenital condition, chronic pain,
      arthritis

( )   Spontaneous onset (no accident or injury, cause not known)

( ✓ )  Other (please describe on page 2)



**MERITAIN™**
HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

BETH NUSSBAUM
9872273915
Page 2

Describe in detail the circumstances that caused the injury/illness: *The circumstances are still being debated by physicians as to whether this injury occurred during recovery period of 2007 surgery, or whether injury specifically was caused by Jan. 2008 car accident or physical demands related to return to professional work in Jan. 2008.*

Is there any other insurance or coverage that may be responsible for all or part
of this claim?  YES ✓  NO _____.

Is there anything about this condition or occurrence that would cause you to take
legal action?  YES ✓  NO_____

If your claim was caused by a motor vehicle accident, work injury/illness, or if
another party was responsible, you will receive a more detailed questionnaire
requesting additional information. Thank you in advance for your prompt response.

Sign and date below    *Dr. David B. Pushkin* (signature)
                       *(201) 206-5160   dpushkin@nj.rr.com*

I certify to the best of my knowledge that the information provided is
correct. I acknowledge that my medical plan has a subrogation and
reimbursement provision which provides that medical benefits paid under the
plan are to be reimbursed from any payment, award, or settlement which may be
paid by a third party because of the injury described above. These provisions
are contained in the Summary of Benefits booklet. I certify that I will not
sign a settlement agreement with any party without the knowledge and consent
of the Plan.

Employee signature_____Date_____

Home Telephone_____Work Telephone_____
Email Address:

Please return this completed form within 30 days to the address above, or you
may fax it to our office at 952-541-9943. Failure to return this form could
result in delay of payment of claims. If you have questions please refer to
your Plan booklet, you may contact our Service Center at 866-839-4301
for assistance.

M:907


**MERITAIN**™
HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 · Fax: 952.541.9943

#E/////AUTCDUUWU5#
BETH NUSSBAUM

200 WINSTON DRIVE APT 812
CLIFFSIDE PARK NJ  07010

Date: AUGUST 05 2009
Re: Claim No: Y855454
ID: 9872273915  Group: 02850.014
Claimant: DAVID    PUSHKIN
Dates of Service:            to

Dear BETH NUSSBAUM:

We understand that you or your dependent have recently been involved in an
automobile, motorcycle or off-road vehicle accident. Before claims related to this
accident can be processed the Plan requires that you submit the following documents:
this completed & signed questionnaire, the Police Report, an exhaust letter & payment
record from your own auto carrier, or documentation of no Medical Payments coverage.
Thank you in advance for your prompt response.

Date of Accident: *1/28/08 (Jan. 28, 2008)*
Type: single vehicle ___*NO*___ multiple vehicles (how many?) __*2*__
Location (address) where accident occured:
*Paramus Road North entrance ramp from NJ Route 4 West*

Driver(s) Name and
address(es) (1) *David B. Pushkin - 200 Winston Dr. #812, Cliffside Park, NJ 07010*
(2) *Robert J. Amitrano - 132 New Bridge Rd, New Milford, NJ 07646*
Was a citation issued? Yes ___ No ✓____ If yes, to whom, _____
please describe the citation in detail:
                    *N/A (But Dr. Amitrano admitted*
                         *full liability in accident)*

Your Vehicle Insurance: *GEICO*
Owner Name, address:
    *David B. Pushkin -*
*300 State Highway Route 3 East, Suite 114, East Rutherford, NJ 07073*
Insurance Company Name and Address:
*GEICO - One GEICO Plaza, Washington DC 20076-0001*
                              *OR - 750 Woodbury Rd, Woodbury, NY 11797-2589*
Policy Number: *2010-74-08-07* Claim Number *0236794160701076*
✱Adjuster name and telephone
number *Lisa Ardron, 1-800-301-1390, ext. 4604*
Do you have medical payments coverage (PIP) on your own vehicle insurance policy?
Yes ✓ No____
If yes, in what amount? *$50,000*___ Is this coverage exhausted? Yes___ No ✓
If PIP is exhausted please provide the payment record.

*✱ Premier Prizm Solutions of Marlton, NJ handles medical claims*
*for this accident claim. Dominic Spaventa was original adjuster (see*
*attached letter), but no longer works for GEICO/Premier Prizm. According*
*to Mr. Ardron, my case was closed in Sept. 2008, but can be reopened*
*by request by me and my attorney. Will be meeting with attorney*
*to discuss this matter on 8/26/09.  DP*



**MERITAIN** HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

BETH NUSSBAUM
9872273915
Page 2

The Insurer(s) of the other(s) involved: *AAA Mid-Atlantic Insurance Group*
Owner or Driver Name and address: *Robert J. Amitrano - 132 New Bridge Rd, New Milford, NJ 07646*

Other Driver's Insurance Company Name and address: *AAA Mid-Atlantic Insurance Group - New Jersey Regional Claims Office*
*P.O. Box 5483 - Mt Laurel, NJ 08054*
Policy Number *0193410449*            Claim Number *0193410449 - 850064*
Adjuster name and telephone number including area code:
*Lisa Sklar, (732) ~~6~~* ~~635-4114~~

If you have hired an attorney to represent you in this matter, provide your
attorney's name, complete address, and telephone number:
*Seth Malkin, Esq. - Levin & Malkin, Attorneys at Law*
                    *75 Essex Street*
                    *Hackensack, NJ 07601*

Sign and date below

I certify to the best of my knowledge that the information provided is correct. *BN* *mlby* *8/8/09* *dpushkin@nj.rr.com* *(201-206-5160)*
I acknowledge that my medical plan has a subrogation and reimbursement
provision which provides that medical benefits paid under the plan are to be
reimbursed from any payment, award, or settlement which may be paid by a third
party because of the injury described above. These provisions are contained in
the Summary of Benefits booklet. I certify that I will not sign a settlement
agreement with any party without the knowledge and consent of the Plan.

Signature of Plan member_____
Home Telephone_____Date_____
Email Address:_____Work Telephone_____
_____

Please return the completed form to the address listed above, or you may fax
it to our office at 952-541-9943. If you have questions please refer to
your Plan booklet, or you may contact our Service Center at 866-839-4301
for assistance.

M:911

 **MERITAIN**™
**HEALTH**

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

#BWNCQWH
#UPOH5YHZ/43Y2H63#
BETH NUSSBAUM
200 WINSTON DRIVE, APT 812
CLIFFSIDE PART NJ 07010

Date: 12-17-09
Claim No: YHZ5485

RE: Y855454

Dear Beth Nussbaum:

Meritain Health has received information pertaining to the 1-28-08 motor
vehicle accident in which David Pushkin was injured.

In order for us to proceed with claim processing in accordance with Plan
provisions the following items are required:

EXHAUST LETTER AND PAYMENT RECORD FROM YOUR VEHICLE INSURANCE CARRIER

Please provide the requested items at your earliest convenience and direct
your response to the Subrogation Department at the address above.

Thank you for your anticipated cooperation.

Sincerely,

Claims Department

M:115



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ANDREW M. CUOMO
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
HEALTH CARE BUREAU

February 23, 2010

Dr. David Pushkin
300 State Highway Rte 3 East
Suite 114
East Rutherford, NJ 07073

Re:    Meritain Health

Dear Dr. Pushkin:

The Attorney General's Health Care Bureau has received the enclosed acknowledgment from Timothy J. Quinlivan, SVP and Chief Counsel at Meritain Health regarding our inquiry. We will notify you of any additional response in this matter.

In addition, Mr. Quinlivan indicates health benefit plan you have is a self-funded ERISA plan. Please know self-funded plans are governed by a federal statute called the Employee Retirement Income Security Act (ERISA) and fall under the primary jurisdiction of the US Department of Labor's Employee Benefits Security Administration (EBSA). As such, these plans are not regulated by state Insurance Laws and are not required to respond to an inquiry from our office. Although it appears the plan will issue a response, in the event we receive an unfavorable response, we would not be able to pursue the matter. In that event, we suggest that you follow the steps outlined in this letter to exercise your rights under ERISA and also file a complaint with the US Department of Labor.

In order to protect your rights, ERISA provides procedures for obtaining information about your benefits. As part of these procedures, all requests for information should be in writing and should be addressed to the plan administrator. If you believe that you are entitled to benefits which have not been paid to you or to your health care providers, you need to file what is referred to as an "ERISA claim". The EBSA cannot intervene on your behalf unless these procedures have been followed.

The procedures for filing an ERISA claim are as follows:

1.      Write a letter to the plan administrator explaining as clearly as possible why your health claims should be paid. Your letter should also include your name, the plan name, and any identification number. If you do not have a copy of what type of claims the plan will pay, you may want to request a copy of the Summary Plan Description (SPD). You can get this by writing to your plan administrator.

2.    Once you write the plan administrator, they have 90 days to respond.  The plan administrator can respond by either paying the claim, requesting more information from you, denying the claim, or ignoring your correspondence.  If they ignore your correspondence, that is treated as a denial.  If they deny your claim, you can file an appeal.  The plan has 60 days after you file an appeal to respond.

3.    If your appeal is denied, you can bring a lawsuit against the plan under ERISA.

If you have further questions concerning your rights under ERISA, please contact the US DOL - EBSA toll-free by phone at 1-866-444-3272, or by mail at US DOL - EBSA, New York Regional Office, 33 Whitehall Street, Suite 1200, New York, NY 10004.

We will notify you of any further update.  Thank you for bringing this matter to the attention of the Attorney General's Health Care Bureau.

Very truly yours,

Marie Briscoe
Legal Assistant

 **MERITAIN** HEALTH

300 Corporate Parkway
Amherst, NY 14226
Direct Dial· 716.319.5058
timothy.quinlivan@meritain.com

February 23, 2010

*CONFIDENTIAL*

Via Fax (518) 402-2163
Ms. Marie Briscoe
Legal Assistant
State of New York, Office of the Attorney General
Division of Social Justice, Health Care Bureau
The Capitol
Albany, NY 12224-0341

  Re: David Pushkin

Dear Ms. Briscoe:

This letter responds to your letter dated February 2, 2010 regarding the above matter.

As you may be aware, Meritain Health is not an insurer, but a third party claims processor for self-funded ERISA health plans.

Please be advised that we are investigating the complaint and are attempting to resolve it. I expect to have a formal response to you with supporting documentation in the near future. Please contact me if you have any questions.

Very truly yours,

Timothy J. Quinlivan
SVP, Chief Counsel Contracting & Compliance



# STATE OF MINNESOTA

### OFFICE OF THE ATTORNEY GENERAL

March 4, 2010

SUITE 1400
445 MINNESOTA STREET
ST. PAUL, MN 55101-2131
TELEPHONE: (651) 296-7575

**LORI SWANSON**
ATTORNEY GENERAL

Dr. Dave Pushkin
300 State Highway Route 3
East Suite 114
East Rutherford, NJ  07073

**Re:**   **Meritain Health**
**File No: PCO/2009/426521/C**

Dear Dr. Pushkin:

Thank you for your letter.

I am sorry for the delay in responding to your complaint. From our research, it appears that you are covered by a self-insured plan. Further, Meritain Health is the third party administrator for RHI Entertainment, LLC. A self-insured plan is a system for which an employer agrees to use its own assets to pay the health claims of its employees. The employer pays all the benefits and the insurance policy is not regulated by a state agency. The United States Department of Labor Employee Retirement Income Security Act (ERISA) regulates such plans.

Individual states have generally been unsuccessful in regulating self-insured plans and in some cases have been enjoined by the courts from attempting to do so. For more information concerning requirements for self-insured plans, you can contact the United States Department of Labor's Employee Benefits Security Administration (EBSA) at its web site, www.dol.gov/ebsa, or call its toll-free hotline at 1-866-444-EBSA (3272). You may wish to file a complaint with the U.S. Department of Labor as follows:

U.S. Department of Labor
Pension and Welfare Benefits Administration
Kansas City Regional Office
1100 Main Street, Suite 1250
Kansas City, MO 64105-5148
(816) 426-5131

Additionally, the Minnesota Attorney General's Office publishes several educational brochures and handbooks to provide information regarding common consumer issues and concerns. *Managing Your Healthcare* provides an overview of Self- Insured Group Coverage. I have enclosed a copy of the publication for your review.

Page 2

Unfortunately, this Office is not able to provide further assistance to you at this time. The jurisdiction of the Minnesota Attorney General's Office as it relates to consumer fraud somewhat limited. It is not a regulatory agency and, accordingly, it does not have authority to simply order a company to make a refund, replace a product or service a warranty. Further while we have authority to represent state agencies, we do not have authority to represent individual citizens in a lawsuit.

I regret that this Office could not be of more assistance in resolving your complaint with Meritain Health. However, your complaint will remain with our records and assist us in gathering background information regarding a particular problem area that may require legal action, legislative advocacy or increased consumer education efforts.

I thank you again for your correspondence.

Sincerely,

PAMELA ONYEKABA
Consumer Services Division
(651) 355-0714 (Voice)
(651) 282-2155 (Fax)

Enclosure



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ANDREW M. CUOMO
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
HEALTH CARE BUREAU

March 11, 2010

Dr. David Pushkin
300 State Highway Rte 3 East
Suite 114
East Rutherford, NJ 07073

Re:  Meritain Health

Dear Dr. Pushkin:

The Attorney General's Health Care Bureau has received the enclosed response from Timothy J. Quinlivan, Senior Vice President and Chief Counsel Contracting and Compliance for Meritain Health. Mr. Quinlivan informs our office all claims for services rendered from July 1, 2009 through September 21, 2009 have been adjudicated. He has included a spreadsheet detailing the claims at issue.

Mr. Quinlivan again notes that Meritain Health is a third party claims administrator for a self-funded ERISA plan. If you are still not satisfied and wish to pursue the matter further, please refer to my letter of February 23, 2010 with information concerning your rights under ERISA and the role of the US Department of Labor. Due to our lack of jurisdiction, we are unable to assist you further in this matter.

If you have complaints or concerns regarding your no-fault coverage under GEICO, please contact the New York Department of Insurance at 1-800-342-3736. If you have questions concerning your current coverage through Horizon Blue Cross Blue Shield of New Jersey, you may wish to contact the New Jersey Department of Banking and Insurance at 609-292-5360 or visit their website at www.njdobi.org. We hope this information is helpful to you.

Thank you for bringing this matter to the attention of the Attorney General's Health Care Bureau.

Very truly yours,

Marie Briscoe
Legal Assistant

The Capitol, Albany, N.Y. 12224-0341 ● Phone (518) 474-8376 ● Fax (518) 402-2163 ● http://www.oag.state.ny.us
Hotline: (800) 428-9071 ● (518) 486-6622

 **MERITAIN**
HEALTH

300 Corporate Parkway
Amherst, NY 14226
Direct Dial: 716.319.5058
timothy.quinlivan@meritain.com

March 8, 2010

*CONFIDENTIAL*

Ms. Marie Briscoe
Legal Assistant
State of New York, Office of the Attorney General
Division of Social Justice, Health Care Bureau
The Capitol
Albany, NY 12224-0341

        Re:    David Pushkin

Dear Ms. Briscoe:

This letter responds to your letter dated February 2, 2010 regarding the above matter.

Please note that Meritain Health is not an insurer, but a third party claims processor for self-funded
ERISA health plans. We note that you have provided us with a copy of a HIPAA authorization
signed by David Pushkin and authorizing Meritain to release to you protected health information for
services from July 2009 to present.

Attached are explanations of benefits (EOBs) showing adjudication and payment of claims incurred
by Mr. Pushkin from July 1, 2009 through September 21, 2009. Please not the Mr. Pushkin's health
coverage was terminated effective September 22, 2009. I also enclose an excel spreadsheet
summarizing the payment of claims. They yellow highlighted claims were denied because they were
incurred after coverage terminated. You will note that, except with respect to member copayments,
and duplicate claims that were submitted more than once, all claims from July 1, 2009 through the
date Mr. Pushkin's coverage ended on September 22, 2009, were paid. Some prescription claims for
dates of service after September 22, 2009 were paid even though Mr. Pushkin did not have
coverage. Those claims are highlighted in green on the attached excel spreadsheet.

Please contact me if you have any questions.

Very truly yours,

Timothy Quinlivan

Timothy J. Quinlivan
SVP, Chief Counsel Contracting & Compliance

**U.S. Department of Labor**

Employee Benefits Security Administration
33 Whitehall St. Suite 1200
New York, NY 10004
Phone:   (212) 607-8600
Telefax:  (212) 607-8681



October 5, 2010

Dr. David Pushkin
300 Highway Route 3, Suite 1143
East Rutherford, NJ 07073

> Re:   Control No.: 201030-14695
>        Meritain Health documents detailing adjudication and payment of claims incurred
>        from July 1, 2009 through September 21, 2009

Dear Dr. Pushkin:

The U.S. Department of Labor's Employee Benefits Security Administration (EBSA) has responsibility for the administration and enforcement of Title I of Employee Retirement Income Security Act of 1974 (ERISA). It is our practice to assist participants in understanding their rights and obligations under ERISA by providing information, assisting them with their claim, and intervening on their behalves if they have been incorrectly denied a benefit.

Per your discussion with Benefits Advisor Robin Paradowski, enclosed please find copies of documents from Meritain Health showing adjudication and payment of your claims incurred from July 1, 2009 through September 21, 2009.

Note that the enclosed spreadsheet summarizes payment of claims. The yellow highlighted claims are denied because they are after September 21, 2009, your effective termination date. The green highlighted claims were paid, notwithstanding the effective termination date. Accordingly, the spreadsheet provided by Meritain Health states that all claims from July 1, 2009 through September 22, 2009 were paid – save any member copayments and duplicate claims.

I hope this information will be helpful. If you need additional assistance, please feel free to contact Benefits Advisor Robin Paradowski at 212-607-8608.

Sincerely,
Jonathan Kay
Regional Director

By:   Valerie Tourso
       Supervisory Benefits Advisor

JK/VT/rzp
Enclosures



**MERITAIN**™
HEALTH

300 Corporate Parkway
Amherst, NY 14226

timothy.quinlivan@prodigyhealthgroup.com
direct: 716.319.5058

November 15, 2010

Via U.S.Mail
Dr. David B. Pushkin
Research Consultant/Affiliate
Carl Wieman Science Education Initiative
300 State Highway Route 3 East, Suite 114
East Rutherford, NJ 07073

Re:     USDOL-EBSA Case #201030-14695

Dear Dr. Pushkin:

In response to your October 18 letter, I enclose copies of the following documentation:

1) RHI Entertainment, LLC Employee Benefit Plan Document exclusion 27 "No obligation to pay";

2) RHI Entertainment, LLC Employee Benefit Plan Document Coordination of Benefits sub-section entitled "No-Fault Limitations";

3) RHI Entertainment, LLC Employee Benefit Plan Document "Right of Subrogation and. Refund";

4) Meritain July 15, 2009 third party liability questionnaire;

5) Meritain August 5, 2009 accident questionnaire; and

6) Meritain letter dated December 17, 2009

As I understand your October 18 letter, you are requesting documentation regarding why your 2009 claims were not immediately paid. Despite your conclusory allegation that Meritain was acting on false information from RHI Entertainment, I find no evidence to substantiate this allegation. The reason your claims were pended for payment was due to the fact that upon receipt of your claims, it was not clear if the claims were the legal responsibility of the Plan, or a third party.  In the completed July 15, 2009 questionnaire, you admitted that the cause of the injuries "are still being debated by physicians…" as to whether they were caused by a prior surgery, the Janurary 2008 car accident or your return to work. As a result of this information provided by you, it was unclear that the Plan was legally responsible to pay the claims. The claims then proceeded in the normal course of business through the subrogation/third party recovery process. When the process was completed, the claims were processed.  I see no evidence that any acts of bad faith were responsible for the delay in claims payment.

Dr. David B. Pushkin
November 15, 2010
Page 2 of 2


Very truly yours,

*Timothy Quinlivan*

Timothy J. Quinlivan
SVP, Chief Counsel Contracting & Compliance




Cc:   Marie Briscoe, New York State Office of the Attorney General, Division of Social Justice
      Robin Paradowski, US Department of Labor, Employee Benefits Security Administration


2

## NOTICE OF ELIGIBLE DETERMINATIONS - STATE PLAN (D10)

| 1. ISSUED BY:<br><br>STATE OF NEW JERSEY<br>DEPARTMENT OF LABOR AND<br>WORKFORCE DEVELOPMENT<br>DIVISION OF TEMPORARY DISABILITY INSURANCE<br>PO BOX 387<br>TRENTON, NEW JERSEY 08625-0387 | 6. CLAIMANT'S S.S. NO.<br>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 | 7. SEQ. NO.<br>001 | 8. DISABILITY DATE<br>11/22/06 |

| 9. CLAIM REC'D. | 10. MAILING DATE | 11. DET. NO. |
| 01/25/07 | 01/31/07 | 001 |

**2. CLAIMANT'S NAME AND ADDRESS:**

DAVID B PUSHKIN
200 WINSTON DR APT 812
CLIFFSIDE PARK NJ 07010-3214

| 12. EXAM. NO.<br>327 | 13. CLAIMANT'S BASE YEAR<br>FROM: 11/20/05    TO: 11/18/06 |

**14. MINIMUM REQUIREMENTS FOR VALID CLAIM**

WAGES = $6200.00    OR 20   BASE WEEKS

BASE WEEK AMOUNT = $   123.00

**3. EIN**   022193746100000000000   4. CHG% 100.00

**5. CHARGEABLE EMPLOYER(S):**
THE FRISCH SCHOOL

**15. CLAIMANT'S COVERED NJ EARNINGS IN BASE YEAR**

A. WAGES = $ 22770.00    B. BASE WEEKS = 11

**16. CLAIMANT ENTITLEMENT;**
(PAYABLE AS ELIGIBLE PERIODS ARE ESTABLISHED)

| A. WEEKLY BENEFIT RATE<br>$488.00 | B. MAXIMUM BENEFIT AMOUNT<br>$  7590.00 |

17.

WE HAVE REVIEWED YOUR CLAIM AND DETERMINED THAT YOU ARE ELIGIBLE FOR TEMPORARY DISABILITY BENEFITS.

YOUR MOST RECENT EMPLOYER WILL RECEIVE A COPY OF THIS DETERMINATION AND A STATEMENT OF BENEFITS PAID TO YOU.  YOU AND YOUR EMPLOYER HAVE THE RIGHT TO APPEAL OR DISAGREE WITH ANY DETERMINATION ISSUED ON YOUR CLAIM.

IF YOU ARE INELIGIBLE FOR ANY PERIOD OR YOUR BENEFITS ARE REDUCED, YOU WILL RECEIVE A SEPARATE NOTICE EXPLAINING WHY.

### GENERAL INFORMATION

DISABILITY BENEFITS WILL NOT BE PAID FOR ANY PERIOD:
  YOU WORKED.
  YOU WERE NOT UNDER MEDICAL CARE OF A LICENSED DOCTOR.
  YOU RECEIVED:
    UNEMPLOYMENT COMPENSATION.
    WORKERS' COMPENSATION.
    REGULAR WEEKLY WAGES.
    SOCIAL SECURITY DISABILITY BENEFITS.
    SICK LEAVE INJURY BENEFITS (NEW JERSEY STATE EMPLOYEES ONLY).

YOUR DISABILITY BENEFITS MAY BE REDUCED IF YOU RECEIVE:

CONTINUED ON REVERSE SIDE ->

*William J Schwarz*
William J. Schwarz
Director

### RIGHT OF APPEAL

IF YOU DISAGREE WITH ANY PART OF THIS DETERMINATION, YOU MAY FILE AN APPEAL BY WRITING TO THE ADDRESS GIVEN ABOVE IN ITEM 1. THIS DETERMINATION WILL BECOME FINAL UNLESS AN APPEAL IS RECEIVED OR POSTMARKED WITHIN SEVEN DAYS AFTER DELIVERY OR TEN DAYS AFTER THE DATE OF MAILING OF THIS NOTICE GIVEN ABOVE IN ITEM 10.

ESTA DETERMINACION AFECTA SU ELIGIBILIDAD PARA BENEFICIOS Y DESCRIBE SU DERECHO DE APELACION.  SI USTED NO HABLA INGLES, BUSQUE, DE INMEDIATO, A UNA PERSONA QUE PUEDA INTERPRETAR ESTA DETERMINACION.

ABS1  R 06/04 D10/D20

07013100173



# Social Security Administration

22 Sussex Street
Hackensack, NJ  07601-5406
Phone:  (201) 678-2827
Office Hours:  9:00 am to 4:00 pm

Claim Number:  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

March 02, 2007

DAVID BARRY PUSHKIN
200 WINSTON DR
APT 812
CLIFFSIDE PARK NJ  07010

**Your In-Office Appointment**

Thank you for contacting us for an in-office appointment. This is confirmation of the date and time of your appointment.  Please have this notice available when you come in for your appointment.  Please be available 5 minutes before the appointment time. If you cannot keep this appointment, please call us at the telephone number below.

Appointment Date: 03/29/07       Appointment Time: 11:00

**What We Need**

We need you to bring the signed forms and/or documents listed below so we may complete your Social Security claim at the time of your appointment. We cannot accept a photocopy of most documents unless the photocopy is certified by the office that issued the original. However, we can accept a photocopy of a Form W-2, tax return or medical report if we request these items. We will return the items to you. Even if you don't have everything that we ask for below, you should keep your appointment. We will help you get the information you do not have.

**Here is what we need you to bring with you to your appointment (other documents or information may be needed once we talk to you):**

- • **Birth Certificate for person applying for benefits**
- ✓ **Marriage Certificate (and divorce records if applicable)**
- • **Medical evidence of your disability  (If you do not have these records in your possession, we will request them from your medical sources for you)**
- • **Please sign, date, have someone witness your signature on the enclosed Medical Release forms, and return them to us.  The signature, date, and witness blocks must be completed where marked on the forms.  If applying for a child age 12 or older, both the child and parent must sign the forms where marked.**

**The Date You File An Application**

It is important that you keep your appointment so that we can help you file an application for these benefits. The sooner you submit the requested documentation and file an application, the sooner we can decide if you are eligible. We can use the date you contacted us as your filing date for Social Security benefits if you file an application within 6 months of the date of this letter.

**If You Have Any Questions**

For general information about Social Security we invite you to visit our website at www.socialsecurity.gov on the Internet. For general questions and specific questions about this case, you may call us toll-free at 1-800-772-1213, or call our office at (201) 678-2827. We can answer most questions over the phone. If you do call or visit an office, please have this letter with you. It will help us answer your questions.

Sincerely,

*Anthony T Pezza*

Anthony T Pezza
District Manager

# Social Security Administration
# **Supplemental Security Income**
Important Information

00000217 01 MB 0.360 T001,L991,0604
DAVID BARRY PUSHKIN
200 WINSTON DR
APT 812
CLIFFSIDE PARK, NJ 07010-3214

SOCIAL SECURITY
22 SUSSEX ST
HACKENSACK, NJ 07601

Date: June 4, 2007
Social Security Number: 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



Office Hours: 09:00 AM - 04:00 PM
Telephone Number: (800) 772-1213

On June 4, 2007, we talked with you about your eligibility for Supplemental
Security Income (SSI). Based on that talk, we have made an informal decision
that you are not eligible for SSI. This informal decision is only about your
eligibility for SSI. This decision is not about eligibility for Social Security benefits
or Medicare.

## **Why You Are Not Eligible**

We believe you are not eligible for SSI for the reason shown below:

• You told us you do not want to file a claim for SSI.

## **Why You May Want To File A Claim**

You may want to file a claim for SSI if:

• You want a formal decision about your eligibility, or

• You disagree with our decision, or

• You want to give us more facts about your case.

If you decide to file, you should do so right away. The sooner you file, the sooner
we will make a formal decision about your eligibility. If we decide you are
eligible, you could lose benefits if you file after August 17, 2007.

## **If You Have Any Questions**

If you have any questions, you may call, write or visit any Social Security office.
If you call or visit our office, please have this letter with you and ask for any SSI
Claims Representative. The telephone number is shown at the top of this letter.

See Next Page

Form SSA-L991(7/94)

June 4, 2007, 12:45
PAGE    6

NH 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                                    SG-SSA-16

REPORTING RESPONSIBILITIES FOR DISABILITY INSURANCE BENEFITS

DAVID BARRY PUSHKIN
200 WINSTON DR
APT 812
CLIFFSIDE PARK NJ 07010

CHANGES TO BE REPORTED AND HOW TO REPORT

FAILURE TO REPORT MAY RESULT IN OVERPAYMENTS THAT MUST BE REPAID, AND IN
POSSIBLE MONETARY PENALTIES

- You change your mailing address for checks or residence. To avoid delay
  in receipt of checks you should ALSO file a regular change of address
  notice with your post office.

- Your citizenship or immigration status changes.

- You go outside the U.S.A. for 30 consecutive days or longer.

- Any beneficiary dies or becomes unable to handle benefits.

- You are confined to jail, prison, penal institution or correctional
  facility for conviction of a crime or you are confined to a public
  institution by court order in connection with a crime.

- You have an unsatisfied warrant for your arrest for a crime or attempted
  crime that is a felony (or, in jurisdictions that do not define crimes as
  felonies, a crime that is punishable by death or imprisonment for a term
  exceeding 1 year).

- You have an unsatisfied warrant for a violation of probation or parole
  under Federal or State law.

- Your stepchild is entitled to benefits on your record and you and the
  stepchild's parent divorce. Stepchild benefits are not payable beginning
  with the month after the month the divorce becomes final.

- Custody Change - Report if a person for whom you are filing, or who is in
  your care dies, leaves your care or custody, or changes address.

- Change of Marital Status - Marriage, divorce, annulment of marriage.

- You become entitled to a pension or annuity based on your employment
  after 1956 not covered by Social Security, or if such pension or annuity
  stops.

- You return to work (as an employee or self-employed) regardless of the

amount of earnings.

June 4, 2007, 12:45
PAGE    7

NH 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                              SG-SSA-16

o  Your condition improves.

o  If you are under age 65 and you apply for or begin to receive Workers'
   Compensation or another public disability benefit (including Black Lung
   benefits), or the amount of your present Workers' Compensation or public
   benefit changes or stops, or you receive a lump sum settlement.

HOW TO REPORT

You can make your reports by telephone, mail, or in person, whichever you
prefer.

If you are awarded benefits, and one or more of the above change(s) occur, you
should report by:

o  Calling us TOLL FREE at 1-800-772-1213;

o  If you are deaf or hearing impaired, calling us TOLL FREE at TTY
   1-800-325-0778; or

o  Calling, visiting or writing your local Social Security Office at the
   phone number and address above.

For general information about Social Security, visit our website at
www.socialsecurity.gov

For those under full retirement age, the law requires that a report of earnings
be filed with SSA within 3 months and 15 days after the end of any taxable year
in which you earn more than the annual exempt amount. You may contact SSA to
file a report. Otherwise, SSA will use the earnings reported by your
employer(s) and your self-employment tax return (if applicable) as the report
of earnings required by law and adjust benefits under the earnings test. It is
your responsibility to ensure that the information you give concerning your
earnings is correct. You must furnish additional information as needed when
your benefit adjustment is not correct based on the earnings on your record.

---

NOTICE ABOUT DOCUMENTS

We recommend that you keep all documents you submitted to us.
____  We are returning the documents you submitted with this claim.

---

Collection and Use of Information From Your Application -
Privacy Act Notice / Paperwork Reduction Act Notice

The Social Security Administration is authorized to collect the information
requested on this form under sections 202, 205 and 223 of the Social Security
Act. The information you provide will be used by the Social Security
Administration to determine if you or a dependent is eligible to insurance
coverage and/or monthly benefits. You do not have to give us the requested
information. However, if you do not provide the information, we will be unable
to make an accurate and timely decision concerning your entitlement or a
dependent's entitlement to benefit payments.

June 4, 2007, 12:45
PAGE    8

NH 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                                    SG-SSA-16

The information you provide may be disclosed to another Federal, State or local government agency for determining eligibility for a government benefit or program, to a Congressional office requesting information on your behalf, to an independent party for the performance of research and statistical activities, or to the Department of Justice for use in representing the Federal Government.

We may also use this information when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

Explanations about these and other reasons why information you provide may be used or given out are available in Social Security offices. If you want to learn more about this, contact any Social Security office.

Paperwork Reduction Act Statement - This information collection meets the requirements of 44 U.S.C. 3507 as amended in section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 20 minutes to read the instructions, gather the facts and answer the questions. SEND OR BRING THE COMPLETED FORM TO YOUR LOCAL SOCIAL SECURITY OFFICE. The office is listed under U.S. Government agencies in your telephone directory or you may call Social Security at 1-800-772-1213. You may send comments on our time estimate above to: SSA, 6401 Security Blvd. Baltimore MD 21235-6401. Send only comments relating to our time estimate to this address, not the completed form.

SOCIAL SECURITY ADMINISTRATION
RETIREMENT, SURVIVORS, AND DISABILITY INSURANCE
Notice of Disapproved Claim

*Not appeld!*

Telephone: (201) 678-2895

Date: July 25, 2007

DAVID B PUSHKIN
200 WINSTON DR
APT 812
CLIFFSIDE PARK NJ 07010

Claim Number: 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

We are writing about your claim for Social Security disability benefits.  Based on a
review of your health problems you do not qualify for benefits on this claim.  This
is because you are not disabled under our rules.

We have enclosed information about the disability rules.

An explanation is provided below of why we decided you are not disabled.

The following reports were considered in deciding your claim:
ANDREW M CASDEN MD  — *Spinal surgery*
DAVID FRIEDMAN MD
NYU MEDICAL CENTER
BETH ISRAEL MED CTR
HACKENSACK UNIV MED CTR
SETH KANE PA MD
MARIO VUKIC MD  — *orthopedist*
STEVEN A WINER MD  — *neurologist*

*Kenneth Park D.O.*
*Pain Management*

We did not obtain any other reports because the ones shown above had enough
information to evaluate your condition.

We have determined that your condition does not keep you from working.  We
considered the medical and other information, your age, education, training, and
work experience in determining how your condition affects your ability to work.

You said you were disabled because of a spine injury.

The following factors were considered in making our decision:

        * While you still experience some pain in your lower back, there is no
        severe muscle weakness or loss of feeling in your limbs.

        * You do have some difficulty bending and stooping, following your low
        back surgery.  However, you are able to stand, sit and move about well
        enough to do some work.

        * We have determined that your back condition will not prevent you from
        working for 12 months in a row.

        * The evidence shows no other condition which significantly limits your
        ability to work.

> \* We realize your condition prevents you from doing your usual work;
> however it does not prevent you from doing other types of work
> requiring less physical effort.

IF YOUR CONDITION GETS WORSE AND KEEPS YOU FROM WORKING, WRITE, CALL OR VISIT
ANY SOCIAL SECURITY OFFICE ABOUT FILING ANOTHER APPLICATION.

ABOUT THE DECISION

Doctors and other trained staff looked at your case and made this decision.  They
work for your State but used our rules.

Please remember that there are many types of disability programs, both government and
private, which use different rules.  A person may be receiving benefits under another
program and still not be entitled under our rules.  This may be true in your case.

IF YOU DISAGREE WITH THE DECISION

If you disagree with this decision, you have the right to appeal.  We will review
your case and consider any new facts you have.  A person who did not make the first
decision will decide your case.

> \* You have 60 days to ask for an appeal.

> \* The 60 days start the day after you get this letter.  We assume you got this
> letter 5 days after the date on it unless you show us that you did not get it
> within the 5-day period.

> \* You must have a good reason for waiting more than 60 days to ask for an appeal.

> \* You have to ask for an appeal in writing.  We will ask you to sign a form
> SSA-561-U2, called "Request for Reconsideration." You may complete this form
> oneline at http://www.socialsecurity.gov/online/ssa-561.pdf. Contact one of
> our offices if you want help.

> \* IN ADDITION, YOU HAVE TO COMPLETE A "RECONSIDERATION DISABILITY REPORT" TO
> TO TELL US ABOUT YOUR MEDICAL CONDITION SINCE YOU FILED YOUR CLAIM.  YOU MAY
> CONTACT ONE OF OUR OFFICES OR CALL 1-800-772-1213 TO REQUEST THIS FORM.  OR,
> YOU MAY COMPLETE THIS REPORT ONLINE AT
> www.socialsecurity.gov/disability/recon

Please read the enclosed pamphlet, "Your Right to Question the Decision Made on Your
Social Security Claim."  It contains more information about the appeal.

NEW APPLICATION

You have the right to file a new application at any time, but filing a new application
is not the same as appealing this decision.  If you disagree with this decision and you
file a new application instead of appealing:

> \* you might lose some benefits, or not qualify for any benefits, and

> \* we could deny the new application using this decision, if the facts and
> issues are the same.

So, if you disagree with this decision, you should ask for an appeal within 60 days.

IF YOU WANT HELP WITH YOUR APPEAL

You can have a friend, lawyer, or someone else help you.  There are groups that can help you find a lawyer or give you free legal services if you qualify.  There are also lawyers who do not charge unless you win your appeal.  Your local Social Security office has a list of groups that can help with your appeal.

If you get someone to help you, you should let us know.  If you hire someone, we must approve the fee before he or she can collect it.  And if you hire a lawyer, we will withhold up to 25 percent of any past due Social Security benefits to pay toward the fee.

OTHER BENEFITS

Based on the application you filed, you are not entitled to any other benefits, besides those you may already be getting.  In the future, if you think you may be entitled to other benefits you will need to apply again.

IF YOU HAVE ANY QUESTIONS

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at the number shown on page 1.  We can answer most questions over the phone.  You can also write or visit any Social Security office. The office that serves your area is located at:

                    22 Sussex Street
                    Hackensack NJ 07601

If you do call or visit an office, please have this letter with you.  It will help us answer your questions.  Also, if you plan to visit an office, you may call ahead to make an appointment.  This will help us serve you more quickly.

                    Regional Commissioner

Enclosure:
SSA Publication No. 05-10058
Disability Rules Fact Sheets

SSA-L443-A (5/94)MRH

DAVID B PUSHKIN

Page 1 of 2

### RULES FOR SOCIAL SECURITY DISABILITY

You must meet certain rules to qualify for Social Security disability benefits:

FOR DISABLED WORKER'S BENEFITS:

You must have the required work credits and your health problems must:

* keep you from doing any kind of substantial work (described below), and

* last, or be expected to last, for at least 12 months in a row, or result in death.

FOR DISABLED CHILD'S BENEFITS:

You must be age 18 or older and your health problems must:

* begin before age 22 OR you must become disabled again within 7 years after the month that your earlier period of disability ended, and

* keep you from doing any kind of substantial work (described below), and

* last, or be expected to last, for at least 12 months in a row, or result in death.

FOR DISABLED WIDOW'S, WIDOWER'S OR SURVIVING DIVORCED SPOUSE'S BENEFITS:

You must be at least age 50, and your health problems must:

* keep you from doing any kind of substantial work (described below), and

* last, or be expected to last, for at least 12 months in a row, or result in death, and

* have started before the end of a special period.

The special period STARTS with the latest of:

-- the month your spouse died, OR

-- the month your Social Security benefits as a parent ended, OR

-- the month your earlier period of WIDOW(ER)'S disability ended.

The special period ENDS at the close of the 84th month (7 years) after the month it started.

Form SSA-443-A (5/94)

DAVID B PUSHKIN

Page 2 of 2

## RULES FOR SOCIAL SECURITY DISABILITY

### INFORMATION ABOUT SUBSTANTIAL WORK

Generally, substantial work is physical or mental work you are paid to do. Work can be substantial even if it is part-time. To decide if your work is substantial, we consider the nature of the job duties, the skills and experience you need to do the job, and how much you actually earn.

Usually, we find that your work is substantial if your gross earnings average over $740 per month after we deduct allowable amounts. This monthly amount is higher for Social Security disability benefits due to blindness.

Your work may be different than before your health problems began. It may not be as hard to do and your pay may be less. However, we may still find that your work is substantial under our rules.

If you are self-employed, we consider the kind and value of your work, including your part in the management of the business, as well as your income, to decide if your work is substantial.

Form SSA-443-A (5/94)

SOCIAL SECURITY ADMINISTRATION

MAY 20 2009

Date:
Claim Number: 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

DAVID BARRY PUSHKIN
300 STATE HIGHWAY
ROUTE 3 EAST STE 114
EAST RUTHERFORD NJ 07073

You must meet certain medical and nonmedical requirements to be entit led to
disability benefits.

We have found that you meet the medical requirements for disability b enefits.
An explanation of our finding is below.  Please read it carefully.

The following reports, covering the periods listed were considered in deciding
your claim:
Dr. KENNETH PARK
ANDREW M CASDEN MD
SETH KANE PA MD
MARIO VUKIC MD
NORTH JERSEY BRAIN & SPINE

We did not obtain any other reports because the one shown above had enough
information to evaluate your condition.

You said you were disabled as of  11/22/06 because of back pain, failed back
surgery.

The following was considered in making our decision:

        * Althougoh you allege that you became disabled as of 11/22/06, the
          medicale vidence does not show that your impairments were severe enough
          to meet our requirements at that time. However, more recent medical
          evidence does show that you are disabled.  Therefore, your onset date
          is being established as of 07/26/07.

We have not yet made a decision about whether you meet the nonmedical requirements,
but we will make that decision soon.  Then we will send you a second notice
explaining our decision.  After you receive this second notice you will have 60 days
to appeal the determination we made about your claim for disability benefits.

If you have any questions about your disability claim or wish to appeal our
findings, please do not get in touch with the Social Security office until you have
the second notice.  The people at the Social Security office will be better able to
answer your questions when they have the information from both notices.

After you have received your second notice, you can call or write any Social
Security office to appeal our determination or to get answers to your questions.
Most questions can be handled by telephone or mail.  If you go to the Social Security
office in person, please take both notices with you.   The office that serves your
area is located at:

**22 Sussex Street**
**Hackensack NJ 07601**

**GREGG M HOBBIE**
**PO BOX 997**
**EATONTOWN NJ 07724**

**SSA-L1157-DI (7/91)**

Social Security Administration
# Retirement, Survivors and Disability Insurance
Important Information

SOCIAL SECURITY
22 SUSSEX ST
HACKENSACK, NJ 07601-5406
Claim Number: 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
May 20, 2009
TE2JCB

DAVID B. PUSHKIN
300 STATE HIGHWAY
ROUTE 3 EAST STE 114
EAST RUTHERFORD, NJ 07073-0000

Dear DAVID B. PUSHKIN

We're writing to ask you to send us the following information:

Your application for Social Security Disability benefits has been approved. In order
for us to complete the processing of your application, we need the enclosed forms
SSA-820/821 completed and returned to us as soon as possible. We need this information
since you stated that your onset date was 11/22/06 however, you have earnings posted to
your record for 2008 in the amount of $21742.00.

A copy of this letter and forms has been sent to your attorney, Gregg Hobbie.


You must send us the original records. If you don't have the original, you must send
a copy certified by the person who is the custodian of the original record. Do not send
copies certified by a notary public. For proof of earnings we can accept a photocopy of a
W-2 form or a tax return (1040, Schedule C, Schedule SE, etc.).

To help us give you better service, please send us this information as soon as you can.
You may use the enclosed envelope to send us the information we need. We will return
the documents to you right away.

**If You Have Any Questions**

For general information about SSI, visit our website at www.socialsecurity.gov on the
Internet. You will find the law and regulations about SSI eligibility and SSI payment
amounts at www.socialsecurity.gov/SSIrules/.

For general questions about SSI or specific questions about your case, you may call us
toll-free at 1-800-772-1213 or call your local Social Security office at 201-678-2834 Ext
222. If you call or visit our office, please bring this letter with you and ask for Mrs. J
Burgos.



*Anthony Pezza*
Anthony Pezza
Field Office Manager

*Reprinted Original on file*

June 1, 2009, 10:32
PAGE    1

NH 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                                          SG-SSA-16


```
--------------------
: UNIT: EXC300     :
:                  :
:                  :
:                  :
:                  :
:                  :
--------------------
```

DAVID BARRY PUSHKIN
300 STATE HIGHWAY
ROUTE 3 EAST STE 114
EAST RUTHERFORD NJ 07073


APPLICATION SUMMARY FOR DISABILITY INSURANCE BENEFITS

On February 12, 2009, we talked with you and completed your application for
SOCIAL SECURITY BENEFITS. We stored the application information electronically
in our records and are enclosing a summary of your statements.

I APPLY FOR A PERIOD OF DISABILITY AND/OR ALL INSURANCE BENEFITS FOR WHICH I AM
ELIGIBLE UNDER TITLE II AND PART A OF TITLE XVIII OF THE SOCIAL SECURITY ACT,
AS PRESENTLY AMENDED.

MY NAME IS DAVID BARRY PUSHKIN.

MY SOCIAL SECURITY NUMBER IS 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.

MY DATE OF BIRTH IS March 21, 1963.

I AM A CITIZEN OF THE UNITED STATES.

I BECAME UNABLE TO WORK BECAUSE OF MY DISABLING CONDITION ON November 22, 2006.

I AM STILL DISABLED.

A PREVIOUS APPLICATION HAS BEEN FILED WITH THE SOCIAL SECURITY ADMINISTRATION
BY OR FOR ME.

I DO NOT WANT TO FILE FOR SSI.

I HAVE NOT FILED NOR DO I INTEND TO FILE FOR ANY WORKERS' COMPENSATION, PUBLIC
DISABILITY OR BLACK LUNG BENEFITS.

I AM NOT ENTITLED TO NOR DO I EXPECT TO BECOME ENTITLED TO A PENSION OR ANNUITY
BASED IN WHOLE OR IN PART ON WORK AFTER 1956 NOT COVERED BY SOCIAL SECURITY.

I AM MARRIED TO BETH NUSSBAUM. WE WERE MARRIED ON December 28, 2003 IN NY BY A
CLERGYMAN OR PUBLIC OFFICIAL. MY SPOUSE'S AGE OR BIRTHDATE IS 047 AND SOCIAL
SECURITY NUMBER IS _____*.

I HAD NO PREVIOUS MARRIAGES THAT LASTED 10 YEARS OR MORE OR ENDED IN DEATH.

June 1, 2009, 10:32
PAGE    2

NH 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                              SG-SSA-16

I DO NOT HAVE ANY CHILDREN UNDER AGE 18; AGE 18-19 ATTENDING ELEMENTARY OR
SECONDARY SCHOOL FULL TIME; OR AGE 18 OR OVER AND DISABLED BEFORE AGE 22 WHO
MAY BE ELIGIBLE FOR SOCIAL SECURITY BENEFITS ON THIS RECORD. THIS INCLUDES
CHILDREN WHO MAY OR MAY NOT BE LIVING WITH ME.

I UNDERSTAND THAT I MUST PROVIDE MEDICAL EVIDENCE ABOUT MY DISABILITY, OR
ASSIST THE SOCIAL SECURITY ADMINISTRATION IN OBTAINING THE EVIDENCE.

I UNDERSTAND THAT I MAY BE REQUESTED BY THE STATE DISABILITY DETERMINATION
SERVICES TO HAVE A CONSULTATIVE EXAMINATION AT THE EXPENSE OF THE SOCIAL
SECURITY ADMINISTRATION AND THAT IF I DO NOT GO, MY CLAIM MAY BE DENIED.

I AUTHORIZE ANY PHYSICIAN, HOSPITAL, AGENCY, OR OTHER ORGANIZATION TO DISCLOSE
ANY MEDICAL RECORD OR INFORMATION ABOUT MY DISABILITY TO THE SOCIAL SECURITY
ADMINISTRATION OR TO THE STATE DISABILITY DETERMINATION SERVICES THAT MAY
REVIEW MY CLAIM OR CONTINUING DISABILITY.

I AUTHORIZE THE SOCIAL SECURITY ADMINISTRATION TO RELEASE ANY INFORMATION ABOUT
ME TO A PHYSICIAN OR MEDICAL FACILITY PREPARATORY TO AN EXAMINATION OR TEST.
RESULTS OF SUCH EXAMINATION OR TEST MAY BE RELEASED TO MY PHYSICIAN OR OTHER
TREATING SOURCE.

I AUTHORIZE THAT INFORMATION ABOUT MY DISABILITY MAY BE FURNISHED TO ANY
CONTRACTOR FOR CLERICAL SERVICES BY THE STATE DISABILITY DETERMINATION
SERVICES.

I AGREE TO NOTIFY THE SOCIAL SECURITY ADMINISTRATION OF ALL EVENTS AS EXPLAINED
TO ME.

I DO NOT HAVE A BANK ACCOUNT.

REMARKS:
I AGREE WITH THE EARNINGS AS SHOWN ON MY SOCIAL SECURITY STATEMENT.

I KNOW THAT ANYONE WHO MAKES OR CAUSES TO BE MADE A FALSE STATEMENT OR
REPRESENTATION OF MATERIAL FACT IN AN APPLICATION OR FOR USE IN DETERMINING A
RIGHT TO PAYMENT UNDER THE SOCIAL SECURITY ACT COMMITS A CRIME PUNISHABLE UNDER
FEDERAL LAW BY FINE, IMPRISONMENT OR BOTH. I AFFIRM THAT ALL INFORMATION I HAVE
GIVEN IN CONNECTION WITH THIS CLAIM IS TRUE.


MY TELEPHONE NUMBER IS ( 201) 206-5160.

SOCIAL SECURITY ADMINISTRATION
RETIREMENT, SURVIVORS, AND DISABILITY INSURANCE
Notice of Disapproved Claim

Telephone: (201) 678-2895

Date:
JUN 1 7 2009
Claim Number: 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

DAVID B PUSHKIN
200 WINSTON DRIVE
APT 812
CLIFFSIDE PARK NJ 07010-3214

We are writing about your claim for Social Security disability benefits.  Based on a
review of your health problems you do not qualify for benefits on this claim.  This
is because you are not disabled under our rules.

We have enclosed information about the disability rules.

An explanation is provided below of why we decided you are not disabled.

The following reports, covering the periods listed were considered in deciding
your claim:

We did not obtain any other reports because the ones shown above had enough
information to evaluate your condition.

You said you were disabled as of  07/26/07 because of back pain, and failed back
surgery.

The following was considered in making our decision:

We have determined that your condition did not keep you from working for 12
months in a row.  In deciding this, we considered the medical evidence, your
statements and how your condition affected your ability to work.

        IF YOUR CONDITION GETS WORSE AND KEEPS YOU FROM WORKING, WRITE, CALL OR
        VISIT ANY SOCIAL SECURITY OFFICE ABOUT FILING ANOTHER APPLICATION.

ABOUT THE DECISION

Doctors and other trained staff looked at your case and made this decision.  They
work for your State but used our rules.

Please remember that there are many types of disability programs, both government and
private, which use different rules.  A person may be receiving benefits under another
program and still not be entitled under our rules.  This may be true in your case.

IF YOU DISAGREE WITH THE DECISION

If you disagree with this decision, you have the right to appeal.  We will review
your case and consider any new facts you have.  A person who did not make the first
decision will decide your case.

* You have 60 days to ask for an appeal.

* The 60 days start the day after you get this letter. We assume you got this
  letter 5 days after the date on it unless you show us that you did not get it
  within the 5-day period.

* You must have a good reason for waiting more than 60 days to ask for an appeal.

* You have to ask for an appeal in writing. We will ask you to sign a form
  SSA-561-U2, called "Request for Reconsideration." You may complete this form
  on-line at http://www.socialsecurity.gov/online/ssa-561.pdf. Contact one of
  our offices if you want help.

* IN ADDITION, YOU HAVE TO COMLETE A "RECONSIDERATION DISABILITY REPORT" TO
  TELL US ABOUT YOUR MEDICAL CONDITION SINCE YOU FILED YOUR CLAIM. YOU MAY
  CONTACT ONE OF OUR OFFICES OR CALL 1-800-772-1213 TO REQUEST THIS FORM. OR,
  YOU MAY COMPLETE THIS REPORT ONLINE AT www.socialsecurity.gov/disability/recon.

Please read the enclosed pamphlet, "Your Right to Question the Decision Made on Your
Social Security Claim." It contains more information about the appeal.

NEW APPLICATION

You have the right to file a new application at any time, but filing a new application
is not the same as appealing this decision. If you disagree with this decision and you
file a new application instead of appealing:

  * you might lose some benefits, or not qualify for any benefits, and

  * we could deny the new application using this decision, if the facts and
    issues are the same.

So, if you disagree with this decision, you should ask for an appeal within 60 days.

IF YOU WANT HELP WITH YOUR APPEAL

You can have a friend, lawyer, or someone else help you. There are groups that can
help you find a lawyer or give you free legal services if you qualify. There are also
lawyers who do not charge unless you win your appeal. Your local Social Security office
has a list of groups that can help with your appeal.

If you get someone to help you, you should let us know. If you hire someone, we must
approve the fee before he or she can collect it. And if you hire a lawyer, we will
withhold up to 25 percent of any past due Social Security benefits to pay toward the
fee.

OTHER BENEFITS

Based on the application you filed, you are not entitled to any other benefits,
besides those you may already be getting. In the future, if you think you may be
entitled to other benefits you will need to apply again.

IF YOU HAVE ANY QUESTIONS

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your
local Social Security office at the number shown on page 1. We can answer most
questions over the phone. You can also write or visit any Social Security office.
The office that serves your area is located at:

22 Sussex Street
Hackensack NJ 07601

If you do call or visit an office, please have this letter with you.  It will help us
answer your questions.  Also, if you plan to visit an office, you may call ahead to
make an appointment.  This will help us serve you more quickly.

Regional Commissioner

Enclosure:
SSA Publication No. 05-10058
Disability Rules Fact Sheets

SSA-L443-A (9/2007)MAS

Page 1 of 2

DAVID B PUSHKIN

### RULES FOR SOCIAL SECURITY DISABILITY

You must meet certain rules to qualify for Social Security disability benefits:

FOR DISABLED WORKER'S BENEFITS:

You must have the required work credits and your health problems must:

* keep you from doing any kind of substantial work (described below), and

* last, or be expected to last, for at least 12 months in a row, or result in death.

FOR DISABLED CHILD'S BENEFITS:

You must be age 18 or older and your health problems must:

* begin before age 22 OR you must become disabled again within 7 years after the month that your earlier period of disability ended, and

* keep you from doing any kind of substantial work (described below), and

* last, or be expected to last, for at least 12 months in a row, or result in death.

FOR DISABLED WIDOW'S, WIDOWER'S OR SURVIVING DIVORCED SPOUSE'S BENEFITS:

You must be at least age 50, and your health problems must:

* keep you from doing any kind of substantial work (described below), and

* last, or be expected to last, for at least 12 months in a row, or result in death, and

* have started before the end of a special period.

The special period STARTS with the latest of:

-- the month your spouse died, OR

-- the month your Social Security benefits as a parent ended, OR

-- the month your earlier period of WIDOW(ER)'S disability ended.

The special period ENDS at the close of the 84th month (7 years) after the month it started.

Form SSA-443-A (5/94)

Page 2 of 2

DAVID B PUSHKIN

## RULES FOR SOCIAL SECURITY DISABILITY

### INFORMATION ABOUT SUBSTANTIAL WORK

Generally, substantial work is physical or mental work you are paid to do.  Work can be substantial even if it is part-time.  To decide if your work is substantial, we consider the nature of the job duties, the skills and experience you need to do the job, and how much you actually earn.

Usually, we find that your work is substantial if your gross earnings average over $740 per month after we deduct allowable amounts.  This monthly amount is higher for Social Security disability benefits due to blindness.

Your work may be different than before your health problems began.  It may not be as hard to do and your pay may be less.  However, we may still find that your work is substantial under our rules.

If you are self-employed, we consider the kind and value of your work, including your part in the management of the business, as well as your income, to decide if your work is substantial.

Form SSA-443-A (5/94)

THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES® LLC
33-00 NORTHERN BOULEVARD
SUITE 7A
LONG ISLAND CITY, NEW YORK 11101
—
Telephone (800) 742-9696
Fax (718) 512-2424

November 1, 2010

Dr. David B. Pushkin
300 State Highway Route 3 East
Apt.: 114
East Rutherford, NJ 07073

Dear Dr. Pushkin:

Congratulations to you on the recent decision by the administrative law judge on your application for Social Security benefits. As noted in the decision, provisions of the Social Security Act do permit the Appeals Council to review any decision by any administrative law judge.

While it is rare, the Appeals Council may review the decision and vacate the award by the administrative law judge. The Appeals Council has the power to decide you are not disabled or to remand the case back for another hearing. The Appeals Council is supposed to notify both of us within sixty days of the administrative law judge's decision if they intend to modify or alter the decision, but under special circumstances they can take even longer.

Fortunately, it is unusual for the Appeals Council to do so. If you do not hear from the Appeals Council in the near future, it is likely that your decision was not reviewed or the Appeals Council reviewed your case and chose not to change the decision. In the unlikely event that the Appeals Council decides to review your case, I will continue to represent you.

If your case is not reviewed then your retroactive payments and/or your monthly checks should be processed. I wish we could guarantee that you would receive your funds quickly or even within a specified time period. I cannot provide that assurance because the process is entirely within Social Security's control. Cases that involve a potential "offset" due to Workers' Compensation, or cases involving a claimant who has younger children may take longer to process.

As always, please be patient. You should receive an award notice shortly. The award notice should explain your monthly rate and the amount of your retroactive benefits as well as any amount being withheld for fees.

*please explain in simple English!*

Keep in mind that regardless of when you became disabled, retroactive benefits are limited to a maximum of one year from the time of your application or the date of your onset of disability, whichever is later. In addition, there is a five-month waiting period on Social Security Disability applications. For Supplemental Security Income (SSI), there is no waiting period, but there is no retroactivity prior to the application itself. With Social Security Disability you receive Medicare twenty-nine months after onset (or two years after the first month in which you are entitled to cash benefits). With SSI benefits, you receive Medicaid.

*America's National Disability Advocacy Company℠*

*What if the 18 month period expired PRIOR TO judge's ruling?*

If prior to the onset of your disability you were employed by a firm that maintained group medical coverage or insurance, the federal law known as COBRA mandates that you are entitled to twenty-nine (29) months of eligibility, as opposed to the normal eighteen (18) months. If you desire to maintain your COBRA insurance, please advise your employer or insurance company in writing of your election. You are responsible for the costs of medical insurance.

Clients frequently ask me how long they will receive Social Security benefits. If you have been awarded an open period of disability, the answer is that you will receive disability until you reach retirement age or until your disability ends or until you return to work. At retirement age, you will receive your Social Security retirement instead of disability benefits.

If you have been awarded a closed period of disability because you have returned to work or because your condition has improved you will be entitled to benefits only for the period Social Security has deemed you disabled, beginning on a specific date and ending at a later date.

The Social Security Act requires that every claimant who has been found disabled must be reviewed every three years with certain exceptions. The exceptions are too complicated to discuss, but generally the younger you are the more likely you are to have your case reviewed in the near future. The closer you are to age sixty-five, the less likely you are to be reviewed.

Contact us immediately if you receive notice that your case is being reviewed. It is easier to keep you on benefits if we handle the "review" from the beginning than if you are cut off benefits and come to us later. Social Security does not consider us to be your representatives anymore so they will not automatically notify us of your review. You must retain us again. If in the future you decide you want to try to go back to work, you may be eligible for a trial work period or a "ticket to work." You may be able to continue to receive cash benefits while you are attempting to see if you can succeed at a job. However, under any circumstances, if you decide to return to work, you are obligated to notify Social Security. I would do so in writing and keep a copy of your letter.

Lastly, if you have not already picked up your medical records, this is your final opportunity to do so. We no longer have the storage facility to save medical records. We advised you of this in the File Storage Notice. Please contact your caseworker immediately to make arrangements to pick them up or to have them shipped to you after payment of the shipping costs. Social Security will keep copies of the medical records so that they can compare your present condition with your future condition in case of any review.

Thank you for allowing us to represent you. I would consider it a great compliment if you have a friend or family member that you would like to recommend us to.

Sincerely,

BINDER & BINDER® -
The National Social Security Disability Advocates® LLC

Charles E. Binder

CEB:ep

## NOTICE ABOUT MEDICAL RECORDS   *11 - 1 - 10*

When we first began as your advocate before the Social Security Administration, you were advised that at the conclusion of our work, all medical records would be made available to you for return, or that we would see that those medical records would be destroyed in a manner consistent with maintaining the confidential nature of the documents. At this juncture, our advocacy has been concluded, and we must know your wishes regarding those documents.

If you wish to receive your medical records, we must hear from you within thirty (30) days. With your notice, we must receive a check for $15.00 made payable to Binder & Binder to cover the costs of shipping and handling. We normally use UPS for the shipment of those records. If the records are only a few pages, and fit into a regular first-class envelope, we will send them to you by mail, free of charge, and will return your payment. In the alternative, you may make an appointment to come to our office to pick up the records without a fee. You must provide photo identification if you elect to personally pick up those documents. If we do not hear from you in thirty (30) days, we will assume that you do not wish the papers, and will have them destroyed.

As we understand the present law, medical records regarding or addressing mental health issues, can only be released to the medical providers which gave us those records, or your current treating physician. If you will kindly have either the medical provider, or your current treating physician, notify us **in writing** that they will accept our mailing of those specific records, we will send them to that medical person or entity. However, if your current treating doctor advises us **in writing** that we are authorized to send those medical records directly to you, we will comply with that doctor's written directions.

Our responsibility for the medical records ends when we either mail the documents, or deliver them to the shipping carrier. If the file is lost in any manner, your only recourse is against the carrier, or postal service.

Please be further advised that your complete file is always available to you directly from Social Security Administration.

David Pushkin

*will send notice of*
*$15 check via US mai[l]*
*[signature] 11/4/20.*

**SOCIAL SECURITY ADMINISTRATION**

Refer To: 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

Office of Disability Adjudication and Review
SSA ODAR Hearing Ofc
1100 Raymond Blvd
3rd Floor
Newark, NJ 07102

Date:
      OCT 1 4 2010

David Pushkin
300 State Highway
Route 3 East Ste 114
East Rutherford, NJ 07073

## Notice of Decision – Partially Favorable

I carefully reviewed the facts of your case and made the enclosed partially favorable decision. Please read this notice and my decision.

Another office will process my decision. That office may ask you for more information. If you do not hear anything within 60 days of the date of this notice, please contact your local office. The contact information for your local office is at the end of this notice.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision. You may use our Request for Review form (HA-520) or write a letter. The form is available at www.socialsecurity.gov. Please put the Social Security number shown above on any appeal you file. If you need help, you may file in person at any Social Security or hearing office.

Please send your request to:

**Appeals Council**
**Office of Disability Adjudication and Review**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice. The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

The Appeals Council will dismiss a late request unless you show you had a good reason for not

Form HA-L76-OP1 (03-2010)

See Next Page

David Pushkin (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)                                             Page 2 of 3

filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case. You may also send us new evidence. You should send your written statement and any new evidence **with your appeal**. Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case. It will consider all of my decision, even the parts with which you agree. Review can make any part of my decision more or less favorable or unfavorable to you. The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do. If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal. If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final. A final decision can be changed only under special circumstances. You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all. My decision could also be used to deny a new application for benefits if the facts and issues are the same. If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP1 (03-2010)

See Next Page

David Pushkin (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)                                              Page 3 of 3

**If You Have Any Questions**

We invite you to visit our website located at www.socialsecurity.gov to find answers to general questions about social security. You may also call (800) 772-1213 with questions. If you are deaf or hard of hearing, please use our TTY number (800) 325-0778.

If you have any other questions, please call, write, or visit any Social Security office. Please have this notice and decision with you. The telephone number of the local office that serves your area is (866) 964-0170. Its address is:

> Social Security
> 935 Allwood Rd
> Clifton, NJ 07012-1997

> Michal L. Lissek
> Administrative Law Judge

Enclosures:
Form HA-L15 (Fee Agreement Approval)
Decision Rationale


cc:     Charles E. Binder
        Binder & Binder
        200 Broadacres Drive
        3rd Floor
        Bloomfield, NJ 07003

Form HA-L76-OP1 (03-2010)

# SOCIAL SECURITY ADMINISTRATION
## Office of Disability Adjudication and Review

### ORDER OF ADMINISTRATIVE LAW JUDGE

| | |
|---|---|
| **IN THE CASE OF** | **CLAIM FOR** |

Period of Disability and Disability Insurance
Benefits

David Pushkin
(Claimant)

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
(Wage Earner)                          (Social Security Number)

I approve the fee agreement between the claimant and his representative subject to the condition that the claim results in past-due benefits. My determination is limited to whether the fee agreement meets the statutory conditions for approval and is not otherwise excepted. I neither approve nor disapprove any other aspect of the agreement.

**YOU MAY REQUEST A REVIEW OF THIS ORDER AS INDICATED BELOW**

**Fee Agreement Approval:** You may ask us to review the approval of the fee agreement. If so, write us within 15 days from the day you get this order. Tell us that you disagree with the approval of the agreement and give your reasons. Your representative also has 15 days to write us if he or she does not agree with the approval of the fee agreement. Send your request to this address:

> Mark Sochaczewsky
> Regional Chief Administrative Law Judge
> SSA ODAR Regional Ofc
> Room 34-116
> 26 Federal Plaza
> New York, NY 10278

**Fee Agreement Amount:** You may also ask for a review of the amount of the fee due to the representative under this approved fee agreement. If so, please write directly to me as the deciding Administrative Law Judge within 15 days of the day you are notified of the amount of the fee due to the representative. Your representative also has 15 days to write me if he/she does not agree with the fee amount under the approved agreement.

You should include the social security number(s) shown on this order on any papers that you send us.

/s/ *Michal L Lissek*

Michal L. Lissek
Administrative Law Judge

OCT 1 4 2010

Date

Form HA-L15 (03-2007)

EF-07

## <u>FEE AGREEMENT</u>

BINDER & BINDER (Charles E. Binder, Primary Representative) and the CLAIMANT agree that pursuant to Section 406(a)(2)(A) of the Social Security Act fees shall be as follows:

1.  Whichever is less of:

    a.  Twenty-five percent (25%) of the past due benefits, or

    b.  The maximum amount set by the Commissioner pursuant to 42 U.S.C. Section 406(a). This amount is currently five thousand three hundred dollars ($5,300.00) for cases adjudicated before June 22, 2009. The maximum amount was raised by the Commissioner on February 3, 2009 to six thousand dollars ($6,000.00) for cases adjudicated after June 22, 2009, 74 F.R. 6080 (February 4, 2009).

2.  Under the Social Security Regulations, "past-due benefits" include all benefits payable to claimants and/or their families/dependents.

3.  If the claim does not result in past due benefits, according to their rules Social Security cannot approve this fee agreement. Under those circumstances, the fee petition process may be used.

4.  This fee agreement will not be valid if an appeal of an unfavorable or partially favorable decision is made to the Appeals Council or if the Appeals Council exercises review on its own motion.

Dated: _____10/7/09_____

David B. Pushkin
S.S. No.  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


BINDER & BINDER

By: _____Charles E. Binder_____ (over)
Charles E. Binder
Primary Representative

By: _____
Co-Representative
NIKHIL S. AGHARKAR

2/09

Exh 13B Pg 1 of 1

## SOCIAL SECURITY ADMINISTRATION
### Office of Disability Adjudication and Review

### DECISION

**IN THE CASE OF**                    **CLAIM FOR**

David Pushkin                         Period of Disability and Disability Insurance
_____               Benefits
(Claimant)                            _____

_____               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
(Wage Earner)                         _____
                                      (Social Security Number)

### JURISDICTION AND PROCEDURAL HISTORY

On February 11, 2009, the claimant filed a Title II application for a period of disability and
disability insurance benefits, alleging disability beginning November 22, 2006. The claim was
denied initially and upon reconsideration on October 2, 2009. Thereafter, the claimant filed a
written request for hearing on October 22, 2009 (20 CFR 404.929 *et seq.*). The claimant
appeared and testified at a hearing held on October 7, 2010, in Newark, New Jersey. The
claimant is represented by Charles E. Binder, an attorney.

### ISSUES

The issue is whether the claimant is disabled under sections 216(i) and 223(d) of the Social
Security Act. Disability is defined as the inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment or combination of
impairments that can be expected to result in death or that has lasted or can be expected to last
for a continuous period of not less than 12 months.

There is an additional issue whether the insured status requirements of sections 216(i) and 223 of
the Social Security Act are met. The claimant's earnings record shows that the claimant has
acquired sufficient quarters of coverage to remain insured through December 31, 2011. Thus,
the claimant must establish disability on or before that date in order to be entitled to a period of
disability and disability insurance benefits.

After careful consideration of all the evidence, the Administrative Law Judge concludes that the
claimant was not disabled prior to January 1, 2009, but became disabled on that date and has
continued to be disabled through the date of this decision. The undersigned also finds that the
insured status requirements of the Social Security Act were met as of the date disability is
established.

### APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has
established a five-step sequential evaluation process for determining whether an individual is

See Next Page

David Pushkin (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)                                    Page 2 of 8

disabled (20 CFR 404.1520(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574 and 404.1575). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1521; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 404.1509), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e) and 404.1545; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.1520(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long

See Next Page

David Pushkin (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)                                                    Page 3 of 8

enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b) and 404.1565). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g) and 404.1560(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.**

**2.   Prior to January 1, 2009, the date the claimant became disabled, the claimant engaged in substantial gainful activity (20 CFR 404.1520(b) and 404.1571 *et seq.*).**

The record indicates that the claimant earned $21,742.80 in 2008 (*see* Exhibits 2D-4D).

The claimant testified to working as an adjunct professor about 40% of the number of hours he worked as a full-time professor. Specifically, from January to May of 2008 he taught three courses and labs for a total of 14 hours per week. During the summer semester from June through August of 2008, he taught one course at three hours per week. From September through December of 2008 he taught a chemistry course at six hours per week.

The claimant also received income as a freelance writer with gross receipts equaling $7,000 and a net profit of $3,615 (Exhibit 1D). He testified that he worked from October 2007 through February 2008 revising a middle school science textbook for a publisher. He did this work at home for approximately 1/2 hours per day, and when he completed the work he was paid a sum certain for each of the chapters.

Substantial gainful activity (SGA) is work that involves doing significant and productive physical or mental duties that are engaged in or intended for pay or profit (20 C.F.R. 404.1572).

As indicated by SSR 83-33:

See Next Page

David Pushkin (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)                                    Page 4 of 8

> Under the disability provisions of the law, except within the trial work period (TWP)
> provisions, a person who is engaging in SGA is not eligible for payment of disability
> benefits. SGA is defined in the regulations as work "that involves doing significant
> physical or mental activities . . . [and] is the kind of work usually done for pay or profit. .
> . ." "Significant activities" are useful in the accomplishment of a job and have economic
> value. **Work may be substantial even if it is performed on a part-time basis**, or even
> if the individual does less, is paid less, or has less responsibility than in previous work.
> Work activity by an employee is gainful if it is the kind of work usually done for pay,
> whether in-cash or in-kind. Activities such as self-care, household tasks, unpaid training,
> hobbies, therapy, school attendance, clubs, social programs, etc., are not generally
> considered to be SGA . . . According to the SGA Earnings Guidelines for employees, earnings
> considered indicative of substantial work are those which average more per month than the
> primary amount for the particular calendar year. On the other hand, earnings which average less
> per month than the secondary amount for the particular calendar year are considered indicative of
> insubstantial work, unless there is evidence to the contrary (emphasis added).

Even if this work can be considered as part time for his line of employment, the claimant's
earnings during the entire year of 2008 amounts to earnings greater than the substantial gainful
activity threshold, and thus constitutes substantial gainful activity which remains unrebutted by
the claimant's arguments (20 CFR 404.1574(b)(2)).

In addition, as is argued by claimant's counsel, even if each individual course of employment the
claimant had engaged in separately (specifically his teaching and his textbook editing) is not
considered substantial gainful activity separately, the claimant's piecing together of enough part-
time work to earn substantial gainful activity constitutes same.

The claimant further argues in the alternative that this work constituted a trial work period.

During a trial work period, a beneficiary receiving Social Security disability benefits may test his
or her ability to work and still be considered disabled. Services performed during the trial work
period are not considered as showing that the disability has ended until services have been
performed in at least 9 months (not necessarily consecutive) in a rolling 60-month period. During
2008, any month in which earnings exceeded $670 is considered a month of services for an
individual's trial work period (20 C.F.R. 404.1592).

SSR 65-62 clarifies that:

> As an incentive to rehabilitation, section 222(c) permits a disability beneficiary who returns to
> work despite his impairments, to continue to receive his benefits during a designated period even
> though his work otherwise is of a nature to constitute substantial gainful activity. After a "trial
> work period," which may not exceed 9 months, it may be found that he is able to engage in
> substantial work and no longer under a disability, that is, his disability has ceased. This "trial work
> period" permits beneficiaries who have not medically recovered from their impairments to attempt
> work without the fear of losing their right to benefits before they have demonstrated their ability to
> work for a significant period of time. Under section 223, the beneficiary will receive his benefits
> for the month in which his disability ceases and for the following 2 months.

Although the claimant attempts to argue that his work during 2008 constituted a trial work
period, this argument is not persuasive given the fact that the claimant's work was for substantial

See Next Page

David Pushkin (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)                                                    Page 5 of 8

gainful activity during the entire year including the summer months, and given that the claimant's disability had not already been established prior to this work.

**3.    Beginning on January 1, 2009, the claimant has not engaged in substantial gainful activity (20 CFR 404.1571 *et seq.*).**

**4.    Since January 1, 2009, the claimant has had the following severe impairments: failed back syndrome, deep vein thrombosis, and depression (20 CFR 404.1520(c)).**

**5.    Since January 1, 2009, the claimant has not had an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

As will be further explained below, the claimant's back disorder does not rise to the level of meeting the spinal stenosis, nerve root, or spinal cord compression requirements of medical listing 1.04 (with the attendant sensory or reflex loss, spinal arachnoiditis or pseudoclaudication), and is not supported by the necessary diagnostic and clinical evidence.

The claimant has the following degree of limitation in the broad areas of functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings in 20 CFR, Part 404, Subpart P, Appendix 1: no restriction in activities of daily living, no difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration.

The claimant's mental impairment(s) does not satisfy the paragraph "C" criteria of the applicable mental disorder listing(s).

**6.    After careful consideration of the entire record, the undersigned finds that since January 1, 2009, the claimant had the residual functional capacity to perform less than sedentary work as defined in 20 CFR 404.1567(a), specifically, the claimant is capable of lifting less than five pounds even on an occasional basis; is unable to sit, stand or walk for longer than one hour during an eight hour workday; is unable to perform even occasional bending or stooping; is unable to climb, stoop, kneel, crouch or crawl even occasionally; must avoid heavy machinery, heights and other hazards; is incapable of work that requires even low stress; requires work that allows for hourly breaks for bathroom visits; and requires work that allows for at least three monthly unscheduled absences.**

In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and

See Next Page

David Pushkin (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)                                    Page 6 of 8

that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible.

The medical record amply documents the claimant's significant lumbar and cervical impairments with attendant sequelae. This has resulted in back , neck and lower extremity range of motion and ambulatory limitations, loss of manual dexterity, and concentration problems. The claimant has also begun treatment for major depression as well as anxiety (*see* Exhibits 1F-6F, 10F-17F, 18F, 19F, 22F-37F).

The claimant has undergone numerous aggressive treatment modalities, including laminectomy and spinal fusion surgical intervention from L2 through S1 from March of 2007 onward.

Diagnostic findings support the extent of the claimant's complaints and alleged limitations (*e.g.* Exhibit 27F, July 2008 and January 2009 nerve conduction studies finding evidence of lumbosacral polyradiculopathy, June 2008 scan finding lumbar scoliosis, June 2008 lumbar CT scans finding spinal stenosis at L5 through S1, disc bulging with herniated disc at L1 through L2, and spondylolisthesis at L5, June 2009 lumbosacral x-ray findings indicating anterolisthesis and retrolisthesis, July 2009 CT scan finding spondylolisthesis at L5, bulging, degenerative changes and foraminal narrowing at L1 through L4 and, significantly, moderate to severe bilateral foraminal narrowing at L5 through S1, and a January 2009 cervical MRI indicating degenerative arthritis of a significant nature and neural foraminal narrowing at multiple levels at C2 through C6).

Significantly, the claimant's treating physicians' credibly opine that the claimant is capable of a markedly narrow range of sedentary work and it is disabled.

The claimant was found to have significant incontinence he problems requiring urinary frequency eight times a day (Exhibit 26F).

It was also credibly opined that the claimant's intractable and severe low back pain— resulting in left leg weakness, limited range of motion of the lumbar and cervical spine as well as the lower extremities, muscle weakness of the lower extremities, an antalgic and unsteady gait, and diminished reflexes— precluded the claimant from lifting even 5 pounds, would interfere with his attention and concentration frequently, would render the claimant incapable of even low stress, would require unscheduled breaks 4 to 5 times a day, and would require absences from work more than three times a month (Exhibit 25F; *see also* Exhibit 23F, treating physician's credible opinion that the claimant is disabled; Exhibit 35F, treating physicians multiple impairment questionnaire indicating a markedly limited sedentary residual functional capacity indicating an inability to walk, back and leg pain, fatigue, and edema).

**7.   Since January 1, 2009, the claimant has been unable to perform any past relevant work (20 CFR 404.1565).**

The demands of the claimant's past relevant work exceed the residual functional capacity.

See Next Page

David Pushkin (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)                                     Page 7 of 8

8.  **The claimant was a younger individual age 18-44 on January 1, 2009, the established disability onset date (20 CFR 404.1563).**

9.  **The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).**

10.  **The claimant does not have work skills that are transferable to other occupations within the residual functional capacity defined above (20 CFR 404.1568).**

11.  **Since January 1, 2009, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.28. However, the additional limitations so narrow the range of work the claimant might otherwise perform that a finding of "disabled" is appropriate under the framework of this rule.

12.  **The claimant was not disabled prior to January 1, 2009, (20 CFR 404.1520(b)) but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g)).**

See Next Page

David Pushkin (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)                                                Page 8 of 8

## DECISION

Based on the application for a period of disability and disability insurance benefits filed on February 11, 2009, the claimant has been disabled under sections 216(i) and 223(d) of the Social Security Act beginning on January 1, 2009.

/s/ *Michal L. Lissek*
_____
Michal L. Lissek
Administrative Law Judge

OCT 1 4 2010
_____
Date

## LIST OF EXHIBITS

| Claimant: | **David Pushkin** | | SSN: | **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** |
|---|---|---|---|---|

| Exh. No. | Part No. | Description | No. of Pages |
|---|---|---|---|
| | | **PAYMENT DOCUMENTS/DECISIONS** | |
| 1 | A | Initial Disability Determination by State Agency, Title II, dated 06/17/2008 | 2 |
| 2 | A | Reconsideration Disability Determination by State Agency, Title II, dated 10/02/2009 | 2 |
| | | **JURISDICTIONAL DOCUMENTS/NOTICES** | |
| 1 | B | Social Security Notice undated | 2 |
| 2 | B | Social Security Notice Of Disapproved Claim dated 06/17/2009 | 5 |
| 3 | B | Field Office Report of Contact - Informational, dated 08/05/2009 | 2 |
| 4 | B | Request for Reconsideration filed 06/30/2009 (rec'd 08/05/2009) | 1 |
| 5 | B | Social Security Notice of Reconsideration dated 10/02/2009 | 3 |
| 6 | B | Request for Hearing filed 10/22/2009 | 3 |
| 7 | B | Appointment of Representative, dated 10/07/2009 | 2 |
| 8 | B | Fee Agreement, dated 10/07/2009 | 1 |
| 9 | B | Letter of Acknowledgement of Request for Hearing dated 11/17/2009 | 2 |
| 10 | B | Notice of Hearing dated 08/16/10 | 6 |
| 11 | B | Representative Correspondence datedc 9/15/10 (OTR) | 5 |
| 12 | B | Acknowledgement of Receipt (Notice of Hearing) dated 8/19/10 | 1 |
| 13 | B | Representative Correspondence dated 10/5/10 | 17 |
| 14 | B | Appointment of Representative, dated 10/7/10 | 1 |
| 15 | B | Fee Agreement, dated 10/7/10 | 1 |

Form HA-L39 (03-2007)

## LIST OF EXHIBITS

**Claimant:**   **David Pushkin**                                   **SSN:**     **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**

| Exh. No. | Part No. | Description | No. of Pages |
|---|---|---|---|
| | | **NON-DISABILITY DEVELOPMENT** | |
| 1 | D | Application for Disability Insurance Benefits filed 06/20/2009 | 6 |
| 2 | D | Detailed Earnings Query, dated 06/28/2010 | 11 |
| 3 | D | DISCO DIB Insured Status Report dated 06/28/2010 | 2 |
| 4 | D | SSA New Hire Query, dated 06/28/2010 | 2 |
| 5 | D | SSA Systems Query - MBR, dated 07/28/2010 | 2 |
| | | **DISABILITY RELATED DEVELOPMENT AND DOCUMENTATION** | |
| 1 | E | Disability Report - Adult, undated | 8 |
| 2 | E | Work Activity Report (Self-Employed) dated 05/27/2009 | 4 |
| 3 | E | Statement of Claimant - Explanation Of Work & Earnings, dated 05/28/2009 | 9 |
| 4 | E | Work Activity Report - Employee dated 06/09/2009 | 8 |
| 5 | E | Disability Report - Appeal dated 07/07/2009 | 15 |
| 6 | E | Function Report - Adult, dated 08/19/2009 | 8 |
| 7 | E | Listing of Claimant's Medications & Treating Sources | 5 |
| | | **MEDICAL RECORDS** | |
| 1 | F | Hospital Records for admission on 03212007 through discharge on 04042007 from Beth Israel Medical Center | 70 |
| 2 | F | Hospital Records for admission/Transfer on 04/04/07  through discharge on 04/18/2007 from Beth Israel Medical Center | 68 |
| 3 | F | Medical Report dated 04/01/2008 from Pain Management Center | 5 |

Form HA-L39 (03-2007)

## LIST OF EXHIBITS

| Claimant: | **David Pushkin** | | SSN: | **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** |
|---|---|---|---|---|

| Exh. No. | Part No. | Description | No. of Pages |
|---|---|---|---|
| 4 | F | Medical Records/X-Ray Reports covering the period from 12/18/2006 to 04/14/2008 from New Century Imaging | 14 |
| 5 | F | Medical Reports dated 02/06/2009 & 03/02/2009 from Seth Kane, M. D. | 3 |
| 6 | F | Medical Records covering the period from 05/06/2008 to 04/22/2009 from Stephen Sherer, M. D. | 28 |
| 7 | F | RFC - Residual Functional Capacity Assessment - Physical (completed by DDS physician) dated 05/01/2009 | 8 |
| 8 | F | Medical Records covering the period from 01/21/2007 to 06/09/2009 from Morris Traube, M. D, NYU Gastroenterology Associated | 16 |
| 9 | F | State Agency Development Summary & Worksheet(s) for the period 06/11/2009 through 06/17/2009 | 2 |
| 10 | F | Medical Records covering the period from 12/21/2006 to 07/01/2009 from Mario Vukic, M. D. | 30 |
| 11 | F | Medical Records/X-Ray Reports dated 01/21/2009 through 07/13/2009 from New Century Imaging | 12 |
| 12 | F | Medical Report covering the period from 06/22/2009 to 08/10/2009 from Gregory Lovallo, M. D. | 8 |
| 13 | F | Medical Report covering the period from 04/01/2008 to 08/13/2009 from Kenneth Park, M. D. | 4 |
| 14 | F | Medical Records covering the period from 11/24/2006 to 08/24/2009 from Mark Gurtovy, M. D. | 19 |
| 15 | F | Medical Records covering the period from 11/08/2008 to 09/01/2009 from Hooman Azmi, M. D. | 20 |
| 16 | F | Medical Report dated 09/02/2009 from New Jersey Center For Prostate Cancer & Urology submitted by Gregory G. Lovallo, M. D. | 6 |
| 17 | F | Medical Records covering the period from 12/18/2008 to 09/17/2009 from Interventional Pain Medicine submitted by Kenneth Park, D. O. | 31 |

Form HA-L39 (03-2007)

## LIST OF EXHIBITS

**Claimant:**   **David Pushkin**                                      **SSN:**     **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**

| Exh. No. | Part No. | Description | No. of Pages |
|---|---|---|---|
| 18 | F | Psychiatric Review Technique Form (completed by DDS physician) dated 10/01/2009 | 14 |
| 19 | F | RFC - Residual Functional Capacity Assessment - Mental (completed by DDS physician) dated 10/01/2009 | 4 |
| 20 | F | RFC - Residual Functional Capacity Assessment - Physical (completed by DDS physician) dated 10/01/2009 | 8 |
| 21 | F | State Agency Development Summary & Worksheets for the period 08/10/2009 through 10/02/2009 | 5 |
| 22 | F | Medical Report dated 10/15/2009 from Boris L. Prakhina, M. D. | 4 |
| 23 | F | Medical Report/Neurological Evaluation dated 11/03/2009 from Hackensack Neurology Group submitted by Mario Vukic, M. D. | 1 |
| 24 | F | Medical Report dated 01/12/2010 from Andrew M. Casden, M. D. | 1 |
| 25 | F | Lumbar Spine Impairment Questionnaire, dated 03/25/2010 by Mario Vukic, M. D. | 7 |
| 26 | F | Medical Records covering the period from 6/22/09 to 8/27/10 from Dr. G. Lavallo | 20 |
| 27 | F | Medical Records covering the period from 7/18/08 to 7/28/09 from Multiple sources | 43 |
| 28 | F | Medical Records covering the period from 6/23/09 to 9/1/09 from Dr. Andrew Casden | 15 |
| 29 | F | Medical Records covering the period from 11/07/06 to 10/09/09 from Dr. Mark Gurtovy | 17 |
| 30 | F | Outpatient Medical Records covering period from 9/21/09 to 11/3/09 from Hackensack University Medical Center | 33 |
| 31 | F | Medical Records covering the period from 9/2/09 to 12/7/09 from Insitute of Diagnosis & Treatment of Pain | 11 |
| 32 | F | Medical Records covering the period from 1/19/07 to 1/12/10 from Dr. Andrew Casden | 39 |
| 33 | F | Medical Records covering the period from 12/21/06 to 3/25/10 from Dr. M. Vukie | 81 |
| 34 | F | Medical Records covering the period from 5/6/08 to 4/8/10 from Sr. Stephen Sherer | 15 |

## LIST OF EXHIBITS

| Claimant: | David Pushkin | | SSN: | 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 |
|---|---|---|---|---|

| Exh. No. | Part No. | Description | No. of Pages |
|---|---|---|---|
| 35 | F | Multiple Impairment Questionnaire dated 5/18/10, by Dr. Stephen Sherer | 8 |
| 36 | F | Medical Records covering the period from 2/25/08 to 5/21/10 from Dr. Seth Kane | 13 |
| 37 | F | MRI spine, Lumber w/wo Contrast  from Dr. G. Nicola dated /21/10 | 5 |

Form HA-L39 (03-2007)

# Social Security Administration
# Retirement, Survivors and Disability Insurance
Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date:  November 13, 2010
Claim Number:  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HA

001011 MCSM77 N3  2.270
DAVID B PUSHKIN
300 STATE HIGHWAY
ROUTE 3 EAST STE 114
EAST RUTHERFORD, NJ 07073

You are entitled to monthly disability benefits beginning June 2009.

**The Date You Became Disabled**

We found that you became disabled under our rules on January 1, 2009.  This is different from the date given on the application.

Also, you have to be disabled for 5 full calendar months in a row before you can be entitled to benefits.  For these reasons, your first month of entitlement to benefits is June 2009.

**What We Will Pay And When**

- You will receive $21,795.00 around November 19, 2010.

- This is the money you are due for June 2009 through October 2010.

- Your next payment of $1,635.00, which is for November 2010, will be received on or about the fourth Wednesday of December 2010.

- After that you will receive $1,635.00 on or about the fourth Wednesday of each month.

- Later in this letter, we will show you how we figured these amounts.

The day we make payments on this record is based on your date of birth.

**Information About Representative's Fees**

We have approved the fee agreement between you and your representative.

Enclosure(s):
Pub 05-10153
Pub 05-10058

C                              See Next Page

Your past-due benefits are $27,795.00 for June 2009 through October 2010. Under the fee agreement, the representative cannot charge you more than $6,000.00 for his or her work.  The amount of the fee does not include any out-of-pocket expenses (for example, costs to get copies of doctors' or hospitals' reports).  This is a matter between you and the representative.

## How To Ask Us To Review The Determination On The Fee Amount

You, the representative or the person who decided your case can ask us to review the amount of the fee we say the representative can charge.

If you think the amount of the fee is too high, write us within 15 days from the day you get this letter.  Tell us that you disagree with the amount of the fee and give your reasons.  Send your request to this address:

> Social Security Administration
> Office of Disability Adjudication and Review
> Attorney Fee Branch
> 5107 Leesburg Pike
> Falls Church, Virginia 22041-3255

The representative also has 15 days to write us if he or she thinks the amount of the fee is too low.

If we do not hear from you or the representative, we will assume you both agree with the amount of the fee shown.

## Information About Past-Due Benefits Withheld To Pay A Representative

We are paying the representative from the benefits we withheld.  Therefore, we must collect a service charge from him or her.  The service charge is 6.3 percent of the fee amount we pay, but not more than $83, which is the most we can collect in each case under the law.  We will subtract the service charge from the amount payable to the representative.

The representative cannot ask you to pay for the service charge.  If the representative disagrees with the amount of the service charge, he or she must write to the address shown at the top of this letter.  The representative must tell us why he or she disagrees within 15 days from the day he or she gets this letter.

## Other Social Security Benefits

The benefit described in this letter is the only one you can receive from Social Security.  If you think that you might qualify for another kind of Social Security benefit in the future, you will have to file another application.

## Your Responsibilities

The decisions we made on your claim are based on information you gave us. If this information changes, it could affect your benefits.  For this reason, it is important that you report changes to us right away.

We have enclosed a pamphlet, "What You Need To Know When You Get Social Security Disability Benefits".  It will tell you what must be reported and how to report.  Please be sure to read the parts of the pamphlet which explain what to do if you go to work or if your health improves.

A provider of employment or vocational rehabilitation services may contact you about getting help to go to work.  The provider may be a State vocational rehabilitation agency or a provider under contract with the Social Security Administration.

If you go to work, special rules allow us to continue your cash payments and health care coverage.  For more information about how work and earnings affect disability benefits, call or visit any Social Security office and ask for the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No.  05-10095).

- Social Security - If You Are Blind--How We Can Help (SSA Publication No.  05-10052).

**Other Information**

We are sending a copy of this notice to CHARLES EDWARD BINDER.

**Do You Disagree With The Decision?**

You have already been notified of your appeal rights regarding the decision made by the Administrative Law Judge and what you must do to have that decision reexamined.  If you believe that any other determination made by us in carrying out the Administrative Law Judge decision is incorrect, you may also request that part of your case be reexamined.

If you want this reconsideration, you may request it through any Social Security office.  If additional evidence is available, you should submit it with your request.  We will review your case and consider any new facts you have.  A person who did not make the first decision will decide your case. We will correct any mistakes.  We will review those parts of the decision which you believe are wrong and will look at any new facts you have.  We may also review those parts which you believe are correct and may make them unfavorable or less favorable to you.

- You have 60 days to ask for an appeal.

- The 60 days start the day after you get this letter.  We assume you got this letter 5 days after the date on it unless you show us that you did not get it within the 5-day period.

- You must have a good reason for waiting more than 60 days to ask for an appeal.

- You have to ask for an appeal in writing.  We will ask you to sign a Form SSA-561-U2, called "Request for Reconsideration".  Contact one of our offices if you want help.

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HA                                                            Page  4 of  5

Please read the enclosed pamphlet, "Your Right to Question the Decision Made on Your Social Security Claim". It contains more information about the appeal.

**Things To Remember For The Future**

Doctors and other trained staff decided that you are disabled under our rules. But, this decision must be reviewed at least once every 3 years. We will send you a letter before we start the review. Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled.

Please tell us if there is a change in the mailing address and/or direct deposit information. We need this information to make sure payments are deposited timely and important notices regarding your payments reach you.

**If You Have Any Questions**

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-866-964-0170. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

> SOCIAL SECURITY
> 935 ALLWOOD RD
> CLIFTON NJ 07012

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Michael J. Astrue
Commissioner
    of Social Security

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HA                                              Page  5 of  5

# PAYMENT SUMMARY

## Your Payment Of $21,795.00

Here is how we figured your
first payment:

> Benefits due for June 2009
> through October 2010
> including any cost of living increase,
> less monthly rounding of benefits ......................$27,795.00

> Amount we subtracted because of

> • money to pay
>   your representative  ..........................   6,000.00

This equals the amount of
your first payment ....................................$21,795.00

## Your Regular Monthly Payment

Here is how we figured your
regular monthly payment effective November 2010:

> You are entitled to a monthly benefit of  ................$ 1,635.60

> Amount we subtracted because of

> • rounding (we must round down to
>   a whole dollar) ................................     .60

This equals the amount of
your regular monthly payment  ...........................$ 1,635.00

# Social Security Administration

Date:  November 19, 2010
Claim Number:  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A



1BEV010000080  0.345  SP  0.440     T
DAVID B PUSHKIN
300 STATE HIGHWAY
ROUTE 3 EAST STE 114
EAST RUTHERFORD NJ 07073

You asked us for information from your record.  The information that you
requested is shown below.  If you want anyone else to have this information,
you may send them this letter.

## Information About Current Social Security Benefits

Beginning June 2009, the full monthly Social Security benefit before any
deductions is $ 1635.60.

We deduct $0.00 for medical insurance premiums each month.

The regular monthly Social Security payment is $ 1635.00.
(We must round down to the whole dollar.)

Social Security benefits for a given month are paid the following month.  (For
example, Social Security benefits for March are paid in April.)

Your Social Security benefits are paid on or about the fourth Wednesday of
each month.

## Date of Birth Information

The date of birth shown on our records is March 21, 1963.

There was no cost of living adjustment in Social Security benefits in
December 2009.  The benefit amount shown is current as of the date on this
letter.

## Type of Social Security Benefit Information

You are entitled to monthly disability benefits.

See Next Page

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A                                                           Page  2 of  2

**If You Have Any Questions**

If you have any questions, you may call us at 1-800-772-1213, or call your local
Social Security office at 866-964-0170.  We can answer most questions over the
phone.  You can also write or visit any Social Security office.  The office that
serves your area is located at:

> SOCIAL SECURITY
> 935 ALLWOOD RD
> CLIFTON, NJ 07012

If you do call or visit an office, please have this letter with you.  It will help
us answer your questions.

Beatrice M. Disman
Regional Commissioner

# Social Security Administration
# Retirement, Survivors and Disability Insurance
Important Information

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date:  November 30, 2010
Claim Number:  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HA

016114 1 SP      0043 LTN T24 PC7 1123

DAVID B PUSHKIN
300 STATE HIGHWAY
ROUTE 3 EAST STE 114
EAST RUTHERFORD NJ 07073

As you requested, beginning December 2010 any Social Security payments will
be sent to

- the financial institution you selected; or
- the new account you selected at the same financial institution.

In order for us to send letters to you, please let us know if your address
changes.

## What We Will Pay And When

- You will receive $1,635.00 for December 2010 around January 26, 2011.

- After that you will receive $1,635.00 on or about the fourth Wednesday
  of each month.

## If You Change Your Account

Please tell us if you change the financial institution or account where your
payments are going.  Also, you should keep the old account open until the
first benefit payment is credited to your new account.  It usually takes 1 to
2 months to process the change.

C                              See Next Page

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HA                                             Page  2 of  2

**If You Have Any Questions**

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-866-964-0170. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

SOCIAL SECURITY
935 ALLWOOD RD
CLIFTON, NJ 07012

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Carolyn L. Simmons
Associate Commissioner for
Central Operations

Wed, Jul 15, 2009  12:08 AM

**Subject: Jobs on Craigs List**
**Date:** Monday, September 24, 2007 9:02 AM
**From:** Beth Nussbaum <BNussbaum@rhifilms.com>
**To:** Dave Pushkin <dpushkin@nj.rr.com>
**Conversation:** Jobs on Craigs List

Here are some jobs that I found that you can answer...(they are relevant to your skills)

SAT I, II, and AP Subject Tutors Wanted!

Reply to: job-429151687@craigslist.org
Date: 2007-09-22, 1:11PM EDT


We carefully select instructors who consistently deliver great results, and pride ourselves in the quality of our programs. C2 Education Centers is seeking full time and/or part time teachers for reading, writing, math, and SAT preparation.

We provide very consistent and flexible scheduling. All instruction is done at our centers. Tutors can expect a predictable weekly pay and do not have to travel to other people's home.

We have new center openings in PA, NJ, and NY: Fort Lee, Paramus, Livingston, Edison, Langhorne, Bluebell, Manhattan, and Nanuet.

We are looking for: highly skilled, motivated, versatile, dependable, and dynamic individuals who have strong communication skills.

Candidate must possess a love for teaching, but previous teaching experience is not a prerequisite.

B.A. is a must.

Strong SAT scores are a must for SAT prep teachers.

Please email resumes and SAT scores to columbia@c2educate.com or fax them to 770.623.1600. Additional information can be found on our website at www.c2educate.com


Location: Fort Lee, Paramus, Livingston, Nanuet
Compensation: hourly: $17-$25, salary: $30k-$40k (w/benefits)
Principals only. Recruiters, please don't contact this job poster.

**Page 1 of 5**

Please, no phone calls about this job!
Please do not contact job poster about other services, products or
commercial interests.

PostingID: 429151687

---

** SAT TEACHERS NEEDED**

Reply to: eng@huntingtonlearningcenter.com
Date: 2007-09-21, 5:37PM EDT

** SEEKING ELEMENTARY & SAT TEACHERS** HUNTINGTON LEARNING CENTER

*TEACHERS WANTED: ENGLEWOOD HUNTINGTON LEARNING CENTER*

**ENGLEWOOD CENTER SEEKING SAT & ELEMENTARY TEACHERS**

HUNTINGTON LEARNING CENTERS IS NOW HIRING PART TIME TEACHERS!!!

Are you interested in a PART TIME position?
Do you have the desire to help students succeed in school?
Would you like to be part of a TEAM that delivers the finest supplemental
services available to students in the United States?

HUNTINGTON LEARNING CENTER IN ENGLEWOOD HAS THE OPPORTUNITY FOR YOU!!!

OUR PART TIME TEACHERS work closely with students from Kindergarten through
High School in READING, MATH, WRITING, STUDY SKILLS, SAT & ACT Prep.

~ Flexible, part-time schedules (6 to 20 hours a week)
~ AFTER SCHOOL & WEEKEND HOURS AVAILABLE
~ Paid training
~ No lessons to plan and no homework to grade
~ PLEASANT WORK ENVIRONMENT!!!

4-Year College Degree REQUIRED.
Higher Level MATHEMATICS & VERBAL a plus!
**SPECIAL EDUCATION A PLUS!
DYNAMIC, ENTHUSIASTIC, COMPASSIONATE & ARTICULATE PROFESSIONALS a MUST!

The Englewood Center is located at 29 Nathaniel Place off Palisade Avenue.