**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRCIT OF NEW YORK**
**MANHATTAN DIVISION**

**PRO SE OFFICE**

**Dr. David B. Pushkin**
*Plaintiff Pro Se*
300 State Highway Route 3 East
Suite 104
East Rutherford, NJ 07073                 CIVIL ACTION NUMBER **10 Civ. 9212 (JGK)(DF)**
(201) 206-5160

**v.**

BETH R. NUSSBAUM, RHI ENTERTAINMENT, INC.
TIMOTHY J. QUINLIVAN, ESQ., MERITAIN HEALTH
KEVIN L. BREMER, ESQ., ARONSOHN WEINER AND SALERNO, L.L.
GEICO, PREMIER PRIZM SOLUTIONS, LISA ARDRON
GINA FUGE, DOMINIC SPAVENTA, PAUL FELDMAN
*Defendants*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _5-9-11_

**RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT**

The Plaintiff is in receipt of Responses and Motions to Dismiss by counsel for TIMOTHY J. QUINLIVAN, ESQ. ("QUINLIVAN") and MERITAIN HEALTH on April 29, 2011, and by counsel for RHI ENTERTAINMENT, INC. ("RHI") on May 2, 2011.  In accordance with Rule 6(b) and Rule 12 of the Federal Rules of Civil Procedure, this Response is concurrent to all three defendants.  Furthermore, the Plaintiff requests the Honorable John G. Koeltl and Honorable Debra Freeman both set a date and time for a hearing on both counsel's Motions for Dismissal, where the Plaintiff will be a direct party to the proceedings. Lastly, the Plaintiff requests that the Court establish a period of Discovery during this hearing, since both counsel's Motions for Dismissal are without merit and should not be granted.

**INTRODUCTION:**

On page 1 of counsel's Memorandum on behalf of QUINLIVAN and MERITAIN HEALTH, counsel states: *the spouse of a member of a self-funded employee benefit plan, seeks to hold the Third Party Administrator ("TPA") of that plan... liable for what Plaintiff alleges are a series of misfortunes which have nothing to do with the TPA or its employee... While his story is sad, it does not, and cannot, impose any liability on either Meritain or Quinlivan.*

As the attached Certificate of Credible Coverage ("COCC", Exhibit A) indicates, MERITAIN HEALTH is identified as a "health insurance company" in accordance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). RHI is identified as the employer, group health plan name, and plan administrator, but not a "health insurance company." RHI is a company that makes movies of

questionable quality – the quality of its movies is a subjective opinion not relevant to this case; however, the fact that RHI makes movies and does not make coverage-related decisions, such as pre-authorization for medical tests and procedures, or hospitalizations, or home health care, and does not provide care management nurses, is relevant to this case. What the mere existence of a COCC establishes is that MERITAIN HEALTH is indeed directly responsible for all health care provisions, authorizations, and coverage decisions. For example, when the Plaintiff required multilevel spinal fusion surgery in March 2007, he did not go to the RHI web site to locate in-network providers; he went to the web site created and maintained by MERITAIN HEALTH, previously known as PERFORMAX. RHI didn't determine where the Plaintiff's surgery, hospitalization, post-hospitalization rehab, and outpatient care would take place; MERITAIN HEALTH did, and by those responsibilities, MERITAIN HEALTH is more than a TPA, or innocent bystander, or any other label counsel claims for the sake of seeking judicial absolution. MERITAIN HEALTH is a health insurer, no different than Blue Cross Blue Shield or United Health Care or AFLAC or any other health insurance company in the United States. MERITAIN HEALTH was the group plan health insurance provider for the Plaintiff and his former wife, BETH NUSSBAUM, for approximately sixty-nine (69) months. MERITAIN HEALTH was the group plan health insurance provider that dictated the terms of health care for the Plaintiff and BETH NUSSBAUM. MERITAIN HEALTH was the group plan health insurance provider on January 1, 2009, the date established for the Plaintiff's disability onset by Social Security Administrative Law Judge Michal L. Lissek on October 14, 2010. Therefore, MERITAIN HEALTH is the group plan health insurance provider of record and liability in accordance with Title II and XVI of the Social Security Act of 1935, the Medicare Act of 1965, and the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). Exhibit B explicitly provides the statutes counsel for MERITAIN HEALTH and QUINLIVAN claims is lacking, vague and implausible in the Amended Complaint filed by the Court on February 17, 2011.

**ALLEGATIONS and DEFENSE CHALLENGES:**

The primary issue of this case is not the divorce between the Plaintiff and BETH NUSSBAUM despite the fact that the divorce precipitated the events in this Complaint. The divorce is final, and both ex-spouses are likely much better off not being in each other's lives. The Plaintiff is already in a committed relationship since June 2010, is not the least interested in any reconciliation with his ex-wife, and is quite transparent in his disdain for his ex-wife as a human being in general. The heart of this case is exclusively the Plaintiff's ongoing health care and his legal rights to the best medical care possible under federal law prior to commencement of Medicare coverage on June 1, 2011. With regards to RHI, MERITAIN HEALTH and QUINLIVAN, the heart of this case focuses on their roles in the compromising of Plaintiff's health care between July 1, 2009 and June 1, 2011, the period of time medical claims on behalf of the Plaintiff were unpaid, providers subsequently discontinued medical care, Plaintiff's hospitalization for acute neurogenic renal failure, Plaintiff's lacking access to equivalent quality health insurance and continued health care, and

Plaintiff's worsening health as a consequence of not having his own continued individual coverage with the insurance provider that had covered him since December 28, 2003.

As stated in Exhibit B, special rules for COBRA exist for disabled individuals already under health insurance coverage, extending their eligible coverage from eighteen (18) to twenty-nine (29) months. COBRA coverage with MERITAIN HEALTH began for both BETH NUSSBAUM and the Plaintiff on November 22, 2008. The Plaintiff's date of disability onset, established by the Social Security Administration on October 14, 2010, was January 1, 2009, well within the first 60 days of COBRA coverage. RHI was notified and consulted by BETH NUSSBAUM of legal separation in February 2009, and of pending divorce proceedings in May 2009, so all parties were fully aware of a pending qualifying event where the Plaintiff would need to be offered his own COBRA policy. At no time was the Plaintiff made aware of his legal right to his own individual COBRA policy by BETH NUSSBAUM, RHI, or MERITAIN HEALTH, and in fact, upon notification by the New Jersey Department of Insurance in August 2009 (Exhibit C), the Plaintiff was unaware of his legal right to an individual COBRA policy under the American Recovery and Reinvestment Act of 2009 ("ARRA"). Under ARRA, as well as the New Jersey Health Insurance Continuation Program and the Federal Health Care and Education Reconciliation Acts of 2009 and 2010, both BETH NUSSBAUM and the Plaintiff would've been eligible, as unemployed individuals, for cost-reduced COBRA coverage, where either the state of New York or New Jersey, respectively, would've supplemented monthly premiums depending on the state each party received unemployment benefits. Both BETH NUSSBAUM and the Plaintiff were aware of the monthly premium amounts associated with individual coverage, as indicated in the COBRA agreement signed in November 2008 (Exhibit D).

As the communications with the New Jersey Department of Insurance demonstrate, there was no effort by BETH NUSSBAUM to notify RHI or MERITAIN HEALTH of Plaintiff's willingness to maintain his own individual COBRA policy at least through the reminder of the eighteen (18) month period originally presumed, no effort by RHI to present the Plaintiff any documents related to obtaining his own individual COBRA policy, and no cooperation by MERITAIN HEALTH during a series of phone calls by the Plaintiff during August and September 2009 with regards to his unpaid claims and inquiries to obtain his own individual COBRA policy. Furthermore, any attempts by the Plaintiff to educate BETH NUSSBAUM about their legal rights to continued COBRA coverage were rebuffed by BETH NUSSBAUM and her attorney, KEVIN L. BREMER, ESQ., during divorce proceedings, for reasons only BETH NUSSBAUM and KEVIN BREMER will need to explain to the Court. If RHI or MERITAIN HEALTH made any effort to inform BETH NUSSBAUM of her and the Plaintiff's rights, none of this information was ever disseminated or articulated directly to the Plaintiff, and he was left with no vehicle in which to obtain his own individual COBRA policy before or after September 22, 2009. Consequently, the Plaintiff laid in a hospital while his COBRA coverage was terminated without him ever having the opportunity to exercise his legal right to continued individual health care coverage with MERITAIN HEALTH.

The March 8, 2010 response by QUINLIVAN stated that MERITAIN HEALTH was under the jurisdiction of the United States Department of Labor, Employee Benefits Security Administration ("USDOL-EBSA"), necessitating an additional complaint and inquiry, commencing April 16, 2010. The Plaintiff did not receive a complete response from QUINLIVAN until October 8, 2010 when in receipt of USDOL-EBSA investigative report, to which he immediately responded to (Exhibit F).

While MERITAIN HEALTH and QUINLIVAN claim to be innocent bystanders in a series of unfortunate events, RHI claims ignorance to any events other than the existence of BETH NUSSBAUM as a former employee from January 2003 until November 2008, an employee paid a handsome compensation package, an employee temporarily terminated in November 2005 as part of a corporate restructuring, only to be hired back three weeks later under a different compensation package, an employee provided two separate severance packages and more than one year of corporate retraining after termination in November 2008 in order for her to be assisted at RHI's cost as she re-entered the job market, an employee who has been hired back multiple times to perform short-term consulting projects since November 2008, and an employee who still publically lists RHI among her current employers on the internet (see profile on LinkedIn.com). Furthermore, as provided by the witness list in the Amended Complaint, BETH NUSSBAUM was an employee who freely verbalized any and all personal issues and problems to any and all colleagues at RHI who would listen to her perpetual complaining. For RHI to claim it has insufficient knowledge of any allegations related to the marital relationship between BETH NUSSBAUM and the Plaintiff is as ludicrous as many of the films it produces for television.

RHI claims no responsibility for any of the Plaintiff's injuries or damages, yet it is already established in Exhibits A, C and F that it serves as the health plan administrator, that it is on record as the initiator of the Plaintiff's unpaid claims between July 1, 2009 and September 21, 2009, that it processed any and all personnel forms regarding the marital status of BETH NUSSBAUM, and that it made zero effort to inform the Plaintiff of his legal rights to individual COBRA coverage during or after divorce proceedings between BETH NUSSBAUM and the Plaintiff.

It is already established that the Plaintiff is burdened with unpaid hospital bills and other medical claims filed between September 22, 2009 and November 16, 2009. It is already established that the Plaintiff's medical care after termination of benefits by MERITAIN HEALTH, and in conjunction, RHI, has not been equivalent in quality compared to during coverage by MERITAIN HEALTH, and that the Plaintiff's health continues to worsen because of disrupted medical care.

Furthermore, it is established that if the Plaintiff was provided his own individual COBRA policy to commence September 22, 2009 or beforehand, there were multiple federal and state statutes and programs to assist him in affording said COBRA coverage, the same amount of money he spent in monthly premiums for his own lesser-quality individual coverage, first with Blue Cross Blue Shield of New Jersey and then with Oxford. If the Plaintiff had his own uninterrupted individual COBRA coverage, he would've still been under coverage with MERITAIN HEALTH, and all unpaid hospital bills and other medical claims would've been

paid, the Plaintiff would not be burdened with unwarranted debt, claims by collection agencies, a subsequent damaged credit rating, and compromised physical and emotional health that permanently prevents him from ever returning to his academic career, even with every possible accommodation met in accordance with Title I of the Americans with Disabilities Act of 1990.

## CROSS-CLAIMS and COUNTER-CLAIMS:

The claims that RHI, MERITAIN and QUINLIVAN are entitled to any relief, compensation, indemnification or damages award are without merit, offensive and obscene with regards to this case. RHI, MERITAIN and QUINLIVAN present themselves as victims when the sole physical and economic victim in this case is the Plaintiff, acting as his own counsel because of his lacking economic means, thus his status as a *Forma Pauperis* litigant. Whatever outstanding and unpaid medical claims remain in this case are the financial obligation of either GEICO/PREMIER PRIZM or MERITAIN. Like BETH NUSSBAUM, RHI hasn't paid one medical claim with its own funds; whatever claims haven't been paid by MERITAIN or GEICO/PREMIER PRIZM have either been paid out of the Plaintiff's pocket or haven't been paid at all. Unlike BETH NUSSBAUM, RHI did pay for ten (10) months of COBRA premiums between November 22, 2008 and September 21, 2009, and that's all RHI has paid with respect to this case. If GEICO/PREMIER PRIZM honored its legal obligation to outstanding medical claims under the Plaintiff's prior auto insurance coverage, and if MERITAIN honored its legal obligation to any claims balance in accordance with what should have been the Plaintiff's uninterrupted individual COBRA coverage until June 1, 2011, RHI would still not be entitled to any compensation or damages award because RHI was not paying for the coverage or any claims.

For RHI to claim it was an injured party in any manner by any of the other eleven (11) Defendants is equally ludicrous and offensive. In fact, RHI is equally as culpable as BETH NUSSBAUM with regards to the termination of the Plaintiff's COBRA coverage and the disruption of medical claims being paid between July 1, 2009 and September 21, 2009, because RHI worked directly with BETH NUSSBAUM regarding all of her personnel files, including health care coverage for her and the Plaintiff. At any time, RHI could have and should have provided notice and due process jointly to BETH NUSSBAUM and the Plaintiff on all health care coverage regulations and forms effective February 12, 2009, their date of legal separation. To not do so and claim the legal obligation all for BETH NUSSBAUM is gross dereliction at its worst.

For MERITAIN and QUINLIVAN to claim any relief or damages is beyond laughable. Furthermore, for counsel to claim QUINLIVAN not be held accountable for his conduct during multiple investigations and inquiries by the Plaintiff, the New York State Attorney General's Office and the USDOL-EBSA is disturbing on many levels, especially since QUINLIVAN is no longer employed by MERITAIN, yet receives joint legal counsel in this case.

Lastly, for counsel for MERITAIN and QUINLIVAN to whine that a Pro Se litigant's Amended Complaint is incurable, fabricates claims against innocent parties, and doesn't warrant a "third chance" to

submit a response to their own Answer, demonstrates true arrogance about the law and presumes the Plaintiff simply folds up and goes away when big bad corporate attorneys submit their Motions. On the contrary, the Plaintiff is obligated to respond to any Defendant Motion within fourteen (14) days, and this legally mandated Response DOES represent counsel's concept of a "third chance", with the necessary relevant statutes and additional evidence, and more than supports the requirements for this case to continue to trial.

## APPLICABLE LAW and PLAUSIBILITY STANDARDS:

Counsel for MERITAIN and QUINLIVAN contend the Plaintiff concocted a claim lacking fair notice plausible factual allegations. In a March 22, 2011 ruling, the U.S. Supreme Court ruled that oral complaints are protected under the Fair Labor Standards Act's (FLSA) (*Kasten v Saint-Gobain Performance Plastics*) (Exhibit G). MERITAIN and QUINLIVAN have well known of the Plaintiff's COBRA-related complaints since August 2009, as soon as he first became aware of problems with his coverage and payment of medical claims. For MERITAIN and QUINLIVAN to contend any complaints came out of nowhere and the Plaintiff, an individual in declining health due to a spinal injury, is bullying "an innocent TPA and its former employee" with falsified claims is quite amusing to say the least.

Counsel for MERITAIN and QUINLIVAN also contends that QUINLIVAN not be held accountable for his conduct because he did not act "for personal profit" is without merit. One doesn't require a law degree or a terminal degree to know U.S. health care is in crisis, and the name of the game for all health insurance companies is to give policyholders as little in return for their monthly premiums as possible while ensuring maximum profits. If this weren't the name of the game, the American people would never need the benefit of legislation like ARRA and the Federal Health Care and Education Reconciliation Acts of 2009 and 2010.

It's clearly apparent that counsel for MERITAIN and QUINLIVAN presumes the Plaintiff is stupid and mentally incompetent regarding his legal health care rights, and must be "barking up the wrong tree" in order to determine how to have his legal health care rights protected. In fact, counsel seems to have complete disdain for the Plaintiff's legal health care rights. If QUINLIVAN didn't give the Plaintiff, the New York State Attorney General's Office and the USDOL-EBSA a ten-month runaround in a collective effort to determine why medical claims were not being paid, and if QUINLIVAN didn't opt for legal protection, as opposed to transparency, the minute he was informed of a COBRA violation, maybe he would be immune from litigation. However, the fact remains that when the inquiries got tougher and more complex, QUINLIVAN ducked for cover, is no longer employed by MERITAIN, and is counseled as a co-defendant with MERITAIN. If counsel wants alternate theories to test plausibility of Plaintiff's claims, let's start with inquiring into the circumstances as to why QUINLIVAN is no longer employed by MERITAIN, the very company he would mutually benefit with by stalling on inquiries and investigations, thus prolonging a conclusion to said inquiries and investigations, thus delaying obligation of insured benefits, thus delaying Plaintiff's legal right to reinstatement to COBRA coverage and honoring of retroactive provider claims in

excess of $50,000, not to mention prevention of additional claims and expenses from an individual already generating provider claims well in excess of $500,000 since March 2007. QUINLIVAN stood to gain personal benefit or profit by making Plaintiff's complaints and claims go away. The longer he prevented the Plaintiff from continued COBRA coverage, the more he served the economic interests of MERITAIN and his own standing as Chief Legal Counsel for Compliance. Perhaps QUINLIVAN could no longer remain an employee of MERITAIN if the Plaintiff filed suit against him and his employers, given the legal precedents his counsel cites. The fact that QUINLIVAN and MERITAIN both share counsel means his role as Chief Legal Counsel for Compliance is just as significant and relevant to this case as MERITAIN itself. If QUINLIVAN's conduct isn't subject to legal scrutiny and jurisdiction, why would MERITAIN offer to provide him joint counsel?

As for a plausible alternate theory for RHI's role in this case, BETH NUSSBAUM was involved in a single-vehicle accident on July 19, 2009 (Exhibit H, serendipitously obtained by Plaintiff November 9, 2009 while monitoring the updated status of his motor vehicle claim under the same original policy number, with regards to his ongoing litigation related to the January 2008 motor vehicle accident). Given her reputation for being a blabbermouth with minimal common sense, perhaps BETH NUSSBAUM notified the RHI benefits office, even though she apparently never had any medical claim associated with the accident. Perhaps in her unnecessary chatter, BETH NUSSBAUM gave the benefits coordinator (Violetta Debowski, according to October 2009 Interrogatory answers during divorce proceedings) the impression that a medical claim needed to be filed on her own behalf, but in the process of additionally blabbering about her divorce, RHI typed the Plaintiff's name into the computer and linked it with his most recent provider claim, a $70 office visit charge by Hackensack Neurology Group in follow-up to a May 2009 brain MRI, which actually had little to do with his January 2008 motor vehicle accident.

However, BETH NUSSBAUM did not cite a medical claim regarding her July 2009 motor vehicle accident, and based on pattern, it's highly unlikely that MERITAIN has the capacity to process a motor vehicle accident claim in the span of seventeen (17) days (from July 19, 2009 to August 5, 2009). Furthermore, if the claim for a motor vehicle accident were submitted July 19, 2009 (the accident was reported to GEICO July 20, 2009), it would not make sense for either RHI or MERITAIN to link a July 1, 2009 office visit with that preceded the date of BETH NUSSBAUM's motor vehicle accident. Somewhere either RHI's or MERITAIN's computer systems, an information error would've been detected. Since apparently no error was ever detected – or at least the Plaintiff was never notified of such error, given he learned of his soon-to-be ex-wife's motor vehicle accident on his own through their common policy – it stands to reason that RHI indeed input information regarding the Plaintiff's January 2008 motor vehicle accident at a time prior to July 1, 2009. The likely time period would be between May 1, 2009 and July 1, 2009, the time period BETH NUSSBAUM met with and consulted with RHI's benefits coordinator to discuss termination of Plaintiff's coverage as terms of divorce and KEVIN BREMER initiated divorce proceedings on behalf of BETH NUSSBAUM. The only reason for BETH NUSSBAUM to discuss the

Plaintiff's January 2008 motor vehicle accident with RHI was to notify RHI that the Plaintiff might have already had secondary medical coverage in the event of termination of coverage with MERITAIN through RHI. Unfortunately, unbeknownst to BETH NUSSBAUM, KEVIN BREMER, RHI and MERITAIN, GEICO closed the Plaintiff's medical claim in September 2008, hence GEICO's, PREMIER PRIZM's and other defendants' roles in this suit as well as a separate civil suit in New Jersey Superior Court. Taking the word of BETH NUSSBAUM as valid, neither RHI nor MERITAIN ever bothered to investigate or verify the status of any secondary medical coverage for the Plaintiff.

Therefore, in accordance with the challenges and statutes raised by counsel for RHI, MERITAIN and QUINLIVAN, two alternate theories exist for this case:

    (1) Incompetence by RHI, MERITAIN and QUINLIVAN

    (2) Overt negligence by RHI, MERITAIN and QUINLIVAN

If neither alternate theory is acceptable, then it stands to reason that RHI, MERITAIN and QUINLIVAN were complicit with BETH NUSSBAUM and KEVIN BREMER as all parties desired to relieve themselves of any and all legal obligations to the Plaintiff's continued health care coverage as a consequence of the divorce between BETH NUSSBAUM and the Plaintiff. Lastly, any claims by Defendants' counsel that the Amended Complaint brings forth charges inapplicable due to statutes of limitation are incorrect. Even with the accepted date of filing being February 17, 2011, all relevant charges with respect to medical care claims are within two years of the Court's filing date.

**CONCLUSION:**

RHI, MERITAIN and QUINLIVAN share joint liability with BETH NUSSBAUM and KEVIN BREMER for the termination of the Plaintiff's legal COBRA coverage as an individual policyholder between September 22, 2009 and June 1, 2011.

RHI, MERITAIN and QUINLIVAN share joint liability with BETH NUSSBAUM and KEVIN BREMER for the disruption of the Plaintiff's health care claims between July 1, 2009 and November 16, 2009 due to falsified information provided to RHI regarding existence of any secondary medical coverage for the Plaintiff as a consequence of his January 2008 motor vehicle accident.

RHI, MERITAIN and QUINLIVAN share joint liability with BETH NUSSBAUM and KEVIN BREMER for all outstanding and unpaid medical claims the Plaintiff incurred between September 22, 2009 and November 16, 2009, the period of time he was completely without any major medical coverage.

RHI, MERITAIN and QUINLIVAN share joint liability with BETH NUSSBAUM and KEVIN BREMER for all health care-related costs the Plaintiff incurred between September 22, 2009 and June 1, 2011,

including but not limited to individual health insurance premiums, provider and pharmacy co-pays, and out of pocket expenses the Plaintiff would not be required to pay if still under COBRA coverage with MERITAIN.

RHI, MERITAIN and QUINLIVAN share joint liability with GEICO, PREMIER PRIZM and other associated defendants regarding all disputed claims related to the Plaintiff's January 2008 motor vehicle accident.

RHI, MERITAIN and QUINLIVAN share joint liability with BETH NUSSBAUM, KEVIN BREMER, GEICO, PREMIER PRIZM and other associated defendants regarding any and all physical, emotional and economic injuries the Plaintiff has suffered as a direct consequence of disruption and termination of COBRA coverage with MERITAIN between July 1, 2009 and September 22, 2009.

RHI, MERITAIN and QUINLIVAN are not immune or exempt from legal proceedings, are indeed legitimate defendants in this case, and should not be dismissed with regards to the Amended Complaint filed by the Court February 17, 2011.

The Amended Complaint filed by the Plaintiff is legitimate and should not be dismissed. A full period of Discovery should be invoked, and a pre-trial hearing should be scheduled for all parties upon the Court's receipt of all of the Plaintiff's Responses to all Defendants' Answers.

The Plaintiff requests that the Court hold all Defendants liable for any and all associated costs incurred with printing, photocopying and postage for this Response.

Respectfully submitted on this **5th** day of **May, 2011.**


**Dr. David B. Pushkin** (Plaintiff *Pro Se*)
**300 State Highway Route 3 East, Suite 104**
**East Rutherford, NJ  07073**
**(201) 206-5160/ (201) 765-9495/ dpushkin@nj.rr.com**
(Telephone Number/FAX/email)

# EXHIBIT A



**MERITAIN**℠
HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

#BWNCQWH
#EC////AUTCDUUWU8#
Beth   Nussbaum and David   Pushkin
200 Winston Drive Apt 812
Cliffside Park, NJ  07010

Date of this Certificate: November 18, 2009
Participant Name: Beth   Nussbaum
ID# of Participant: 9872273915
Name of Group Health Plan:
   Rhi Entertainment, LLC

Under the federal Health Insurance Portability and Accountability Act (HIPAA) of 1996, health insurance companies and/or employers must provide "certification of coverage" to participants verifying past coverage.

This certificate provides evidence of your prior health coverage.  You may need to furnish this certificate if you become eligible under a group health plan that excludes coverage for certain medical conditions that you have before you enroll.  This certificate may need to be provided if medical advice, diagnosis, care or treatment was recommended or received for the condition within the 6-month period prior to your enrollment in the new plan.  If you become covered under another group health plan, check with the plan administrator to see if you need to provide this certificate.  You may also need this certificate to buy, for yourself or your family, an insurance policy that does not exclude coverage for medical conditions that are present before you enroll.

### Certification of Coverage

| Name | Date Waiting Period Began | First Date Covered | Last Date Covered |
|------|---------------------------|--------------------|--------------------|
| Beth   Nussbaum  -  Subscriber | N/A | 12-28-03 | 09-21-09 |
| David   Pushkin  -  Spouse | N/A | 12-28-03 | 09-21-09 |

Name and address of plan administrator or issuer responsible for providing this certificate:
   Rhi Entertainment, LLC
   1325 Av Of Americas 21st Floor
   New York, NY  10019
   212-261-9181

**This Certificate of Coverage is for your records.  Please keep this with your other important records.  We strongly recommend that you do not discard this information.**

Questions about the

# EXHIBIT B





U.S. Department of **Health & Human Services**          ⟩⟩ **www.hhs.gov**

**CMS/** Centers for **Medicare & Medicaid** Se~~Search now~~      [ Search ]

| Home | Medicare | Medicaid | CHIP | About CMS | Regulations & Guidance | Research, Statistics, Data & Systems | Outreach & Education | Tools |

CMS Home > Regulations and Guidance > COBRA Continuation of Coverage > Extended Periods of Coverage

## COBRA Continuation of Coverage

Overview
Covered Benefits
**Extended Periods of Coverage**
Contracted Periods of Coverage
Notices Required of Employers or Plans
Notices Required of Qualified Beneficiaries
Paying for Coverage
Other Coverage Considerations

## Extended Periods of Coverage

**29-Month Period (Disability Extension):** Special rules for disabled individuals and certain family members may entitle them to an 11-month extension of Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) continuation coverage (from 18 to 29 months). Specifically, if a qualified beneficiary is determined under Title II or XVI of the Social Security Act to have been disabled within the first 60 days of COBRA coverage, then that qualified beneficiary and all of the qualified beneficiaries in his or her family may be able to extend COBRA continuation coverage for up to an additional 11 months. (An individual who has been determined under Title II or Title XVI of the Social Security Act to have been disabled before the first day of COBRA continuation coverage, and who has not been determined to be no longer disabled at any time between the date of that disability determination and the first day of COBRA continuation coverage, is considered to be disabled within the first 60 days of COBRA continuation coverage.)

However, qualified beneficiaries may lose all rights to the additional 11 months of coverage if notice of the determination is not provided to the plan administrator within 60 days of the date of the determination (when the determination is issued during the initial 18-month period of COBRA coverage) and before the expiration of the 18-month period. The qualified beneficiary who is disabled or any qualified beneficiaries in his or her family may notify the plan administrator of the determination. (Click on "Notices Required of Qualified Beneficiaries" on the left navigation bar.)

**18 to 36-Month Period (Special Rule):** A special rule for dependents provides that if a covered employee becomes entitled to Medicare benefits (either Part A or Part B) before experiencing a qualifying event that is a termination of employment or a reduction of employment hours, the period of coverage for the employee's spouse and dependent children ends with the later of the 36-month period that begins on the date the covered employee became entitled to Medicare, or the 18- or 29-month period that begins on the date of the covered employee's termination of employment or reduction of employment hours. (Note that under this special rule, the employee's Medicare entitlement is not a qualifying event because it does not result in loss of coverage for the employee's dependents; thus, the 36-month coverage period would be part regular plan coverage and part continuation coverage.)

**18 to 36-Month Period (Second Qualifying Event):** A spouse and dependent children who experience a second qualifying event may be entitled to a total of 36 months of COBRA coverage. Second qualifying events may include the death of the covered employee, divorce or legal separation from the covered employee, the covered employee becoming entitled to Medicare benefits (under Part A, Part B or both), or a dependent child ceasing to be eligible for coverage as a dependent under the group health plan. The following conditions must be

Case 2:12-cv-00324-KM-MAH   Document 208-2   Filed 08/30/12   Page 14 of 69 PageID: 3742
Extended Periods of Coverage COBRA Continuation of Coverage                                    5/4/11 4:18 PM
Case 1:10-cv-09212-JGK -DCF   Document 57-1   Filed 05/09/11   Page 5 of 60

met in order for a second event to extend a period of coverage:

(1) The initial qualifying event is the covered employee's termination, or reduction of hours, of employment, which calls for an 18–month period of continuation coverage;

(2) The second event that gives rise to a 36–month maximum coverage period occurs during the initial 18–month period of continuation coverage (or within the 29–month period of coverage if a disability extension applies);

(3) The second event would have caused a qualified beneficiary to lose coverage under the plan in the absence of the initial qualifying event;

(4) The individual was a qualified beneficiary in connection with the first qualifying event and is still a qualified beneficiary at the time of the second event; and

(5) The individual meets any applicable COBRA notice requirement in connection with a second event, such as notifying the plan administrator of a divorce or a child ceasing to be a dependent under the plan within 60 days after the event. (Click on "Notices Required of Qualified Beneficiaries" on the left navigation bar.)

If all conditions associated with a second qualifying event are met, the period of continuation coverage for the affected qualified beneficiary (or beneficiaries) is extended from 18 months (or 29 months) to 36 months.

**Downloads**

There are no Downloads

**Related Links Inside CMS**

There are no Related Links Inside CMS

**Related Links Outside CMS**

There are no Related Links Outside CMS

Page Last Modified: 12/01/2010 8:53:16 AM
Help with File Formats and Plug–Ins

Submit Feedback

Department of Health & Human Services | Medicare.gov | USA.gov
Web Policies & Important Links | Privacy Policy | Freedom of Information Act | No Fear Act
Centers for Medicare & Medicaid Services, 7500 Security Boulevard Baltimore, MD 21244

www

Case 2:12-cv-00324-KM-MAH   Document 208-2   Filed 08/30/12   Page 15 of 69 PageID: 3743
Maintaining Your Health Insurance After Divorce
Case 1:10-cv-09212-JGK -DCF   Document 57-1   Filed 05/09/11   Page 6 of 60
5/4/11 4:52 PM

About Us | Contact WIFE

## Divorce

# Maintaining Your Health Insurance After Divorce

By Michele Sacks Lowenstein

Your health is the most important asset you have, and health insurance coverage is a close second.



If your health insurance is through your spouse's employer, once the divorce is final you will need to obtain health insurance for yourself. It is very important that there is no gap in coverage, so you must deal with the issue early in divorce negotiations.

COBRA - It's a Federal Law, Not a Snake

While your spouse may be required by the court to keep the health insurance for the children, he or she will be unable to maintain the health insurance for you after the divorce.

If your spouse works for a company that employs 20 or more people, then you are eligible to apply for continued health insurance coverage in his employer's plan under a Federal law known as "COBRA" (Consolidated Omnibus Budget Reconciliation Act).

The 60 Day Rule

Your spouse's employer is required to provide COBRA coverage for you, but only if you notify the health plan administrator within 60 days of becoming divorced. If you don't give the administrator proper notice, then you will not be eligible for COBRA coverage.

Coverage Through Your Own Employer May be Cheaper

You may not want to be covered under COBRA if you can obtain health insurance through your employer. This is because your spouse's employer is probably paying for all or a portion of your current health insurance premium.

Under COBRA, you will be responsible for the **entire amount** of the premium. (Actually, you may be charged 102% of the cost of the group rate.)

If your employer provides health insurance for you at little or no charge to you, then you are better off obtaining health insurance through your employer. But, for people who do not have this option, COBRA may be their only viable choice.

Before you opt for the COBRA coverage, check out other private plans such as Blue Cross, to compare the benefits and the cost. You may find options that are less expensive and more permanent than the COBRA coverage.

One way to find a list of these private insurers is to ask the personnel at your doctors' offices what insurance plans they accept, and which ones make payments that are the most hassle-free.

COBRA Coverage Ends in 36 Months

COBRA coverage for a former spouse ends within 36 months. So, you need to be prepared for this coverage to end and new health insurance to take its place.

If you have questions about the impact of preexisting conditions on obtaining new health

Search

Additional Health Plans
Aetna, Blue Cross, CIGNA & UHC. Get Free Health Insurance Quotes!
www.IndividualHealthQuotes.com

Health Insurance Plans
No Email Address Required. Compare the Best Health Plans Instantly!
www.eHealthInsurance.com

Affordable Health Plans
Get Affordable Health Insurance Online - Plans from $30 / Month!
Affordable-Health-Insurance-Plans.org

Quality Business Insurance
Insurance Plans insured by UnitedHealthcare Insurance Company.
AARP-HealthCare.com

**Bahr Investment Group** (Carlsbad, CA)
Understanding your deepest concerns and needs is critical as you approach this part of your life. Find out how Bahr Investment Group can help you achieve your goals.



IT'S MORE THAN MONEY   ITS YOUR LIFE

Securities offered through LPL Financial, Member FINRA/SIPC.

Sign Up for our Free E-Newsletter


www.WIFE.org

Get a FREE Bumper Sticker!


Follow us on Twitter

facebook   Become a Fan of WIFE.org

Only $5.00 Each

**Financial Freedom Booklets**

| 150 Ways to Save Lives Through Life's Transitions | LOVE AND MONEY | 150 Ways to Divorce Without Going Broke |
| --- | --- | --- |

Case 2:12-cv-00324-KM-MAH   Document 208-2   Filed 08/30/12   Page 16 of 69 PageID: 3744
Maintaining Your Health Insurance After Divorce                                                    9/4/11 4:52 PM
Case 1:10-cv-09212-JGK -DCF   Document 57-1   Filed 05/09/11   Page 7 of 60

insurance once the COBRA coverage expires, you should contact someone who is knowledgeable about the different kinds of health insurance plans available in your area.

If you are healthy, consider a private plan rather than taking the COBRA coverage for three years. If you took the COBRA coverage and became ill during the three-year period, you might find that you were uninsurable at the end of three years, when the COBRA coverage expired. A private plan, rather than a group plan under COBRA, would facilitate continuing coverage and might be worth any extra expense.

*Note: This information is not to be considered legal advice to create an attorney-client relationship. Laws and practices vary from state to state. Taking legal information out of context generally has negative consequences. If you have questions relating to your particular matter, you should contact an attorney in your state for advice.*

At WIFE we welcome your comments. Please feel free to <u>contact us</u>.

## Help support WIFE.org and the Money Club

All proceeds support the non-profit Money Club and WIFE web site and projects
### <u>Free Gifts with Different Membership Levels</u>

  

<u>Home</u> | <u>Finances</u> | <u>Divorce</u> | <u>Widowhood</u> | <u>Taxes</u> | <u>Retirement</u> | <u>Family</u> | <u>Savvy Women</u> | <u>Resources</u> | <u>Shopping</u> | <u>Blog</u>
Unless otherwise noted, copyright © 2008 WIFE.org
PO Box 910014, San Diego, CA 92191
<u>Disclaimer</u>

# **New Jersey**

Consumer Guide to Getting and Keeping Health Insurance

Last updated January 2006
Previous: Individual Health Insurance Sold by Private Insurers
Next: Conversion

# COBRA Continuation Coverage

## When do I have to be offered COBRA coverage?

If you are leaving your job and you had group coverage, you may be able to stay in your group plan for an extended time through COBRA or state continuation coverage. The information presented below was taken from publications prepared by the U.S. Department of Labor. You should contact them for more information about your rights under COBRA.

- *To qualify for COBRA continuation coverage, you must meet 3 criteria*:

First, you must work for an employer with 20 or more employees. If you work for an employer with less than 20 employees, you may qualify for state continuation coverage.

Second, you must be covered under the employer's group health plan as an employee or as the spouse or dependent child of an employee.

Finally, you must have a qualifying event that would cause you to lose your group health plan.

COBRA QUALIFYING EVENTS

*For employees*

- Voluntary or involuntary termination of employment for reasons other than gross misconduct
- Reduction in numbers of hours worked

*For spouses*

- Loss of coverage by the employee because of one of the qualifying events listed above
- Covered employee becomes eligible for Medicare
- Divorce or legal separation of the covered employee
- Death of the covered employee

*For dependent children*

- ○
  - ▪ Loss of coverage because of any of the qualifying events listed for spouses
  - ▪ Loss of status as a dependent child under the plan rules
- *Each person who is eligible for COBRA continuation can make their own decision.* If your dependents were covered under your employer plan, they may independently elect COBRA coverage as well.
- *To qualify as HIPAA eligible, you must use up any COBRA continuation coverage available to you.*
- *You must be notified of your COBRA rights when you join the group health plan, and again if you qualify for COBRA coverage.* The notice rules are somewhat complicated and you should contact the U.S. Department of Labor for more information.

In general, if the event that qualifies you for COBRA coverage involves the death, termination, reduction in hours worked, or Medicare eligibility of a covered worker, the employer has 30 days to notify the group health plan of this event. However, if the qualifying event involves divorce or legal separation or loss of dependent status, YOU have 60 days to notify the group health plan. Once it has been notified of the qualifying event, the group health plan has 14 days to send you a notice about how to elect COBRA coverage. Each member of your family eligible for COBRA coverage then has 60 days to make this election.

Once you elect COBRA, coverage will be re-instated retroactive to the qualifying event. You will have to pay premiums dating back to this period.

### SPECIAL SECOND CHANCE TO ELECT COBRA FOR TRADE-DISLOCATED WORKERS

- *A second COBRA election period may be available for TAA eligible people who did not elect cobra when it was first offered.* The second election period can be exercised 60 days from the 1st day of TAA eligibility, but in no case later than 6 months following loss of coverage. Coverage elected during this second election is reinstated retroactive to the beginning of the special election period - not back to qualifying event.

- *Certain people who lost their job-based health coverage because of the impact of imports on their employers have a limited second chance to elect COBRA.* People who are receiving benefits from the Trade Adjustment Assistance (TAA) Program are eligible for a federal income tax credit (the Health Coverage Tax Credit, or HCTC) that will pay 65% of their premiums.

- *For some laid off workers, TAA benefits begin after their 60-day period to elect COBRA continuation coverage has expired.* In this circumstance, TAA-eligible people have a second 60-day period, starting on the date of their TAA eligibility, to elect COBRA. (However, in no case can COBRA be elected more than 6-months following the original qualifying event (i.e. layoff) that caused the loss of group health plan coverage.)

- *When COBRA is elected during this special, second election period, coverage starts on the first date of the special election period.* Any time that has elapsed between the original qualifying event and the first date of the special

Case 2:12-cv-00324-KM-MAH   Document 208-2   Filed 08/30/12   Page 19 of 69 PageID: 3747

COBRA Continuation Coverage | New Jersey Case 1:10-cv-09212-JGK -DCF   Document 57-1   Filed 05/09/11   Page 10 of 60   5/4/11 4:56 PM

election period is not counted as a lapse in coverage in determining continuous coverage history.

## What will COBRA cover?

- *Your covered health benefits under COBRA will be the same as those you had before you qualified for COBRA.* For example, if you had coverage for medical, hospitalization, dental, vision, and prescription drug benefits before COBRA, you can continue coverage for all of these benefits under COBRA. If these benefits were covered under more than one plan (for example, a separate health insurance and dental insurance plan) you can choose to continue coverage under any or all of the plans. Life insurance cannot be continued under COBRA.

If your employer changes the health benefits package after your qualifying event, you must be offered coverage identical to that available to other active employees who are covered under the plan.

## What about coverage for my pre-existing condition?

- *Because your group coverage is continuing, you will not be faced with a new pre-existing condition exclusion period under COBRA.* However, if you were in the middle of a pre-existing condition exclusion period when your qualifying event occurred, you will have to finish it.

## What can I be charged for COBRA coverage?

- *You must pay the entire premium (employer and employee share, plus a 2% administrative fee) for COBRA continuation coverage.*
- *If you elect the 11-month disability extension, the premium may increase to 150% of the total cost of coverage.* See below for more information about the disability extension.
- *If you have lost your health insurance and are receiving benefits from the Trade Adjustment Assistance (TAA) Program then you may be eligible for a federal income tax credit to help pay for new health coverage.* This credit is called the Health Coverage Tax Credit (HCTC), and it is equal to 65% of the cost of qualified health coverage, including COBRA and state continuation coverage.
- *If you are a retiree aged 55-65 and receiving pension benefits from Pension Benefit Guarantee Corporation (PBGC), then you may also be eligible for the HCTC.*

## How long does COBRA coverage last?

- *COBRA coverage generally lasts up to 18 months and cannot be renewed.* However, dependents are sometimes eligible for up to 36 months of COBRA continuation coverage, depending on their qualifying event. In addition, special rules for disabled individuals may extend the maximum period of coverage to 29 months. To qualify for the disability extension, you must have been determined to have been disabled within 60 days of the time of your COBRA qualifying event (such as termination of employment or reduction in hours). You must obtain this disability determination from the Social Security Administration, and you must notify your group health plan within 60 days of receiving this disability determination letter, and before your original 18 months expires.

HOW LONG CAN COBRA COVERAGE LAST?

COBRA Continuation Coverage | New Jersey
Case 2:12-cv-00324-KM-MAH   Document 208-2   Filed 08/30/12   Page 20 of 69 PageID: 3748   5/4/11 4:56 PM
Case 1:10-cv-09212-JGK -DCF   Document 57-1   Filed 05/09/11   Page 11 of 60

Qualifying event(s) — Eligible person(s) — Coverage

Termination — Employee/spouse/Dependent Child – 18 months *

Reduced hours– Employee/spouse/Dependent Child – 18 months *

Employee enrolls in Medicare — Spouse/Dependent Child — 36 months

Divorce or legal separation– Spouse/Dependent Child — 36 months

Death of covered employee– Spouse/Dependent Child — 36 months

Loss of "dependent child" status — Dependent child — 36 months

* Certain disabled persons and their eligible family members can extend coverage an additional 11 months, for a total of up to 29 months. *Usually, COBRA continuation coverage ends when you join a new health plan.* However, if your new plan has a waiting period or a pre-existing condition exclusion period, you can keep whatever COBRA continuation coverage you have left during that period. For specifics, ask your former employer or contact the U.S. Department of Labor.

- *COBRA coverage also ends if your employer stops offering health benefits to other employees.*
- *COBRA coverage might end if you are in a managed care plan that is available only to people living in a limited geographic area and you move out of that area.* However, if you are eligible for COBRA and are moving out of your current health plan's service area, your employer must provide you with the opportunity to switch to a different plan, but only if the employer already offers other plans to its employees. Some examples of the other plans your employer may offer you are a managed care plan whose service area includes the area you are moving to, or another plan that does not have a limited service area.
- *In New Jersey, you can buy an individual health insurance policy regardless of whether you used up your COBRA continuation coverage.* Compare the options to see which is best for you. However, if you are planning to move to another state, you may need to be HIPAA eligible to buy individual coverage. If so, you may want to consider COBRA.

## What about state continuation coverage?

- If your employer offers fully insured health benefits and has fewer than 20 employees and you have been covered under that group plan, you may also be eligible continuation coverage under a New Jersey law that is similar to COBRA. Unlike COBRA, you must elect in writing within 30 days after the qualifying event. In addition, you will have to make a premium payment (employer and employee share, plus a 2% administrative fee) within a certain period of time after electing coverage. Ask your former employer or contact the New Jersey Insurance Department about state continuation coverage if you think it applies to you. In addition, information about state continuation coverage is available on the New Jersey's Small Employer Health Coverage Program at http://www.nj.gov/dobi/sehpage.htm.

## What about other ways to extend coverage under group plans?

- *In New Jersey, fully insured group plans must extend dependent coverage to eligible children up to the age of 30.* If you are under the age of 30 and a dependent of a person covered under a fully insured group plan that offers coverage to dependents, then you may be able to get coverage through that plan (see page 10).

- In New Jersey, if you are losing fully insured group coverage, except large group HMO coverage, because you are totally disabled, then you, and your qualified dependents, may be eligible to extend your coverage until you are no longer disabled. To qualify you have been covered under the group plan for 3 months prior to the date that you would otherwise coverage under the plan. Ask your former employer or contact the New Jersey Insurance Department about continuation coverage for the totally disabled, if you think it applies to you.

Previous: Individual Health Insurance Sold by Private Insurers
Next: Conversion

⌐ BOOKMARK ▗■  ▞▘▚

- Subscribe to Our e-Newsletter

  - • Welcome
  - A Summary of Your Protections
  - Group Health Plans
  - Individual Health Plans
    - o Individual Health Insurance Sold by Private Insurers
    - o COBRA Continuation Coverage
    - o Conversion
  - Small Employer or Self-employed Person
  - Financial Assistance
  - For More Information
  - Helpful Terms
  - Authors and Acknowledgments

  - Disclaimer

## • More Free Consumer Guides



Copyright © 2009 Georgetown University Health Policy Institute
*healthinsuranceinfo.net* - FREE and accurate guides to help you make informed healthcare coverage choices

# New York

Consumer Guide to Getting and Keeping Health Insurance

Last updated June 2009
Previous: Individual Health Insurance Sold by Private Insurers
Next: Conversion Coverage

# COBRA and State Continuation Coverage

## When do I have to be offered COBRA coverage?

If you are leaving your job and you had group coverage, you may be able to stay in your group plan for an extended time through COBRA or state continuation coverage. The information presented below was taken from publications prepared by the U.S. Department of Labor. You should contact it for more information about your rights under COBRA.

· *To qualify for COBRA continuation coverage, you must meet 3 criteria*:

First, you must work for an employer with 20 or more employees. If you work for an employer with 2-19 employees, you may qualify for state continuation coverage.

Second, you must be covered under the employer's group health plan as an employee or as the spouse or dependent child of an employee.

Finally, you must have a qualifying event that would cause you to lose your group health plan.

---

**COBRA QUALIFYING EVENTS**

*For employees*
· Voluntary or involuntary termination of employment for reasons other than gross misconduct
· Reduction in numbers of hours worked

*For spouses*
  Loss of coverage by the employee because of one of the qualifying events listed above
  Covered employee becomes eligible for Medicare
  Divorce or legal separation of the covered employee
  Death of the covered employee

*?or dependent children*
  Loss of coverage because of any of the qualifying events listed for spouses
  Loss of status as a dependent child under the plan rules

---

Case 2:12-cv-00324-KM-MAH   Document 208-2   Filed 08/30/12   Page 23 of 69 PageID: 3751

COBRA and State Continuation Coverage | New York   Case 1:10-cv-09212-JGK -DCF   Document 57-1   Filed 05/09/11   Page 14 of 60   5/4/11 5:01 PM

· *Each person who is eligible for COBRA continuation can make his or her own decision.* If your dependents were covered under your employer plan, they may independently elect COBRA coverage as well.

· *You must be notified of your COBRA rights when you join the group health plan, and again if you qualify for COBRA coverage.* The notice rules are somewhat complicated and you should contact the U.S. Department of Labor for more information.

In general, if the event that qualifies you for COBRA coverage involves the death, termination, reduction in hours worked, or Medicare eligibility of a covered worker, the employer has 30 days to notify the group health plan of this event. However, if the qualifying event involves divorce or legal separation or loss of dependent status, you have 60 days to notify the group health plan. Once it has been notified of the qualifying event, the group health plan has 14 days to send you a notice about how to elect COBRA coverage. Each member of your family eligible for COBRA coverage then has 60 days to make this election.

Once you elect COBRA, coverage will begin retroactive to the qualifying event. You will have to pay premiums dating back to this period.

· *To qualify as HIPAA eligible, you must choose and use up any COBRA or state continuation coverage available to you.*

· *In New York, you can buy individual health insurance regardless of whether you used up your COBRA coverage.* Compare the options to see which is best for you. If you are planning to move to another state, you may need to be HIPAA eligible to buy individual coverage. In this case, you may want to consider COBRA.

---

## SPECIAL SECOND CHANCE TO ELECT COBRA FOR TRADE-DISLOCATED WORKERS

· *A second COBRA election period may be available for TAA eligible people who did not elect COBRA when it was first offered.* The second election period can be exercised 60 days from the 1st day of TAA eligibility, but in no case later than 6 months following loss of coverage. Coverage elected during this second election begins retroactive to the beginning of the special election period – not back to qualifying event.

· *Certain people who lost their job-based health coverage because of the impact of imports on their employers have a limited second chance to elect COBRA.* People who are receiving benefits from the Trade Adjustment Assistance (TAA) Program are eligible for a federal income tax credit (the Health Coverage Tax Credit, or HCTC) that will pay 80% of their premiums.

· *For some laid off workers, TAA benefits begin after their 60-day period to elect COBRA continuation coverage has expired.* In this circumstance, TAA-eligible people have a second 60-day period, starting on the date of their TAA eligibility, to elect COBRA. (However, in no case can COBRA be elected more than 6-months following the original qualifying event (i.e. layoff) that caused the loss of group health plan coverage.)

· *When COBRA is elected during this special, second election period, coverage starts on the first date of the special election period.* Any time that has elapsed between the original qualifying event and the first

---

date of the special election period is not counted as a lapse in coverage in determining continuous coverage history.

## What will COBRA cover?

· *Your covered health benefits under COBRA will be the same as those you had before you qualified for COBRA.* For example, if you had coverage for medical, hospitalization, dental, vision, and prescription drug benefits before COBRA, you can continue coverage for all of these benefits under COBRA. If these benefits were covered under more than one plan (for example, a separate health insurance and dental insurance plan) you can choose to continue coverage under any or all of the plans. Life insurance is not covered by COBRA.

If your employer changes the health benefits package after your qualifying event, you must be offered coverage identical to that available to other active employees who are covered under the plan.

## What about coverage for my pre-existing condition?

*Because your group coverage is continuing, you will not have a new pre-existing condition exclusion period under COBRA.* However, if you were in the middle of a pre-existing condition exclusion period when your qualifying event occurred, you will have to finish it.

## What can I be charged for COBRA coverage?

*You must pay the entire premium (employer and employee share, plus a 2% administrative fee) for COBRA continuation coverage.* The first premium must be paid within 45 days of electing COBRA coverage.

*If you elect the 11-month disability extension, the premium will increase to 150% of the total cost of coverage.* See below for more information about the disability extension.

*If you have lost your group health plan and are receiving benefits from the Trade Adjustment Assistance (TAA) program, you may be eligible for a federal income tax credit to help you pay for new health coverage.* This credit is called the Health Coverage Tax Credit (HCTC), and it is equal to 80% of the cost of qualified health coverage, including COBRA. (see Financial Assistance)

*If you are a retiree aged 55-65 and receiving pension benefits from PBGC, then you may be eligible for a federal income tax credit to help pay for new health coverage.* This credit is called the Health Coverage Tax Credit (HCTC). (see Financial Assistance)

*If you lost your group health plan because of involuntary termination of employment that occurred between September 1, 2008 and December 31, 2009, you may be eligible for a federal tax credit that can help you pay for your COBRA premiums for up to nine months.* This tax credit was created as part of The American Recovery and Reinvestment Act of 2009 (ARRA) and covers 65% of your COBRA premium. For more information call the Employee Benefits Security Administration at the United State Department of Labor at (866) 444-3272 or visit the COBRA/AARA information center at http://www.dol.gov/ebsa/cobra.html. Information about the COBRA tax credit is also available from the IRS at http://www.irs.gov/newsroom/article/0,,id=204505,00.html and Department of Health And Human Services

COBRA and State Continuation Coverage | New York                                              5/4/11 5:01 PM

at http://www.cms.hhs.gov/COBRAContinuationofCov/.

· *Call the Department of Labor at (866) 444-3272 to find out if other temporary COBRA subsidies are available to you.*

## How long does COBRA coverage last?

· *COBRA coverage generally lasts up to 18 months and cannot be renewed.* However, certain disabled people can opt for coverage up to 29 months, and dependents are sometimes eligible for up to 36 months of COBRA continuation coverage, depending on their qualifying event (see box). In addition, special rules for disabled individuals may extend the maximum period of coverage to 29 months. To qualify for the disability extension, you must have been disabled at the time of your COBRA qualifying event (such as termination of employment or reduction in hours) or within 60 days of that qualifying event. You must obtain this disability determination from the Social Security Administration, and you must notify your group health plan of this disability determination.

---

### LENGTH OF COBRA COVERAGE

| *Qualifying event(s)* | *Eligible person(s)* | *Coverage* |
|---|---|---|
| Termination/<br>Reduced hours | Employee<br>Spouse<br>Dependent child | 18 months * |
| Employee enrolls in Medicare/<br>Divorce or legal separation/<br>Death of covered employee | Spouse<br>Dependent child | 36 months |
| Loss of dependent child status | Dependent child | 36 months |

*Special rules may extend coverage an additional 11 months for certain disabled individuals and their eligible family members.

---

Usually, *COBRA continuation coverage ends when you join a new health plan.* However, if your new plan has a waiting period or a pre-existing condition exclusion period, you can keep whatever COBRA continuation coverage you have left during that period. For specifics, ask your former employer or contact the U.S. Department of Labor.

*COBRA coverage also ends if your employer stops offering health benefits to other employees.*

*COBRA coverage might end if you are in a managed care plan that is available only to people living in a limited geographic area and you move out of that area.* However, if you are eligible for COBRA and are moving out of your current health plan's service area, your employer must provide you with the opportunity to switch to a different plan, but only if the employer already offers other plans to its employees. Examples of the other plans your employer may offer you are a managed care plan whose service area includes the

area you are moving to, or another plan that does not have a limited service area.

## What about New York continuation coverage?

· *If your employer offers health benefits, you may also be eligible for up to 18 to 36 months of continuation coverage under a New York law that is similar to COBRA.* To qualify, you must apply for state continuation coverage within 60 days of losing your old coverage. Ask your former employer or the New York Insurance Department about state continuation coverage if you think it applies to you.

· *In New York, you can buy individual health insurance regardless of whether you used up your state continuation coverage.* Compare the options to see which is best for you. If you are planning to move to another state, you may need to be HIPAA eligible to buy individual coverage. In this case, you may want to consider continuation coverage.

· If you lost your group health plan because of involuntary termination of employment that occurred between September 1, 2008 and December 31, 2009, you may be eligible for a federal tax credit that can help you pay for your state continuation coverage premiums for up to nine months. This tax credit was enacted in The American Recovery and Reinvestment Act of 2009 (ARRA) and covers 65% of your continuation coverage premium. For more information call the Employee Benefits Security Administration at the United State Department of Labor at (866) 444-3272 or visit them online at http://www.dol.gov/ebsa/cobra.html. Also see "Health Information About State Continuation Coverage and ARRA" on the website of the Department of Health And Human Services at http://www.cms.hhs.gov/COBRAContinuationofCov/.

Previous: Individual Health Insurance Sold by Private Insurers
Next: Conversion Coverage

BOOKMARK

- Subscribe to Our e-Newsletter
  - • Welcome
  - A Summary of Your Protections
  - Group Health Plans
  - Individual Health Plans
    - Individual Health Insurance Sold by Private Insurers
    - COBRA and State Continuation Coverage
    - Conversion Coverage
  - Small Employer or Self-employed Person
  - MEDICAID
  - Child Health Plus
  - Family Health Plus
  - Healthy New York
  - Cancer Services Program Partnership
  - Other State Programs
  - The Federal Health Coverage Tax Credit (HCTC)
  - For More Information
  - Helpful Terms
  - Authors and Acknowledgments

COBRA and State Continuation Coverage | New York

5/4/11 5:01 PM

- <u>Download the Guide</u>
- <u>Disclaimer</u>

# • **More Free Consumer Guides**



Copyright © 2009 Georgetown University Health Policy Institute
*healthinsuranceinfo.net* - FREE and accurate guides to help you make informed healthcare coverage choices

# EXHIBIT C

Wednesday, May 4, 2011 5:21 PM

**Subject: RE: Questions about electing New Jersey Continuation of COBRA and options**
**Date:** Wednesday, August 26, 2009 8:34 AM
**From:** DeRosa, Ellen <Ellen.DeRosa@dobi.state.nj.us>
**To:** Dave Pushkin <dpushkin@nj.rr.com>

Dr. Pushkin,
It sounds like your wife will not give the plan notice that you would like to continue on your own.  The plan will have no way of knowing, absent her notification.  So, if you need to reach out to the former employer or the administrator in order to access COBRA  then reach out!  It is not like you are asking for a favor.  Yhe law provides the opportunity for an independent election and you seek to take avantage of it!

Sorry, I know nothing about the workings of either PAAD or Rx4NJ.  I know they are pharmacy programs so I mentioned them as possible resources for you.  I am sure someone at Rx4NJ can answer your questions.

Ellen

Ellen F. DeRosa
Executive Director
NJ Individual & Small Employer Health Coverage  Programs
New Jersey Department of Banking and Insurance
P.O. Box 325
Trenton, NJ  08625
Phone:  609-633-1882 ext 50302
Fax:  609-633-2030
Web site:  www.state.nj.us/dobi/reform.htm

**From:** Dave Pushkin [mailto:dpushkin@nj.rr.com]
**Sent:** Tuesday, August 25, 2009 11:46 PM
**To:** DeRosa, Ellen
**Subject:** Re: Questions about electing New Jersey Continuation of COBRA and options

Hi Ms. DeRosa,

Thanks again for more information!

On 8/25/09 1:40 PM, "DeRosa, Ellen" <Ellen.DeRosa@dobi.state.nj.us> wrote:

Hi Dr. Pushkin,

Ubnder COBRA there is an independent right to election for each person who has a loss of coverage due to a qualifying event. In this case, the event was the termination of employment. COBRA allows up to an 18 month period for continued coverage. So, if you are correct, and the employer was paying the COBRA premiums for 10 months, only 8 months remain.

You may elect to remain on COBRA for the balance of the 18 months even if your wife chooses otherwise. The former employer will likely ask you to complete an election form. Plus, the employer will need to tell you the cost for single coverage.

I'm not sure what anyone will be telling me. My wife receives all "explanation of benefits" statements from our insurance, and doesn't forward anything to me, or provide them contact information for me the last few months. Unless I call the insurance company directly and ask questions, I'm in the dark on everything about my health coverage. That's how spiteful my divorce is going, unfortunately.

Since the loss of coverage was due to an involuntary termination of employment, you can apply for treatment as an assistance eligible individual.The months the employer paid the premium will reduce the period for the premium reduction. The reduction generally began for periods of coverage march 1 and later. So, the employer paid for 7 months meaning the reduction may only be available for 2. But two months at 35% is better than no months. When you fill out the COBRA election form for yourself also ask for the form to request treatment as an assistance eligible individual.

Okay. This is assuming anyone contacts me. If not, I'll have to contact Meritain Health directly. I somehow sense contacting my wife's former employer might agitate the divorce process worse than it already is. This is why I'm already exploring other insurance companies, even if the coverage is minimal.

At the end of the 18 months you'll need coverage. If you need pharmacy coverage the basic and essential plan is really not for you.  Even in the plans with a rider that add pharmacy coverage the benefit is 50% up to a very low maximum benefit. Your options for pharmacy will be Rx4NJ or possibly PAAD.

I just downloaded the PAAD application. Maybe if I include my ongoing documentation from SSA, I might be able to make enough of a case to get approval.

I've already explored Rx4NJ, and like the idea, but there seem to be a couple of issues --

1.  I can't find a pharmaceutical participant for each of my medications, which surprised me very much. You basically have to apply to individual pharmaceutical companies for each medication you take, right? There's no simpler way?

**Page 2 of 11**

2. My physicians don't want my medications shipped and delivered to their offices, as required by the companies! They think that's a little silly for an educated 46-year-old professional who unfortunately happens to be in my situation. Are the companies flexible on this expectation?

I'm on so many medications, including monitored narcotics for pain management (for my spine), but I essentially need to apply to almost as many pharmaceutical companies in order to get free or discounted meds. Forgive me, but the system is a little crazy, isn't it? We're not asking for reform for nothing...

Thanks.
Best,
Dave Pushkin


Ellen



Ellen F. DeRosa
Executive Director
NJ Individual & Small Employer Health Coverage Programs
New Jersey Department of Banking and Insurance
P.O. Box 325
Trenton, NJ 08625
Phone:  609-633-1882 ext 50302
Fax: 609-633-2030
Web site:  www.state.nj.us/dobi/reform.htm


---

**From:** Dave Pushkin [mailto:dpushkin@nj.rr.com]
**Sent:** Tuesday, August 25, 2009 12:58 PM
**To:** DeRosa, Ellen
**Subject:** Re: Questions about electing New Jersey Continuation of COBRA and options

Hi Ms. DeRosa,

Thanks again for your reply. I will try and answer your questions to the best of my knowledge.

On 8/25/09 8:42 AM, "DeRosa, Ellen" <Ellen.DeRosa@dobi.state.nj.us> wrote:

> Hi Dr. Pushkin,
> I'm going to try to cut to the essential pieces of information concerning health insurance.
>
> You are currently covered as a dependent (yes, a spouse is a dependent) under the plan from your wife's former employer.
>
> She was terminated in November 2008 and the former employer is paying 100% of the cost of coverage for 10 months. That payment arrangement will cease 9/21/09.
>
> Your wife will not elect COBRA to continue coverage beyond September 21, 2009.

**Yes. All true and correct.**

> You need coverage, and while you have a disability, you are not entitled to Medicare. (Entitled is the term used with Medicare that means a person is enrolled and has Medicare.)

**Okay. I understand.**

> The following information is needed:
>
> You stated a divorce is in process. When will it be finalized?

**Ballpark estimation — sometime in October. We're still at the stage of filing responses to the court.**

> You stated the former employer is paying 100% for 10 months. Does this 100% represent COBRA payments or did the employer keep your wife on the plan as if still active such that the initial COBRA election would be made in September? (Sometimes COBRA runs from the date of termination of employment, sometimes it runs from the end of the agreed upon period of coverage following termination. The employer makes that determination.)

**I really don't know. I only know the effective dates are 11/22/08 – 9/21/09, and this was part of my wife's severance package. What I sent you**

yesterday was the  COBRA election form, so I'm assuming our COBRA period
began 11/22/08, thus her  former employer was paying for the first 10
months of COBRA payments.    Her date of termination was 11/22/08.


Was your wife's employment termination an involuntary termination  of
employment?

It was an  involuntary termination.  Her employer eliminated her entire
department,  which she was the head of.

I hope my answers were helpful.
Thanks  again for your help.
Dave Pushkin




Ellen
Ellen F.  DeRosa
Executive  Director
NJ Individual  & Small Employer Health Coverage   Programs
New Jersey  Department of Banking and Insurance
P.O. Box  325
Trenton, NJ  08625
Phone:    609-633-1882 ext 50302
Fax:  609-633-2030
Web site:   www.state.nj.us/dobi/reform.htm




**From:** Dave Pushkin [mailto:dpushkin@nj.rr.com]
**Sent:** Monday, August 24, 2009 5:24 PM
**To:** DeRosa,  Ellen
**Subject:** Re: Questions about electing New Jersey  Continuation  of COBRA
and options

Dear  Ms. DeRosa:

Thank you  for your reply.

On 8/24/09 8:39 AM,  "DeRosa, Ellen"
<Ellen.DeRosa@dobi.state.nj.us>   wrote:


> Dr. Pushkin,
> Your email says you are unemployed and on an   extended
> benefits program through New Jersey. I assume  the  extended
> benefits you are referring to continued health  coverage under
> either COBRA   or NJ continuation.

No.   What  I meant by "extended benefits" was that I'm now on
the  second 20-week  unemployment insurance benefits program.  I
exhausted my Tier I  unemployment benefits at the beginning of
July.   My health coverage has  been completely irrelevant to my
unemployment benefits so far, since I worked   only part-time for
my  employers with no insurance provided in 2008 after  receiving
NJ  Temporary Disability benefits in 2007 and earning practically no
taxable income for 2007.  I had major spinal surgery in March
2007 after  a spinal injury forced me to stop working in November
2006.


> Your email says you spouse is unemployed and receiving
> extended    benefits through New York. I assume the extended
> benefits you  are  referring to continued health coverage under
> either COBRA  or  NY  continuation.  You did not say  if you are
> covered as a  dependent under  that NY coverage.   You could
> only have rights  under that NY plan to the   extent you have
> been covered under  it.

My wife is   essentially at the same stage collecting unemployment
benefits,  although she's  been unemployed a month longer than
me.  Is a  spouse also considered a  "dependent"?  I thought that
term only  applied to children.  Then I  guess I'm a "dependent"...
At least  until the divorce my wife seeks is  finalized in court (see
attached  COBRA election form for  clarification).

But what should New  York state have to do with me?   The only
connection to NY is the  location of my wife's former  employer.

The premium reduction under ARRA requires that the person seeking status as an assistance eligible individual cannot be eligible under another group plan. The fact both you and your spouse seem to have coverage would preclude treatment as an assistance eligible individual if the coverage allows dependent coverage.

I'm a little lost here. From what I understand of the ARRA, it's to help NJ residents continue insurance coverage with their plan who have lost it for a variety of reasons. My wife elected COBRA for us in November 2008, and her former employer is paying 100% for ten months. Those ten months will expire September 21, 2009, and my wife has decided to decline COBRA independently, due to the monthly cost (which is perfectly understandable), but she's also unilaterally terminating my insurance coverage — i.e., I'm not making the decision myself — which happens to coincide with her reasons for divorce (my health). This is why I'm exploring my rights to maintain insurance coverage, even as an ex-spouse.

Regarding the basic and essential plan, the coverage is very limited. Given your statement that you have a disability the benefits may not be sufficient for your needs. A rider amends the basic and essential plan to add one or more benefits. Even with a rider the basic and essential plan is not comprehensive medical coverage. The cost for the basic and essential plan can be as low as it is because it does not cover much. As one person has put it - what is good is not cheap and what is cheap is not good.

Considering how little I'm collecting in unemployment benefits, the basic and essential plan coverage will have to be better than nothing, since I'm not even sure how well I can afford the monthly premiums. If it can enable me to go for doctor office visits and get prescription medications, it will have to do for the time being, and that's a pretty sad decision.

Does your disability qualify you for Medicare?

In theory, it should have for the past 2+ years, but that's before you go through countless fights with the Social Security Administration and their "rules" for what makes you "disabled". I could go on for hours and hours and pages and pages of how a

person with a major section of his spine is held together with so much metal that you'd think I was smuggling a '56 Buick, struggles to walk, stand, and do routine things for himself, and takes a zillion pills just to function every day — and somehow SSA thinks I'm more than capable of doing some menial form of work after being a chemistry and physics professor for 25 years!

So, the joke is I keep applying to universities for academic positions, and the slightest hint that I'm a "cripple" gets my application tossed in the trash, and SSA wants me to sit around doing nothing for an indefinite number of years in order to prove to them I'm "disabled" for them to give me monthly benefits I've paid into since 1978, as well as Medicare, and if they approved my application for extended disability benefits in 2007 to recover from my spinal surgery, you and I wouldn't even be having this conversation! I'd probably be fully recovered from my surgery, possibly be back to reasonably normal health, and back to being a professor somewhere and doing what I've loved for what seems a lifetime, instead of a lifetime ago.

Sorry for venting, but sometimes the whole thing steams me up. I'd still rather be working full-time at a university again, even in a wheelchair, than what I'm dealing with now.

Is there any alternative way to qualify for Medicare besides SSA? I'm only 46. I could easily qualify for NJ temporary disability benefits again, just like I did in 2006-07, but it seems like the key is "permanent", and the only thing this has qualified me for to date is my handicapped parking tag. I don't understand the system at all. It's not like I woke up one day and decided to smash up my spine, and one look at my x-rays shows this is hardly an injury one can fake.

Anyway, thank you for your assistance and feedback. I'm sorry for being grumpy and less than savvy about the way things work.

Take care,
Dave Pushkin


Elien
Ellen F. DeRosa
Executive Director
NJ Individual & Small Employer Health Coverage Programs

New Jersey  Department of Banking and  Insurance
P.O. Box  325
Trenton, NJ  08625
Phone:   609-633-1882 ext 50302
Fax:   609-633-2030
Web site:   www.state.nj.us/dobi/reform.htm

---

**From:** Dave Pushkin [mailto:dpushkin@nj.rr.com]
**Sent:** Sunday, August 23, 2009 3:17 PM
**To:** DeRosa,  Ellen
**Subject:** Questions about electing New  Jersey  Continuation of
COBRA and options
**Importance:**  High

**Ellen  DeRosa**
**New Jersey Department of Banking  and**
**Insurance**
**609-633-1882 ext  50302**
**ellen.derosa@dobi.state.nj.us**

Dear Ms. DeRosa:

I need to impose upon your office  with   an unusual and
perhaps complicated COBRA  question...

I am  unemployed  and on the extended  benefits
program through New Jersey,  and am going through  a
divorce from my wife, who is unemployed and  receiving
extended  benefits  through New York.  From November
21,  2008 until  September 21, 2009, we  have received
health insurance from  her  former employer via COBRA.
Her  former employer has paid 100%   of the cost.

Effective September 21,  2009, my  soon-to-be  ex-wife
does not wish to continue her COBRA insurance, but  I
would  still like to explore continuing for myself as the
spouse until and   after our divorce is finalized (we're
divorcing in the state of NJ).   I  have a pre-existing

New Jersey  Department of Banking and  Insurance
P.O. Box  325
Trenton, NJ   08625
Phone:   609-633-1882 ext 50302
Fax:   609-633-2030
Web site:   www.state.nj.us/dobi/reform.htm

---

**From:** Dave Pushkin [mailto:dpushkin@nj.rr.com]
**Sent:** Sunday, August 23, 2009 3:17 PM
**To:** DeRosa,  Ellen
**Subject:** Questions about electing New  Jersey  Continuation of
COBRA and options
**Importance:**  High

**Ellen  DeRosa**
**New Jersey Department of Banking  and**
**Insurance**
**609-633-1882 ext  50302**
**ellen.derosa@dobi.state.nj.us**

Dear Ms. DeRosa:

I need to impose upon your office  with   an unusual and
perhaps complicated COBRA  question...

I am  unemployed  and on the extended  benefits
program through New Jersey,  and am going through  a
divorce from my wife, who is unemployed and  receiving
extended  benefits  through New York.  From November
21,  2008 until  September 21, 2009, we  have received
health insurance from  her  former employer via COBRA.
Her  former employer has paid 100%   of the cost.

Effective September 21,  2009, my  soon-to-be  ex-wife
does not wish to continue her COBRA insurance,  but  I
would  still like to explore continuing for myself as the
spouse until and   after our divorce is finalized (we're
divorcing in the state of NJ).   I  have a pre-existing

person with a major section of his spine is held together with so much metal that you'd think I was smuggling a '56 Buick, struggles to walk, stand, and do routine things for himself, and takes a zillion pills just to function every day — and somehow SSA thinks I'm more than capable of doing some menial form of work after being a chemistry and physics professor for 25 years!

So, the joke is I keep applying to universities for academic positions, and the slightest hint that I'm a "cripple" gets my application tossed in the trash, and SSA wants me to sit around doing nothing for an indefinite number of years in order to prove to them I'm "disabled" for them to give me monthly benefits I've paid into since 1978, as well as Medicare, and if they approved my application for extended disability benefits in 2007 to recover from my spinal surgery, you and I wouldn't even be having this conversation! I'd probably be fully recovered from my surgery, possibly be back to reasonably normal health, and back to being a professor somewhere and doing what I've loved for what seems a lifetime, instead of a lifetime ago.

Sorry for venting, but sometimes the whole thing steams me up. I'd still rather be working full-time at a university again, even in a wheelchair, than what I'm dealing with now.

Is there any alternative way to qualify for Medicare besides SSA? I'm only 46. I could easily qualify for NJ temporary disability benefits again, just like I did in 2006-07, but it seems like the key is "permanent", and the only thing this has qualified me for to date is my handicapped parking tag. I don't understand the system at all. It's not like I woke up one day and decided to smash up my spine, and one look at my x-rays shows this is hardly an injury one can fake.

Anyway, thank you for your assistance and feedback. I'm sorry for being grumpy and less than savvy about the way things work.

Take care,
Dave Pushkin


Ellen
Ellen F. DeRosa
Executive Director
NJ Individual & Small Employer Health Coverage Programs

condition and a documented physical disability that requires ADA accommodation in the workplace, so continued health insurance is important for me.

That being said, am I legally eligible for COBRA continuation with my present insurer, at 35% my cost, 65% their cost? Do you know off-hand if this same provision is available to my wife, since it's her former employer and she's collecting unemployment benefits in New York?

I've also started investigating getting my own individual insurance — I want a basic & essential plan, based on what I consider are barely affordable monthly premiums.

1. What exactly is a "Rider"? Does this pertain to pre-existing conditions? The web site doesn't appear to explicitly state so or not.
2. Should I contact the individual health insurance carriers to do my comparison shopping? Please forgive me, but I've never had to deal with this before, since my health insurance has always been connected to my own employment until my wife insisted I go on her plan prior to developing a disability.

Again, I apologize for all of my questions, but this is a circumstance I never planned for during 25 years of being a scientist and professor.
Thank you in advance for your assistance and patience with my questions.
Dave Pushkin



--
Dr. David B. Pushkin
Adjunct Chemistry Faculty
Fairleigh Dickinson University, School of Natural Sciences, Teaneck, NJ
Adjunct Online Mathematics Faculty
Excelsior College, Online Natural Sciences and Mathematics Program, Albany, NY

email: dpushkin@nj.rr.com
phone: (201) 206-5160

The happiest people don't have the best of everything...
They just make the best of everything they have!



ne American Recovery and Reinvestment Act of 2009: Information Center                    5/4/11 5:18 PM



The American Recovery and Reinvestment Act of 2009: Information Center

*Update July 6, 2010 — For those claiming the homebuyer credit, the deadline for closing (going to settlement) on home purchases was extended from June 30 to Sept. 30, 2010.*

Información en Español

## Information for Individuals

Can you benefit from Recovery Act tax credits? Try the White House Tax Savings Tool to find out.

Many of the Recovery Act provisions are geared toward individuals:

- **Homebuyer Credit.** Homebuyers who purchased by April 30, 2010, and settled by Sept. 30, 2010, may be eligible for a credit of up to $8,000. Documentation requirements apply. See the first-time homebuyer page for more.

- **COBRA.** Workers who lost their jobs between Sept. 1, 2008, and May 31, 2010, may qualify for reduced COBRA health insurance premiums for up to 15 months.

- **Education benefits.** The American opportunity credit and enhanced benefits for 529 college savings plans help families and students find ways to pay higher education expenses.

- **Home energy efficiency and renewable energy incentives.** See what you can do to reap tax rewards.

- **Earned Income Tax Credit.** The EITC was bigger in 2009 and 2010.

- **Additional child tax credit.** More families qualified for the ACTC in 2009 and 2010.

- **Making Work Pay Tax Credit.** This credit meant more take-home pay for many Americans in 2009 and 2010. Make sure enough tax is withheld from your pay with the help of the IRS withholding calculator. See Making Work Pay for more.

- **$250 for Social Security Recipients, Veterans and Railroad Retirees.** The Economic Recovery Payment was paid by the Social Security Administration, Department of Veterans Affairs and the Railroad Retirement Board in 2009 or, in some cases, 2010. To verify whether you received it, call 1-866-234-2942 and select Option 1 or visit Did I Receive a 2010 Economic Recovery Payment? on this website.

- **Money Back for New Vehicles.** Taxpayers who bought new cars and certain other new vehicles in 2009 can deduct the state and local sales taxes they paid as well as other taxes and fees they paid in states with no sales tax.

- **Increased Transportation Subsidy.** Employer-provided benefits for transit and parking rose in 2009.

- **Up to $2,400 in Unemployment Benefits Tax Free in 2009.** Individuals should check their tax withholding.

- **Health Coverage Tax Credit.** This credit increased from 65 percent to 80 percent of qualified health insurance premiums, and more people are eligible.

## Information for Businesses

The following Recovery Act provisions affect businesses:

- **Making Work Pay Tax Credit.** The 2010 withholding rates, contained in Notice 1036, reflected reduced withholding. An optional withholding procedure was available for pension plan administrators.

- **Work Opportunity Tax Credit.** This expanded credit added returning veterans and "disconnected youth" to the list of new hires that businesses may claim.

- **COBRA: Health Insurance Continuation Subsidy.** The IRS has extensive guidance for employers, including an updated Form 941.

- **Energy Efficiency and Renewable Energy Incentives.** See what businesses can do to reap tax rewards.

- **Net Operating Loss Carryback.** Small businesses can offset losses by getting refunds on taxes paid up to five years ago. Find information on carrybacks, an expanded section 179 deduction and other business-related provisions. The Worker, Homeownership And Business Assistance Act Of 2009 (WHBAA) expanded the five-year NOL carryback to most businesses.

- **Municipal Bond Programs.** New ways to finance school construction, energy and other public projects .

Related Items:

- IRS news releases, multimedia and legal guidance
- Marketing products for partners
- Summary of the key provisions from the Senate Finance and House Ways and Means committees

For information on the Administration's broader economic recovery program, visit

RECOVERY.

*Page Last Reviewed or Updated: March 22, 2011*

# EXHIBIT D

**MERITAIN™**
HEALTH

400 Highway 169 South, Suite 8000
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

# COBRA Election Form

NOVEMBER 18 2008
BETH NUSSBAUM AND COVERED SPOUSE/DEPENDENT(S)

200 WINSTON DRIVE APT 812
CLIFFSIDE PARK NJ  07010

| | | |
|---|---|---|
| File No: | 02850.005 | |
| SSN: | 9872273915 | |
| Employer: | RHI ENTERTAINMENT, LLC | |

overage under the group plan terminated on 11-22-08  Due to Termination of Employment

e you or any of the dependents for whom coverage is requested currently covered under another group health plan or Medicare?
_____ Yes    X    No

you answered yes, please indicate who the coverage is with: _____

ective date of other coverage or Medicare: _____

ave read the Notice to Plan Participants and want to continue the following coverages (You must check all coverages being elected and list
Qualified Beneficiaries electing COBRA coverage):

NTAL COVERAGE IS INCLUDED WITH MEDICAL COVERAGE.

| Medical Coverage | Monthly Premium | Dental Coverage | Monthly Premium | Vision Coverage | Monthly Premium |
|---|---|---|---|---|---|
| Employee only | 1032.00 | ☑ Employee only | 0.00 | ☑ Employee only | 0.00 |
| Employee & Spouse | 1857.00 | ☑ Employee & Spouse | 0.00 | ☑ Employee & Spouse | 0.00 |
| Employee & One Child | 0.00 | ☑ Employee & One Child | 0.00 | ☑ Employee & One Child | 0.00 |
| Employee & Children | 0.00 | ☑ Employee & Children | 0.00 | ☑ Employee & Children | 0.00 |
| Employee, Spouse & Children | 0.00 | ☑ Employee, Spouse & Children | 0.00 | ☑ Employee, Spouse & Children | 0.00 |
| Spouse & One Child | 0.00 | ☑ Spouse & One Child | 0.00 | ☑ Spouse & One Child | 0.00 |
| Spouse & Children | 0.00 | ☑ Spouse & Children | 0.00 | ☑ Spouse & Children | 0.00 |
| Spouse only | 1032.00 | ☑ Spouse only | 0.00 | ☑ Spouse only | 0.00 |
| One Child | 0.00 | ☑ One Child | 0.00 | ☑ One Child | 0.00 |
| Two Children | 0.00 | ☑ Two Children | 0.00 | ☑ Two Children | 0.00 |
| Three or More Children | 0.00 | ☑ Three or More Children | 0.00 | ☑ Three or More Children | 0.00 |

| Qualified Beneficiaries Electing COBRA Coverage | Soc. Sec. # | Qualified Beneficiaries Electing COBRA Coverage | Soc. Sec. # |
|---|---|---|---|
| ETH NUSSBAUM | 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 | 4. _____ | |
| DAVID RISHKIN | 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 | 5. _____ | |
| | | 6. _____ | |

erstand this form must be returned to Meritain within 60 days of the date of this notice, or 60 days after the COBRA event (whichever is later)
ler to continue coverage and that my benefits and/or coverage may change subject to any change in my former employer's plan. I understand
ny first payment is due to Meritain 45 days from the date I mail or fax this form and that I will not be billed for this amount. My first payment
include the total of all premiums due, from the date my coverage terminated as an active employee 11-22-08  through the date I
actual payment. In order to continue my coverage after that, I understand I must continue to pay the Monthly Premium due to Meritain on
ore the first day of the coverage period in which it is due and that I WILL NOT be billed for premiums due. I also understand that continuation
verage under this plan will terminate if the employer terminates this plan for its active employees.

_____ *(signature)*
Date                          Signature of Qualified Beneficiary ELECTING Coverage

DO NOT wish to continue your coverage, please sign below and return to our office.

E BEEN GIVEN THE OPPORTUNITY TO CONTINUE MY GROUP HEALTH COVERAGE AND HAVE CHOSEN NOT TO DO SO.

_____              _____
Date                          Signature to DECLINE Coverage

# EXHIBIT E

Wednesday, May 4, 2011 5:44 PM

**Subject: Meritain Health coverage denial**
**Date:** Monday, March 8, 2010 4:23 PM
**From:** Dave Pushkin <dpushkin@nj.rr.com>
**To:** Marie Briscoe <Marie.Briscoe@ag.ny.gov>
**Priority:** Highest

Dear Ms. Briscoe,

I have just received the following statement from the billing office of my internist, Dr. Stephen Sherer, during a check-up this afternoon. While most of the statement (as well as associated statement from Quest Diagnostics) does not fall under your office's domain, the FIRST service, dated September 21, 2009 does specifically relate to your ongoing dialogue with Meritain Health and Mr. Quinlivan.

According to the attached statement, Meritain Health denied payment of claim filed by Dr. Sherer's practice for services provided on September 21, 2009, my last date of coverage, and has yet to paid for this claim. All subsequent claims are under the obligation of GEICO, which is in dispute relevant to my ongoing auto accident litigation in New Jersey.

Dr. Sherer's office has notified me that these unpaid claims will now go to collection and drop me as a patient pending a letter from my attorney, Seth Malkin, Esq. However, there is no reason for the September 21, 2009 claim to remain unpaid by Meritain Health.

To remind your office, as well as Mr. Quinlivan's office, my coverage with Meritain Health was through September 21, 2009, as evidence by the attached COCC and COBRA documentation. Therefore, I will expect Mr. Quinlivan to provide an explanation for this denied coverage as well, in addition to the approximately $7,000 of unpaid claims dating back to July 2009.

Thank you for your attention to this matter. If you have any questions, please don't hesitate to contact me.
Respectfully,
Dave Pushkin

Dr. David B. Pushkin
Adjunct Chemistry Faculty
*Fairleigh Dickinson University, School of Natural Sciences, Teaneck, NJ*
Adjunct Online Mathematics Faculty



**Excelsior College, Online Natural Sciences and Mathematics Program, Albany, NY**
**Research Consultant/Affiliate**
*Carl Wieman Science Education Initiative, University of British Columbia*

**email: dpushkin@nj.rr.com**
**phone: (201) 206-5160**
**FAX: (201) 939-6717**
**Internet FAX: (201) 765-9495**
**Twitter: DoctorPuppy@twitter.com**

**The happiest people don't have the best of everything...**
**They just make the best of everything they have!**
☺

*** CONTINUED ON NEXT PAGE ***

MERITAIN™ HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9043

#BWNCQWH
#EC///AUTCDUUWU8#
Beth Nussbaum and David Pushkin
200 Winston Drive Apt 812
Cliffside Park, NJ 07010

Date of this Certificate: November 18, 2009
Participant Name: Beth Nussbaum
ID# of Participant: 987227393
Name of Group Health Plan:
Rhi Entertainment, LLC

Under the federal Health Insurance Portability and Accountability Act (HIPAA) of 1996, health insurance companies and/or employers must provide "certification of coverage" to participants verifying past coverage.

This certificate provides evidence of your prior health coverage. You may need to furnish this certificate if you become eligible under a group health plan that excludes coverage for certain medical conditions that you have before you enroll. This certificate may need to be provided if medical advice, diagnosis, care or treatment was recommended or received for the condition within the 6-month period prior to your enrollment in the new plan. If you become covered under another group health plan, check with the plan administrator to see if you need to provide this certificate. You may also need this certificate to buy, for yourself or your family, an insurance policy that does not exclude coverage for medical conditions that are present before you enroll.

**Certification of Coverage**

| Name | Date Waiting Period Began | First Date Covered | Last Date Covered |
|---|---|---|---|
| Beth Nussbaum - Subscriber | N/A | 12 20 03 | 08 21 09 |
| David Pushkin Spouse | N/A | 12 20 03 | 08 21 09 |

Name and address of plan administrator or issuer responsible for providing this certificate:
Rhi Entertainment, LLC
1325 Ave Of Americas 21st Floor
New York, NY 10019
212 261 9191

This Certificate of Coverage is for your records. Please keep this with your other important records. We strongly recommend that you do not discard this information.

Questions about the coverage listed above should be directed to the service center at 866 939 4301

**MERITAIN**
HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

## COBRA Election Form

NOVEMBER 18 2008
KEITH NUSSBAUM AND COVERED SPOUSE/DEPENDENT(S)

File No: 57350.308
SSN: 9872273915
Employer: SHI ENTERTAINMENT, LLC

208 WINSTON DRIVE APT 812
CLIFFSIDE PARK NJ 07010

Coverage under the group plan terminated on 11-22-08  Due to TERMINATION of Employment

Are you or any of the dependents for whom coverage is requested currently covered under another group health plan or Medicare?
_____ Yes __X__ No

If you answered yes, please indicate who the coverage is with: _____
Effective date of other coverage or Medicare: _____

• Have read the Notice to Plan Participants and wish to continue the following coverages (You must check all coverages being elected and list all Qualified Beneficiaries electing COBRA coverage)

DENTAL COVERAGE IS INCLUDED WITH MEDICAL COVERAGE.

| Medical Coverage | Monthly Premium | Dental Coverage | Monthly Premium | Vision Coverage | Monthly Premium |
|---|---|---|---|---|---|
| ☐ Employee only | 1022.00 | ☐ Employee only | 0.00 | ☐ Employee only | 0.00 |
| ☐ Employee & Spouse | 2027.00 | ☐ Employee & Spouse | 0.00 | ☐ Employee & Spouse | 0.00 |
| ☒ Employee & One Child | 0.00 | ☒ Employee & One Child | 0.00 | ☒ Employee & One Child | 0.00 |
| ☐ Employee & Children | 0.00 | ☐ Employee & Children | 0.00 | ☐ Employee & Children | 0.00 |
| ☐ Employee, Spouse & Children | 0.00 | ☐ Employee, Spouse & Children | 0.00 | ☐ Employee, Spouse & Children | 0.00 |
| ☐ Spouse & One Child | 0.00 | ☐ Spouse & One Child | 0.00 | ☐ Spouse & One Child | 0.00 |
| ☐ Spouse & Children | 0.00 | ☐ Spouse & Children | 0.00 | ☐ Spouse & Children | 0.00 |
| ☐ Spouse only | 1022.00 | ☐ Spouse only | 0.00 | ☐ Spouse only | 0.00 |
| ☒ One Child | 0.00 | ☐ One Child | 0.00 | ☐ One Child | 0.00 |
| ☐ Two Children | 0.00 | ☐ Two Children | 0.00 | ☐ Two Children | 0.00 |
| ☐ Three or More Children | 0.00 | ☐ Three or More Children | 0.00 | ☐ Three or More Children | 0.00 |

| Qualified Beneficiaries Electing COBRA Coverage | Soc. Sec. # | Qualified Beneficiaries Electing COBRA Coverage | Soc. Sec. # |
|---|---|---|---|
| 1. KEITH NUSSBAUM | 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 | 4. | |
| 2. DAVID NUSSAUM | 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 | 5. | |
| 3. | | 6. | |

I understand this form must be returned to Meritain within 60 days of the date of this notice, or 60 days after the COBRA event (whichever is later) in order to continue coverage and that my benefits and/or coverage may change subject to any change in my former employer's plan. I understand that my first payment is due to Meritain 45 days from the date I mail or fax this form and that I will not be billed for this amount. My first payment must include the total of all premiums due, from the date my coverage terminated as an active employee 11-22-08 through the date I make actual payment. In order to continue my coverage after that, I understand I must continue to pay the Monthly Premium due to Meritain on or before the first day at the coverage period in which it is due and that I WILL NOT be billed for premiums due. I also understand that continuation of coverage under this plan will terminate if the employer terminates the plan for its active employees.

_____     _____
Date                                Signature of Qualified Beneficiary ELECTING Coverage

If you DO NOT wish to continue your coverage, please sign below and return to our office

I HAVE BEEN GIVEN THE OPPORTUNITY TO CONTINUE MY GROUP HEALTH COVERAGE AND HAVE CHOSEN NOT TO DO SO.

_____     _____
Date                                Signature to DECLINE Coverage

Wednesday, May 4, 2011 5:42 PM

**Subject: Re: Meritain Health coverage denial**
**Date: Monday, March 15, 2010 5:51 PM**
**From: Dave Pushkin <dpushkin@nj.rr.com>**
**To: <12019455604@myfax.com>**

## *From the desk of Dr. Dave Pushkin...*

March 15, 2010

Dr. Stephen Sherer
714 Bergen Blvd.
Ridgefield, NJ 07657
FAX: 201-945-5604

ATTN: Billing Office

RE:    Unpaid claim by Meritain Health for services on 9/21/09

The following communication was received on March 12th from Marie Briscoe from the NYS
Attorney General's Health Care Bureau.
Please re-file your claim for services for 9/21/09 accordingly.

I will follow-up with my attorney, Seth Malkin, Esq. regarding remaining claims for September
22-25 and October 6, 2009. I requested last week that his office contact you regarding litigation
with GEICO over disputed provider claims, as discussed on March 8.

If you have any questions, please don't hesitate to contact me.


On 3/12/10 8:43 AM, "Marie Briscoe" <Marie.Briscoe@ag.ny.gov> wrote:

> Hello, Dr. Pushkin. In yesterday's mail, I sent you a copy of the
> response we received from Meritain which includes a spreadsheet of all
> the claims they have processed for you and the corresponding explanation
> of benefit statements. The response does not reference any claim for
> services rendered by Dr. Sherer on date of service 9/21/09, either in
> the spreadsheet or the EOB's. The bill you attached to your email is
> not itemized with the codes required to process a claim, and there is no
> corresponding EOB with your email. As such, there is no evidence that
> Meritain received and denied this claim. At this time, we recommend
> that Dr. Sherer submit an itemized claim form to Meritain for

**Page 1 of 2**

> processing.  If you or Dr. Sherer receive an explanation of benefit
> statement erroneously denying the claim for no coverage on the date of
> service, please either email it to me or have the doctor fax the EOB and
> corresponding claim form to me at 518-402-2163.  At that time, we will
> be able to follow up with Meritain concerning this particular claim.
> Thank you. - MB

--

**Dr. David B. Pushkin**
**Adjunct Chemistry Faculty**
*Fairleigh Dickinson University, School of Natural Sciences, Teaneck, NJ*
**Adjunct Online Mathematics Faculty**
*Excelsior College, Online Natural Sciences and Mathematics Program, Albany, NY*
**Research Consultant/Affiliate**
*Carl Wieman Science Education Initiative, University of British Columbia*

email: dpushkin@nj.rr.com
phone: (201) 206-5160
FAX: (201) 939-6717
Internet FAX: (201) 765-9495
Twitter: DoctorPuppy@twitter.com

**The happiest people don't have the best of everything...**
**They just make the best of everything they have!**
☺

The Plaintiff was never aware of the 29-month COBRA rule until November 1, 2010, when notified of this legal right by counsel on his Social Security Disability case, Binder and Binder (Nikhil S. Agharkar, Esq.). The Plaintiff notified QUINLIVAN on November 16, 2010 of this statute, after already submitting a final inquiry on October 18, 2010 regarding the genesis of unpaid claims between July 1, 2009 and September 21, 2009. The final response of QUINLIVAN was to seek outside counsel for himself and MERITAIN HEALTH, rather than providing detailed and complete answers regarding Plaintiff's inquiry, which began with a December 14, 2009 complaint to the Attorney Generals of both New York State and the State of Minnesota (the address regarding patient claims with MERITAIN HEALTH is listed in Minneapolis, and has been since coverage for BETH NUSSBAUM and the Plaintiff commenced December 28, 2003).

According to QUINLIVAN the genesis was merely a "random and automated process", approximately eighteen (18) months after Plaintiff's motor vehicle accident, MERITAIN HEALTH stating in an August 5, 2009 inquiry to BETH NUSSBAUM "We understand that you or your dependent have recently been involved in an automobile accident", listing the Plaintiff as the claimant, seems highly suspect. Unless counsel for all defendants or the Court follows a different calendar or concept of time than the Plaintiff, January 28, 2008 and August 5, 2009 do not seem very close in proximity. The Plaintiff was a chemistry and physics professor from 2004 until 2008, and shouldn't have to explain units of measurement to law school graduates, but for the benefit of all parties' quantitative reasoning skills, this use of "recent" translates to five-hundred fifty-four (554) days, or thirteen-thousand two-hundred ninety-six (13,296) hours.

For RHI or MERITAIN HEALTH to assert no previous knowledge of the Plaintiff's January 2008 motor vehicle accident flies in the face of all health care provision in the United States.  Standard procedure in all hospital emergency rooms is to obtain all patient insurance coverage information. Not only was Hackensack University Medical Center ("HUMC") informed of the Plaintiff's automotive insurance with GEICO, it was also notified of the Plaintiff's major medical coverage with MERITAIN HEALTH – and by name of group plan, RHI -- in order to provide proof of secondary coverage. GEICO was also provided proof of the Plaintiff's major medical coverage with MERITAIN HEALTH as part of their claims protocol. Furthermore, RHI knew of the Plaintiff's January 2008 motor vehicle accident because BETH NUSSBAUM was called at her RHI office while the Plaintiff was en route to HUMC.

MERITAIN HEALTH was first notified of Plaintiff's complaint and inquiry regarding unpaid medical claims for the period July 1-September 21, 2009 on February 2, 2010. QUINLIVAN responded on March 8, 2010 that MERITAIN HEALTH paid all outstanding claims, including "some prescription claims for dates of service after September 22, 2009." On the same date, Plaintiff was notified by his Primary Care Physician's billing office that MERITAIN HEALTH had not indeed paid all outstanding claims (Exhibit E). In fact, as recently as June and July of 2010, the Plaintiff's neurologist, Hackensack Neurology Group – the very same provider MERITAIN HEALTH ceased paying claims from in July 2009 – notified the Plaintiff of yet unpaid claims having to be re-filed with MERITAIN HEALTH.

# EXHIBIT F

**Subject: Re: 201030-14695**
Date: Friday, October 8, 2010 2:16 PM
From: Dr. David B. Pushkin <dpushkin@nj.rr.com>
To: "Paradowski, Robin - EBSA" <Paradowski.Robin@dol.gov>
Priority: Highest

Dear Robin,

I received your mailing yesterday afternoon. Thank you.
I'm attaching a scan of the cover letter received

I hate to break the news to you, but you've spent all these months repeating everything that AG Andrew Cuomo's office received and forwarded to me in the first place.  None of this information provides either of us with the genesis of how the denial of paying benefits started in July 2009, and it appears Mr. Quinlivan is withholding this information from you as well as the AG's office.

It confuses me how two government agencies are unable to get Mr. Quinlivan to explain how this whole mess started in the first place, and I don't think "oops… But all the bills are now paid" is sufficient on his part.  Someone associated with RHI Entertainment and its Meritain health plan provided false information regarding my medical coverage and the result was not only months of provider claims being denied, but my being chased after by collection agencies for bills that were supposed be paid upon my providing information to Meritain that their own employees in Minneapolis kept losing in their computer system for several weeks. And I don't even want to think about how low my credit score has dropped over all this.  I'd be surprised if my credit score is even three digits anymore!

The worst part of all is that there was never a reason for me to provide the requested information because there was no open claim involving any other insurance company at the time this ordeal started.  I feel like I have to paint a picture over and over again to state the obvious:

1. Someone provided false or incorrect information to the RHI employee benefits administrator
2. That administrator passed along this information to Meritain Health
3. Meritain Health requested information from me based on that false information

**Page 1 of 3**

4. I provided valid and correct information to Meritain to clear up any questions
5. My claims never got paid until after the AG's office put pressure on Meritain

Unless I'm completely missing the point, it appears the AG's office and yours are being played by Mr. Quinlivan and whomever he's working with at RHI. If this is the best your office can come up with, then I guess the ball falls back into my court to get the answers to the questions I've been asking since over a year ago.

Unless there's any other follow-up your office is allowed to take, I plan to write a personal letter to Mr. Quinlivan myself and give him ten days notice to provide me the names of the people responsible for this original mess, or I will file a civil suit in federal district court against him and parties associated with RHI in order to get to the bottom of this. Nonsense like this just doesn't happen by accident, and this is what I've asked both your office and AG Cuomo's office to determine in the first place. I don't care anymore that the bills are paid. I want to know who's responsible for the stopping of payment that went on for almost six months, and whether your office is able to determine it or not, I plan on finding out who's committed perjury at our expense.

Please let me know where your office stands at this point, so I can move accordingly.
Cheers,
Dave Pushkin

--
Dr. David B. (Dave) Pushkin
Research Consultant/Affiliate
*Carl Wieman Science Education Initiative, University of British Columbia, Vancouver, BC*
Chairperson
*American Chemical Society — Subdivision for Chemists with Disabilities*

email: dpushkin@nj.rr.com
phone: (201) 206-5160
FAX: (201) 765-9495

**Skype: DoctorPuppy**
**Twitter.com/DoctorPuppy**
**Blog Site: http://doctorpuppycommentary.blogspot.com**


**The happiest people don't have the best of everything...**
**They just make the best of everything they have!**
 ☺


U.S. Department of Labor     Employee Benefits Security Administration
33 Whitehall St. Suite *200
New York, NY 10004
Phone: (212) 607-8600
Telefax: (212) 607-8661



October 5, 2010

Dr. David Pushkin
300 Highway Route 3, Suite 1143
East Rutherford, NJ 07073

    Re:     Control No.: 201030-14695
         Meritain Health documents detailing adjudication and payment of claims incurred
         from July 1, 2009 through September 21, 2009

Dear Dr. Pushkin:

The U.S. Department of Labor's Employee Benefits Security Administration (EBSA) has
responsibility for the administration and enforcement of Title I of Employee Retirement Income
Security Act of 1974 (ERISA). It is our practice to assist participants in understanding their rights and
obligations under ERISA by providing information, assisting them with their claim, and intervening
on their behalves if they have been incorrectly denied a benefit.

Per your discussion with Benefits Advisor Robin Paradowski, enclosed please find copies of documents
from Meritain Health showing adjudication and payment of your claims incurred from July 1, 2009
through September 21, 2009.

Note that the enclosed spreadsheet summarizes payment of claims. The yellow highlighted claims are
denied because they are after September 21, 2009, your effective termination date. The green highlighted
claims were paid, notwithstanding the effective termination date. Accordingly, the spreadsheet provided
by Meritain Health states that all claims from July 1, 2009 through September 22, 2009 were paid - save
any member copayments and duplicate claims.

I hope this information will be helpful. If you need additional assistance, please feel free to contact
Benefits Advisor Robin Paradowski at 212-607-8608.

Sincerely,
Jonathan Kay
Regional Director

By: *Valerie Touso* SD
    Valerie Touso
    Supervisory Benefits Advisor

JK/VT/rvp
Enclosures

**Page 3 of 3**

# EXHIBIT G

**Case 2:12-cv-00324-KM-MAH   Document 208-2   Filed 08/30/12   Page 58 of 69 PageID: 3786**
Supreme Court sets "fair notice" standard for complaints – 04/20/11
Case 1:10-cv-09212-JGK -DCF   Document 57-1   Filed 05/09/11   Page 49 of 60          5/5/11 6:18 PM

**Wolters Kluwer**
Law & Business

CCH®
Aspen Publishers
Technical Answer Group (TAG)
ftwilliam.com

About CCH   Contact Us   Find a Rep   Feedback   Support

Search

Advanced Search

**Right Answer, Right Now**

Log On    More Info

Log On



**NetNews**
*FREE Email Newsletter*
Sign Up | Current

**PRODUCT CATEGORIES**

▸ BENEFITS

▸ ENVIRONMENTAL

▸ LABOR & EMPLOYMENT LAW

▸ HR MANAGEMENT

▸ PAYROLL

▸ PENSION

▸ SAFETY / OSHA

▸ UNEMPLOYMENT INSURANCE / SOCIAL SECURITY

**PRODUCT TRAINING**

Salary Calculator

Job Title

City

State
- Select State -

powered by
PayScale            GO

PayScale Salary Calculator

**Resources & Links**

▸ Issues and Answers

Can a dress code bar ethnic attire based on customer preferences?

Milwaukee religious leader

## CCH® PAYROLL — 04/20/11
### Supreme Court sets "fair notice" standard for complaints

Oral complaints are protected under the Fair Labor Standards Act's (FLSA) antiretaliation provisions, the U.S. Supreme Court ruled in a 6-2 opinion (*Kasten v Saint-Gobain Performance Plastics*, Dkt No 09-834, March 22, 2011, Breyer, S). Resolving a conflict among the circuits, the majority found the scope of the statutory term "filed any complaint" found in FLSA, Sec. 215(a)(3), encompasses oral as well as written complaints. The Court vacated a Seventh Circuit decision that held a discharged employee did not engage in FLSA-protected conduct when he made a verbal complaint about the location of the employer's time clocks, which prevented employees from getting paid for time spent donning and doffing protective gear—in violation of the Act.

**Facts**

In his FLSA retaliation suit, the employee contended that he "raised a concern" with his shift supervisor that the location of the employer's time clocks was illegal. He told his lead operator that he "was thinking about starting a lawsuit about the placement of the time clocks." He told an HR employee and an operations manager that, if the time clock location were challenged in court, the company would lose. In short, he made repeated (verbal) efforts to inform the employer of his concerns, in accordance with the company's internal grievance resolution procedure, and was suspended and then discharged as a result. The employer denied that the employee made any meaningful complaint. Moreover, it claimed the employee was fired because he failed to clock in and out, despite repeated warnings.

**Seventh Circuit decision**

In the decision below, the Seventh Circuit held the employee did not suffer retaliation within the meaning of the FLSA because he was not engaged in FLSA-protected activity. Addressing for the first time whether internal complaints are protected activity, the Seventh Circuit concluded, "in line with the vast majority of circuit courts to consider this issue," that under the plain language of the Act, intra-company complaints are covered, and that protection from retaliation is not limited to formal complaints filed in court or with an administrative agency. However, unwritten verbal complaints are not covered. The appeals court rejected the Secretary of Labor's contention, in an amicus brief, that the retaliation provision should be read expansively to include such unwritten objections, reasoning instead that the provision refers to "filing" a complaint, which connotes a complaint made in writing. In a 7-3 vote, the Seventh Circuit denied rehearing.

**"Filing any complaint"**

The Supreme Court majority found that, while the language of FLSA, Sec. 215(a)(3), in isolation may be ambiguous, the purpose of the FLSA and the context in which it was enacted compelled the conclusion that oral complaints are protected.

Looking first to dictionary definitions of the term "filed" the majority noted that, while there are some definitions that contemplate a writing, they don't necessarily limit the scope of the phrase to written complaints. Moreover, the majority cited instances in which legislators, administrators, and judges have used the word "file" to include oral statements. Numerous regulations promulgated by various federal agencies permit complaints to be filed orally, and "a review of contemporaneous judicial usage shows that oral filings were a known phenomenon when the Act was passed." The broader phrase "filed any complaint" suggests an even broader interpretation was contemplated—one that would encompass oral complaints, the majority reasoned. But the "bottom line" the Court concluded, was that a textual interpretation was not enough to resolve the matter. Therefore, the majority considered the "functional considerations" at play.

**Statutory objectives**

Limiting the meaning of Sec. 215(a)(3) to written complaints "would undermine the Act's basic objectives" of prohibiting detrimental labor conditions and promoting a minimum standard of living for workers. Illiteracy rates were high among the poor at the time the FLSA was enacted, the majority observed. "Why would Congress

**FEATURED PRODUCT**

**U.S. Master Payroll Guide (2011)**
This one-source resource to payroll is part of CCH's Master Series of professional guidebooks. You'll find everything you need to know about payroll from employers and their obligations to payroll withholding and tax deposits to payroll management and administration issues.

Learn More ▾

charged in religious visa fraud scheme; Indian nationals allegedly paid $30,000 to fraudulently enter US as religious workers

Federal Law Change Summaries – May 2011

Test Your Human Resources Knowledge

Labor Law Journal Submissions

Human Resources Links

Labor Arbitrators' Awards and Biographies

want to limit the enforcement scheme's effectiveness by inhibiting use of the Act's complaint procedure by those who would find it difficult to reduce their complaints to writing, particularly illiterate, less educated, or overworked workers?" Breyer queried. "President Franklin Roosevelt pointed out at the time that these were the workers most in need of the Act's help."

Moreover, limiting the antiretaliation provision to the filing of written complaints would undermine the flexibility available to those agencies charged with enforcing the Act, the majority reasoned. "It could prevent Government agencies from using hotlines, interviews, and other oral methods of receiving complaints." Citing the broad interpretation that the Court has afforded the National Labor Relations Act's (NLRA) antiretaliation provision, the similar need for effective enforcement of the FLSA argues for a broad rather than narrow reading of the word "complaint" here.

**Fair notice standard**

The employer urged that the FLSA intended to establish an enforcement system that was fair to employers as well, and that to do so, the employer must have fair notice of employee complaints that might subject it to a potential retaliation claim. "We agree with [the employer] that the statute requires fair notice," the majority wrote. "But we also believe that a fair notice requirement does not necessarily mean that notice must be in writing."

The Court then set forth the minimum requirements for an employee complaint to satisfy this fairness element: "To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." This standard could be met by both oral and written complaints, the Court concluded, leaving it to the lower courts to decide whether the employee here will be able to satisfy this requirement.

Agency deference

The Court also gave deference to the Secretary of Labor's consistent position that the words "filed any complaint" encompass oral complaints. The Department of Labor (DOL) articulated that view in an enforcement action years ago, and has reaffirmed that view in subsequent briefs. The majority also noted that the DOL recently created a hotline to receive oral complaints, thus acting in accordance with this view. (The majority noted, for good measure, that the Equal Employment Opportunity Commission has set forth a similar view in its compliance manual.) Because these agency views are reasonable and—having been long-held—reflected careful consideration and not "post hoc rationalization," they "add[ed] force" to the Court's holding.

**Employer ramifications**

Commenting on the decision, Attorney Stacy Smiricky, Partner at the Chicago office of Wildman, Harrold, Allen & Dixon LLP and Employment Law Daily Advisory Board member, notes that the majority's broad reading of the phrase "filed any complaint" is not surprising. Further, the decision is similar to other employment-related statutes under which employees' rights and employers' obligations are triggered by non-written complaints. "The employer community can only hope that common sense will guide the extent to which *Kasten* may be deemed applicable in future cases to oral complaints such as 'the time clock is in such an inconvenient place that we ought to be paid for walking to and from it.' Such complaints could impose additional burdens on employers to investigate every employee gripe. Cautious employers will do so," Smiricky stated. While the majority emphasizes that an employee's non-written complaint must be sufficiently clear and detailed for a reasonable employer to understand it as an assertion of rights, the very nature of such oral complaints invites fact disputes: exactly what do the employer and employee each say was the content and context of the employee's oral complaint about the unpaid time? Such fact disputes may decrease employers' ability to resolve such cases on summary judgment. As such, Smiricky recommends that employers train their supervisors and managers to be aware of these types of non-written complaints, report them immediately to the person responsible for investigating those complaints, and thoroughly document both the oral complaint and the company's investigation of it.

For more information on this and other topics, consult the Visit our News Library.

Visit our News Library to read more news stories.

---

©2005-2011 CCH Incorporated or its affiliates

Copyright | Privacy Policy | Site Map

# EXHIBIT H

**GEICO** | Claims Service Center

Terms of Use | Privacy Policy | Site Map | My Claim Center | Log Out

BETH NUSSBAUM
Mon November 09, 2009 11:50 AM

Policy Number: 2010349807
Claim Number: 0236794150101024

| | |
|---|---|
| Claim Type: | Auto |
| Loss Date: | 07/19/2009 |
| Vehicle: | 2006 TOYOTA COROLLA   View more info |
| Driver: | BETH NUSSBAUM |
| Loss State: | NY |
| Claim Status: | Closed 10/30/2009 |
| Reported Date: | 07/20/2009 |

Upload Documents or Photos

**Adjuster Contact Information**

| Helen Aulov | 516-496-5129 | 516-704-2592 | Liability |

↰ Return to Claim Center  |  ↰ Return to Claim List

Now that your claim is closed,
take a moment to explore all

⌐ Upload Documents or Photos
  Email Us

Frequently Asked Claims Questions
How an Accident Affects My Rate
Insurance Terms Explained
Vehicle Damage Claim Basics
Get the Scoop on Renting a Vehicle

/2000-2009 GEICO

**Thursday, May 5, 2011 11:05 PM**

**Subject: Health insurance stuff**
**Date:** Monday, July 27, 2009 11:27 PM
**From:** Beth Nussbaum <bethprgirl@msn.com>
**To:** Dave Pushkin <dpushkin@nj.rr.com>

Dave,
I finally got to the pile of mail!
This was sent to me, but it's for you to fill out - so I scanned it for you so that
you'd have it right away.

Beth

NEW mobile Hotmail. Optimized for YOUR phone. Click here. <http://
windowslive.com/Mobile?ocid=TXT_TAGLM_WL_CS_MB_new_hotmail_072009>

 **MERITAIN**™
HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

#E/////AUTCDUUWU5#
BETH NUSSBAUM

Date: JULY 15 2009
Re: Claim No: XZV0859 270695
ID: 9872273915  Group: 02850.014
Claimant: DAVID   PUSHKIN
Dates of Service: 07-01-09 to 07-01-09

200 WINSTON DRIVE APT 812
CLIFFSIDE PARK NJ  07010

Dear BETH NUSSBAUM:

The Contract Administrator for the RHI ENTERTAINMENT, LLC Employee Medical Plan
has received a claim for David   Pushkin
for a back or neck injury or disorder.

The purpose of this letter is to assist us in evaluating your claim and to
ensure that no other party is responsible for payment. In accordance with the
terms of your plan document, your cooperation is required in providing the
requested information. Please provide the date of occurrence and check the box
nearest the most accurate description of the reason for the treatment noted
above. Provide a brief description in the space provided on page 2.

Date of onset, occurrence, or injury: _____

( )   Motor Vehicle Accident(any accident involving an automobile or
      motorcycle on a public road)

( )   Off Road Vehicle accident not involving automobile (i.e. ATV, dirt bike,
      snowmobile)

( )   Work injury or illness(worker's compensation)

( )   Wear and tear, developed over time

( )   Other party responsible (i.e. property liability, medical malpractice,
      product liability, animal bite, assault)

( )   Injury in your own home, home of neighbor, friend, or relative

( )   Recreational or sports injury (i.e. bicycle, soccer, play equipment)

( )   Illness or ongoing condition such as congenital condition, chronic pain,
      arthritis

( )   Spontaneous onset (no accident or injury, cause not known)

( )   Other (please describe on page 2)

 **MERITAIN**™ HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

BETH NUSSBAUM
9872273915
Page 2

Describe in detail the circumstances that caused the injury/illness:_____
_____
_____
_____
_____

Is there any other insurance or coverage that may be responsible for all or part
of this claim?   YES_____   NO _____.

Is there anything about this condition or occurrence that would cause you to take
legal action?   YES_____   NO_____

If your claim was caused by a motor vehicle accident, work injury/illness, or if
another party was responsible, you will receive a more detailed questionnaire
requesting additional information. Thank you in advance for your prompt response.

Sign and date below

I certify to the best of my knowledge that the information provided is
correct. I acknowledge that my medical plan has a subrogation and
reimbursement provision which provides that medical benefits paid under the
plan are to be reimbursed from any payment, award, or settlement which may be
paid by a third party because of the injury described above. These provisions
are contained in the Summary of Benefits booklet. I certify that I will not
sign a settlement agreement with any party without the knowledge and consent
of the Plan.

Employee signature_____Date_____

Home Telephone_____Work Telephone_____
Email Address:
_____

Please return this completed form within 30 days to the address above, or you
may fax it to our office at 952-541-9943. Failure to return this form could
result in delay of payment of claims. If you have questions please refer to
your Plan booklet, you may contact our Service Center at 866-839-4301
for assistance.

M:907

**Thursday, May 5, 2011 11:04 PM**

**Subject: This form came for you!**
**Date:** Friday, August 14, 2009 4:02 PM
**From:** Beth Nussbaum <bethprgirl@msn.com>
**To:** Dave Pushkin <dpushkin@nj.rr.com>

Windows Live™: Keep your life in sync. Check it out. <http://windowslive.com/explore?ocid=PID23384::T:WLMTAGL:ON:WL:en-US:NF_BR_sync:082009>



**MERITAIN**
HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll free: 800.925.2272 • Fax  952.541.9943

TO: /AUTHORITYS/
BETH NUSSBAUM

Date: AUGUST 05 2009
Re: Claim No: Y885454
ID#: 9472275019  Group: 02980.014
Claimant: DAVID   PUSHKIN
Date of Service:        as

300 ALLISON DRIVE APT W12
CLIFFSIDE PARK NJ  07010

Dear BETH NUSSBAUM,

We understand that you or your dependent have recently been involved in an
autonobile, motorcycle or off road vehicle accident. Before claims related to this
accident can be processed the plan requires that you submit the following documents:
this completed , signed questionnaire, the police report, an exhaust letter & payment
record from your own auto carrier, or documentation of no Medical Payments coverage.
Thank you in advance for your prompt response.

Date of Accident:
one small vehicle                        multiple vehicles (how many)
location (address) where accident occurred:

Driver(s) Name and
address(es):

Was a citation issued? yes    no   if yes, to whom,
please describe the citation in detail:

Your Vehicle Insurance:
Owner Name, address:

Insurance Company Name and Address:

Policy Number:                           Claim Number:
Did the name and policyholder
number

Do you have medical payments coverage (PIP) or Uninsured Motorist coverage? If yes,
Yes___ No___
      your insurer's claim number                to this coverage subsequently beg.   We
PIP is exhausted please provide the payment record.

 **MERITAIN**™ HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

Date: AUGUST 05 2009
Re: Claim No: Y855454
ID: 9872273915  Group: 02850.01
Claimant: DAVID   PUSHKIN
Dates of Service:           to

#E/////AUTCDUUWU5#
BETH NUSSBAUM

200 WINSTON DRIVE APT 812
CLIFFSIDE PARK NJ  07010

Dear BETH NUSSBAUM:

We understand that you or your dependent have recently been involved in an
automobile, motorcycle or off-road vehicle accident. Before claims related to this
accident can be processed the Plan requires that you submit the following documents:
this completed & signed questionnaire, the Police Report, an exhaust letter & payment
record from your own auto carrier, or documentation of no Medical Payments coverage.
Thank you in advance for your prompt response.

Date of Accident: _____
Type: single vehicle _____ multiple vehicles (how many?)_____
Location (address) where accident occured:
_____
_____
Driver(s) Name and
address(es)_____

Was a citation issued? Yes____No____If yes, to whom, _____
please describe the citation in detail:_____
_____
_____


Your Vehicle Insurance:
Owner Name, address:
_____
Insurance Company Name and Address:
_____
_____
Policy Number:_____Claim Number_____
Adjuster name and telephone
number_____
Do you have medical payments coverage (PIP) on your own vehicle insurance policy?
Yes____No____
If yes, in what amount?_____Is this coverage exhausted? Yes____No____
If PIP is exhausted please provide the payment record.

 **MERITAIN**℠
HEALTH

400 Highway 169 South, Suite 800
Minneapolis, MN 55426-1141
Toll-free: 800.925.2272 • Fax: 952.541.9943

BETH NUSSBAUM
9872273915
Page 2

The Insurer(s) of the other(s) involved:
Owner or Driver Name and address:

_____
_____

Other Driver's Insurance Company Name and address:

_____
_____

Policy Number_____Claim Number_____
Adjuster name and telephone number including area code:_____
_____

If you have hired an attorney to represent you in this matter, provide your
attorney's name, complete address, and telephone number:_____
_____


Sign and date below

I certify to the best of my knowledge that the information provided is correct.
I acknowledge that my medical plan has a subrogation and reimbursement
provision which provides that medical benefits paid under the plan are to be
reimbursed from any payment, award, or settlement which may be paid by a third
party because of the injury described above. These provisions are contained in
the Summary of Benefits booklet. I certify that I will not sign a settlement
agreement with any party without the knowledge and consent of the Plan.


Signature of Plan member_____Date_____
Home Telephone_____Work Telephone_____
Email Address:_____


Please return the completed form to the address listed above, or you may fax
it to our office at 952-541-9943. If you have questions please refer to
your Plan booklet, or you may contact our Service Center at 866-839-4301
for assistance.

M:911

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's RESPONSE was sent to the below named Defendant Counsels on this the 5th day of **May, 2011**.

This RESPONSE was sent to the below named parties by **regular mail**.

**Sherri L. Eisenpress, Esq. (Counsel for RHI)**
**Reiss Eisenpress & Sheppe LLP**
**425 Madison Avenue, 19th Floor**
**New York, NY 10017**

**Alexis L. Cirel, Esq. (Counsel for Meritain Health and Timothy J. Quinlivan, Esq.)**
**Katten Muchin Rosenman LLP**
**575 Madison Avenue**
**New York, NY  10022**

**Dr. David B. Pushkin** (Plaintiff *Pro Se*)
**300 State Highway Route 3 East, Suite 104**
**East Rutherford, NJ  07073**
**(201) 206-5160/ (201) 765-9495/ dpushkin@nj.rr.com**
(Telephone Number/FAX/email)

\* All other parties to be served upon Plaintiff receipt of materials/copies from Pro Se Office!